# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **WILLIAM GLENN ROGERS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:13-cv-00141** |
| | ) | **CHIEF JUDGE CRENSHAW** |
| **BRUCE WESTBROOKS, Warden,** | ) | |
| | ) | **DEATH PENALTY CASE** |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

Petitioner William Glenn Rogers, a prisoner on Tennessee's death row at Riverbend Maximum Security Institution, has filed a petition under 28 U.S.C. § 2254 for the writ of habeas corpus. The operative petition under review is the amended petition filed by appointed counsel on November 7, 2013.[1] (Doc. No. 14.) Respondent filed an answer (Doc. No. 29), in which he denied that Petitioner is entitled to any relief, along with more than 9,600 pages of the state court records pertaining to Petitioner's conviction. (Doc. Nos. 24–26.) Both Petitioner and Respondent sought permission to conduct discovery (Doc. Nos. 33, 34, 42, 83), which the Court granted to a large degree. (Doc. Nos. 37, 75, 50, 89.) Respondent filed a motion for summary judgment on September 29, 2016, along with a 232 page memorandum in support. (Doc. No. 95.) On February 28, 2017, Petitioner filed a 535 page response to the motion, accompanied by more than 12,700 pages of exhibits. (Doc. Nos. 111–129.) Respondent filed a reply in support of his motion on June 27, 2017 (Doc. No. 134), followed by Petitioner's surreply on August 15, 2017. (Doc. No. 138.) The motion is fully briefed and ripe for decision. For the reasons set forth below, the Court will

---

[1] All references herein to the "petition" are to the November 2013 amended petition filed by counsel.

grant Respondent's motion.

## I.  FACTS AND PROCEDURAL HISTORY

The Tennessee Supreme Court summarized the facts introduced at trial as follows:

At the guilt phase of the trial, the State presented proof that on July 3, 1996, nine-year-old Jacqueline ("Jackie") Beard was playing with her twelve-year-old brother, Jeremy Beard, and her eleven-year-old cousin, Michael Carl Webber, at a mud puddle near her home in the Cumberland Heights area of Clarksville in Montgomery County. The defendant, thirty-four-year-old William Glenn Rogers, approached the children and introduced himself as "Tommy Robertson." He said he was an undercover police officer, offered the children fireworks, and invited them to go swimming. Jackie went home and told her mother, Jeannie Meyer, about the man. Mrs. Meyer took Jackie back to the mud puddle to investigate. While the children played with the fireworks, Mrs. Meyer talked with Rogers, who continued to identify himself as undercover officer Tommy Robertson. After approximately thirty-five minutes, Rogers left in his car.

At around 1:30 p.m. on July 8, 1996, Rogers appeared at the Meyer residence asking about a lost key. Jackie was with her mother when Mrs. Meyer spoke with Rogers. Rogers was last seen walking down the road toward a nearby abandoned trailer. A few minutes later, Mrs. Meyer gave Jackie permission to pick blackberries to take to the doctor's office where Mrs. Meyer had an appointment that afternoon. Jackie changed her shorts immediately before leaving the house. At 1:55 p.m., Mrs. Meyer was ready to leave and called for Jackie but could not find her. At around 2:00 p.m., a neighbor, Mike Smith, saw a car matching the description of Rogers' car leaving the immediate area. Smith had seen the same car heading in the direction of the Meyer residence about an hour or two earlier. Mrs. Meyer searched the area by car and on foot to no avail. Jackie was never seen alive again.

Mrs. Meyer reported her daughter's disappearance to the authorities. A composite drawing of the suspect was published in the Clarksville newspaper. Several people reported to the Montgomery County Sheriff's Department that the person in the drawing resembled Rogers.

On July 11, 1996, law enforcement officers questioned Rogers, who at first denied being in the Cumberland Heights area. In his next interview, however, Rogers told the officers that he had been in the area on July 3, 1996, shooting fireworks with three boys. He later acknowledged that Jackie was one of the three children. Rogers admitted speaking with Mrs. Meyer about his lost key on July 8, 1996, but denied seeing Jackie that day. He said he walked to the abandoned trailer, went to the bathroom there, and then left in his car to look for a job. As the questioning continued, Rogers changed his story again and acknowledged that Jackie was present during his conversation with her mother on July 8, 1996. Rogers ultimately confessed that, after leaving the abandoned trailer, he accidently ran over Jackie as he backed up his car. Rogers said he heard a thud, discovered the victim under the

car, and pulled her out. Her chest was moving as she tried to inhale, and blood was coming out of her nose. Rogers saw tire tracks across her right calf, right shoulder, and neck. He covered the victim's head with a shirt that he removed from the trunk of the car. Rogers placed the victim in the front passenger seat of the car, drove to a bridge over the Cumberland River, and threw her body, along with a sandal that had fallen from her foot, into the water. He stated that he did not touch her "in any way sexually or abusive." Rogers reduced this story to writing and signed the statement. Rogers made a diagram depicting how his car had run over the victim. He also signed the back of a photograph of the victim where he had written, "This is the girl I hit."

The following day, July 12, 1996, when officers asked Rogers about the possibility that the victim's fingerprints were in the car, Rogers changed his story yet again. In a second written statement, Rogers corrected his earlier statement by adding that the victim had gotten into the passenger side of his car and talked to him for about five minutes before she left saying her mother had to go to the doctor. Later on July 12, 1996, Rogers went with officers and his court-appointed attorney to the sites where he allegedly had run over the victim and thrown her body into the river. Rogers re-enacted the events of July 8, 1996, in a manner consistent with his written statements.

Investigation of the abandoned trailer showed that the victim's home and yard were visible from a bay window. A search of Rogers' car revealed a handheld telescope, a can of glass cleaner, and a map opened to the Middle Tennessee region, including the Land Between the Lakes area. A floor mat was on the driver's side but not the passenger's side. Although Rogers' fingerprints were on loose items in the car, officers found no fingerprints on the car's interior surfaces. Divers searched in the Cumberland River near the bridge where Rogers said he had thrown the victim's body, but nothing was found.

On November 8, 1996, four months after the victim's disappearance, two deer hunters discovered the victim's skull in a remote, wooded area in Land Between the Lakes in Stewart County. DNA analysis of the teeth established that the mitochondrial DNA sequence matched the DNA sample from the victim's mother. The skeletal remains of the victim were scattered around the area, which was several hundred yards from the Cumberland River and approximately forty-eight miles from her home. Both of the victim's sandals were found at the scene. The clothing worn by the victim when she disappeared was strewn near the bones. Her shirt had been turned completely inside out, and human semen stains were on the inside crotch of her shorts. A DNA sequence could not be obtained from the semen stains for comparison to the DNA sample provided by Rogers. FN2 However, fibers consistent with carpet in Rogers' house were found in his car and on the victim's shorts.

> FN2: Meghan Clement, an expert in forensic serology and DNA analysis, explained that there were four possible reasons that she was unable to obtain a sequence from the stain: the DNA was too degraded; the quantity of the DNA in the sample was insufficient;

the DNA in the sample came from multiple sources, either two sources of semen or one source of semen and vaginal fluid from the victim; or the chemical inhibitors from environmental contaminants prevented the sequence from being obtained.

Dr. Murray K. Marks, a forensic anthropologist, examined the victim's skeletal remains. He testified that the remains had been in the area from three to ten months. Dr. Marks explained that some of the victim's bones—the hands, the feet, one entire leg, and the lower part of another leg—were never recovered and probably had been removed from the scene by animals. Dr. Marks could not determine the cause of death but stated that he found no ante-mortem trauma to the bones such as would be expected had a car run over the victim. Likewise, Dr. Robert Lee, the Stewart County Medical Examiner, was unable to determine the cause or manner of the victim's death.

Rogers' estranged wife, Juanita Rogers, testified that on July 4, 1996, she and Rogers went to Land Between the Lakes. On the drive back, they stopped at a picnic area off Dover Road about ten to fifteen miles from where the victim's body was found. After walking in the woods, Rogers remarked to his wife that "you could bury a body back here and nobody would ever find it." Mrs. Rogers also testified that on July 8, 1996, the day of the victim's disappearance, she did not see Rogers from before lunch until after 6:00 p.m. When he appeared that evening, his pants were muddy at the knees. The outside of the car also was muddy. Rogers told his wife that he had been in a tobacco field on Dover Road. When she noticed a spot of blood on his shirt, he told her that he had cut his finger, but she did not see a cut. Although she had given Rogers money to put gasoline in the car earlier in the day, the tank was almost empty. Mrs. Rogers also noticed small fingerprints on the inside of the passenger side windshield. The muddy prints went down the windshield. When asked by his wife if a child had been in the car, Rogers said no.

Mrs. Rogers further testified that on July 9, 1996, the day following the victim's disappearance, she accompanied Rogers to the garbage dump. She thought it was unusual that Rogers took only one bag of trash all the way to the dump. She noticed that the car had been cleaned since the day before, both inside and out, but Rogers denied cleaning it. On July 11, 1996, after the police contacted Rogers, he told his wife he had informed the police that he had been with her the entire afternoon of July 8, 1996. She refused to support his alibi. On the evening of July 11, 1996, after his arrest, Rogers called his wife and told her that he had confessed to vehicular homicide and would be home in a couple of hours.

Rogers made several additional, sometimes contradictory, statements about his involvement in the victim's death. He called his wife numerous times from jail seeking to speak with her and promising, if she would pick up the telephone, he would tell her what really happened and where the victim could be found. Rogers also wrote his wife a letter stating that the victim's death had been an accident, had not been planned or thought out, and had "just happened." Rogers told his mother and half-brother that he had run over the victim and informed his mother that she should not worry because "all they could get him for was vehicular homicide."

Rogers sent the victim's stepfather a letter, in which he wrote that he did not hurt the victim in any way. Rogers also contacted David Ross, a Clarksville reporter, and denied ever hitting the victim with his car. Rogers told Ross that he had last seen the victim on July 8, 1996, as she walked away from his car toward her house. Rogers said he had told the police what they wanted to hear because he was confused and frightened.

Rogers presented evidence that law enforcement officers had investigated three other suspects in the case: Quinton Donaldson, Tommy Robertson, and Chandler Scott. Rogers also tried to point out discrepancies and contradictions in the State's evidence and offered proof that he was looking for a job on the day the victim disappeared. Three people testified that Rogers applied for a job at a service station on Riverside Drive in Clarksville around 4:30 to 5:00 p.m. on July 8, 1996. According to the witnesses, he was driving a blue pickup truck and wearing a mechanic's uniform.

On rebuttal, an investigator with the Montgomery County Sheriff's Department testified that Rogers had never mentioned wearing a mechanic's uniform or applying for a job at a service station on July 8, 1996. Furthermore, there was no evidence that Rogers ever drove a blue pickup truck.

Based upon the above evidence, the jury convicted Rogers of first degree premeditated murder, first degree felony murder in the perpetration of a kidnapping, first degree felony murder in the perpetration of a rape, especially aggravated kidnapping, rape of a child, and two counts of criminal impersonation. The trial court merged the felony murder convictions with the premeditated murder conviction. A sentencing hearing was conducted to determine punishment.

During the sentencing phase, the State presented proof that Rogers had pleaded guilty to two counts of aggravated assault in Gwinnett County, Georgia, on April 12, 1991. A prosecutor from Gwinnett County testified that the statutory elements of the offenses involved the use of violence to the person.

The victim's mother, Jeannie Meyer, testified that she lost her job because she spent so much time searching for the victim after she disappeared. Mrs. Meyer stated that the victim's brother, Jeremy, felt guilty that he had not been there to save his sister. Following his sister's murder, Jeremy had been placed in juvenile homes and hospitalized for posttraumatic stress disorder, depression, and anxiety. His treatment had cost thousands of dollars. The victim's other brother, Joshua, was angry and refused to discuss his sister's death. Mrs. Meyer testified that she would never get over the loss of her only daughter and felt powerless and devastated. Mrs. Meyer said she felt an enormous amount of guilt. She described the victim as an intelligent, musically talented, happy child with many friends.

In mitigation, Rogers presented the testimony of his older sister, his father and other family members, and friends. Their testimony revealed that Rogers' parents, Cynthia and Lazarus Rogers, first divorced in 1961 when Rogers' sister, Mildred, was two years old. After Rogers was born on March 24, 1962, his parents remarried. In 1964, his mother left again and took the children with her. She later told Lazarus

Rogers that he was not Rogers' biological father.

When Rogers was a young child, his mother married Danny Schexnayder, by whom she had two sons, Danny, Jr., and David. Rogers' mother and stepfather would argue and fight. The home was dirty and unkempt. Schexnayder also showed marked partiality toward Danny, Jr. and David. Schexnayder shunned Rogers' attempts to be close to him and physically and verbally abused Rogers. Mildred Rogers told how Schexnayder would hold Rogers up in the air, spank him, and drop him to the floor. She related that Schexnayder had beaten Rogers about the head with a tether ball pole. Rogers also was chained to his bed for long periods of time. When Rogers soiled his mattress, his stepfather would push his head into the soiled area.

When Rogers and his sister went unfed, as they often did, Schexnayder would tell them that their father had sent no child support. While not physically abusive herself, Rogers' mother would not intervene to protect Rogers and ignored the children when Schexnayder was present. She would not allow Rogers' father to visit. Gifts sent by their father were taken away from Rogers and his sister. In addition, Rogers witnessed his sister being sexually abused by Schexnayder's brother, who also may have abused Rogers. Rogers reported being sexually abused by other persons, including a man who gave him a ride when he ran away from home. Mildred Rogers also recounted that Rogers suffered eye and head injuries in a serious automobile accident in 1980.

Rogers was described as withdrawn and friendless as a child. When chained to his bed, he would howl like a wolf. He bit and hit other children at school, where he was nicknamed "Wolfie." His former elementary school principal, Victoria Meares, described him as aggressive and a serious disciplinary problem. Rogers ran away from home and stole. Eventually, Rogers was sent to a group home for boys, where he was allegedly abused, and then to the Louisiana Training Institute ("LTI"), a juvenile facility. Dr. Cecile Guin, a social worker from Louisiana, testified that at the time Rogers entered LTI the facility was notorious for its poor conditions and mistreatment of its occupants. Among some of the egregious acts reported were the guards' hitting the children with belt buckles, chaining them to beds, slamming doors against them, and hanging them from clothes lines.

Lazarus Rogers confirmed that he had little contact with his son when Rogers was young. Rogers had called several times complaining that his mother was not good to him, but Lazarus Rogers claimed not to have known what was going on in the Schexnayder household. When Rogers was in the seventh grade, he ran away to his father's house. He said that his stepfather had tried to beat him with a wire clothes hanger. Lazarus Rogers further testified that Rogers' wife, Juanita, was much older than Rogers and very dominant. Lazarus Rogers recalled that he was present on July 8, 1996, at approximately 12:30 p.m., when Rogers told Juanita that he was going to a cabinet shop to look for work and she reacted angrily because she did not want him to go.

Rogers was evaluated by two mental health experts for the defense. Dr. Thomas Neilson, a clinical psychologist, testified that Rogers' unstable childhood bred

insecurity and a sense of abandonment. Dr. Neilson opined that the physical, emotional, and sexual trauma of Rogers' childhood had permanently affected how Rogers' brain functioned and led to mood swings and violent behavior. Dr. Neilson also recounted that, after leaving LTI in 1978, Rogers had been sent to the Oakley Training School in Mississippi in 1979 and had been incarcerated as an adult in Florida from 1981 to 1984, in Mississippi from 1984 to 1988, and in Georgia from 1990 to 1994. Dr. Neilson diagnosed Rogers as suffering from posttraumatic stress disorder, depressive disorder not otherwise specified (i.e., mild to moderate depression), dissociative disorder not otherwise specified, and personality disorder not otherwise specified with antisocial and borderline features (i.e., mixed personality disorder). Dr. Neilson explained that persons suffering from dissociative disorder report having other personalities and will withdraw from situations too traumatic to experience. This type of behavior indicates severe childhood trauma. Rogers reported two other identities: Billy or William Little and Roger. Letters written by Rogers' other personalities were introduced into evidence. According to Dr. Neilson, however, Rogers did not suffer from "full blown" dissociative identity disorder, commonly known as split or multiple personalities. Rogers had a Global Assessment of Functioning number of fifty, which meant that he was severely impaired. Dr. Neilson reported that Rogers' verbal IQ was 95, his performance IQ was 127, and his full-scale IQ was 108. Dr. Neilson found no neuro-organic impairments.

Dr. Keith Caruso, a forensic and general psychiatrist, described Rogers' life as a downward spiral and diagnosed Rogers as having antisocial personality disorder and borderline personality disorder. Dr. Caruso stated that Rogers exhibited all of the common characteristics of antisocial personality disorder: engaging in criminal behavior, deceitfulness, impulsiveness, irritability, aggressiveness, and lack of regard for the danger of a situation. Dr. Caruso explained that borderline personality disorder is a severe condition characterized by unstable emotions and relationships and sensitivity to abandonment. Dr. Caruso opined that at the time of the offense in this case Rogers was suffering from extreme emotional distress, was subject to several stressors, and was in an "abandonment crisis" because his relationship with his wife was in jeopardy and he feared losing his father. Dr. Caruso did not diagnose Rogers with posttraumatic stress disorder and did not think that psychotic or dissociative symptoms had any bearing on the offense. Dr. Caruso also had ruled out a diagnosis of pedophilia and did not think that Rogers was malingering.

Dr. Mark Cunningham, a clinical and forensic psychologist, also testified for the defense. Based on studies of various populations of prisoners, Dr. Cunningham performed a violence risk assessment of Rogers to determine the likelihood of his future violent behavior. Dr. Cunningham opined that Rogers' potential for violent behavior was below the base rate and that Rogers had an eight to seventeen percent chance of perpetrating a violent act in prison. Dr. Cunningham stated that he had factored in Rogers' previous escape from prison in determining that the risk of violence from Rogers was low in prison but high in the community.

In rebuttal, the State called Juanita Rogers to introduce a letter in which Rogers told her that he would not plead guilty to something that he had not done and stated, "If

I do get time, they will either kill me trying to escape or I'll kill myself." Both Mrs. Rogers and Lisa Sanders, Rogers' former wife, testified that Rogers had never mentioned being physically or sexually abused as a child.

Dr. William Bernet, a psychiatrist, testified for the State that, based on his evaluations of Rogers and his review of background information and interviews with Rogers' wife, Rogers suffered from a dissociative disorder not otherwise specified, possible pedophilia, malingering, and antisocial personality disorder. Dr. Bernet stated that, although Rogers suffered a mental disorder, he was able to appreciate the wrongfulness of his misconduct. Dr. Bernet opined that no connection existed between the offense and Rogers' dissociative disorder or difficult childhood. The crime, Dr. Bernet said, was driven by Rogers' antisocial personality disorder and pedophilia.

Based upon this proof, the jury found that the State had proven beyond a reasonable doubt all four statutory aggravating circumstances: the murder was committed against a person less than twelve years of age and the defendant was eighteen years of age or older; the defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence; the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in the committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any rape or kidnapping. See Tenn. Code Ann. § 39–13–204(i)(1), (2), (6) and (7). The jury further found that the State had proven beyond a reasonable doubt that the statutory aggravating circumstances outweighed any mitigating circumstances. As a result, the jury sentenced Rogers to death for the murder of Jackie Beard.

State v. Rogers, 188 S.W.3d 593, 598–604 (Tenn. 2006).

The Montgomery County jury convicted Petitioner on January 17, 2000, of first-degree premeditated murder, two counts of first-degree felony murder, especially aggravated kidnaping, aggravated kidnaping, rape of a child, and two counts of criminal impersonation. Id. at 597–98; (Doc. No. 24-5 at 42–3, 118, 129–31). The jury unanimously sentenced him to death on January 21, 2000, for the first-degree premeditated murder. (Doc. No. 24-5 at 113–14, 118; Doc. No. 25-17 at 39–41.) The trial court merged both felony murder convictions with the premeditated murder conviction. Rogers, 188 S.W.3d at 598; (Doc. No. 24-5 at 118). It sentenced Petitioner to consecutive prison terms of 24 years each for especially aggravated kidnapping and rape of a child,

and to a concurrent 6-month term for criminal impersonation, for a total effective prison sentence of 48 years.[2] Rogers, 188 S.W.3d at 598; (Doc. No. 24-5 at 129–31). Petitioner moved for a new trial, which the trial court denied. (Doc. No. 24-5 at 144–66.) The Tennessee Court of Criminal Appeals and the Tennessee Supreme Court affirmed on direct appeal. (Doc. No. 26-3 at 14–42; Doc. No. 26-6.) The United States Supreme Court denied certiorari on October 2, 2006. Rogers v. Tennessee, 549 U.S. 862 (2006).

Petitioner filed a pro se petition for post-conviction relief in the trial court on November 2, 2006. (Doc. No. 26-7 at 6.) The court appointed counsel, and a first and second amended petition were filed.[3] (Doc. No. 26-7 at 75, 106, 178.) The court held a full evidentiary hearing and denied the petition on August 26, 2010. (Doc. No. 26-8 at 30–223.) The Tennessee Court of Criminal Appeals affirmed (Doc. No. 26-17), and the Tennessee Supreme Court denied review on December 11, 2012. (Doc. No. 26-19.)

Petitioner filed his timely original petition for the writ of habeas corpus in this Court on February 14, 2013. (Doc. No. 1.) This Court appointed counsel to represent Petitioner on August 9, 2013 (Doc. No. 8), and counsel filed the amended petition on November 7, 2013. (Doc. No. 14.)

## II.    ISSUES PRESENTED

Petitioner asserts fifteen separate categories of alleged constitutional violations in this case,

---

[2] The Court is unable to locate any judgment pertaining to the aggravated kidnaping conviction and presumes that the trial court merged it with the especially aggravated kidnaping. The same is true for the second count of criminal impersonation.

[3] Throughout this Memorandum, the Court will cite Petitioner's "Annotated Second Amended Petition for Post-Conviction Relief" (Doc. No. 26-7 at 178–211) when discussing his post-conviction petition, because the annotated version provides a clearer understanding of his claims and the asserted bases for them.

comprised of more than 250 total claims. The Court lists here only the fifteen broad categories of claims as alleged by Petitioner and will address each individual claim as appropriate below:

Claim A – Petitioner was denied his right to due process and an impartial jury in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

Claim B – The state withheld material, exculpatory evidence in violation of Brady, and presented and failed to correct false testimony in violation of Napue and Giglio, depriving Petitioner of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

Claim C – Petitioner's counsel were ineffective in their investigation and preparation for trial, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

Claim D – Petitioner's counsel were ineffective in their defense of him at trial, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

Claim E – Petitioner's counsel were ineffective in their defense of him at sentencing, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

Claim F – Petitioner's counsel were ineffective in presenting the motion for new trial and on direct appeal, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

Claim G – The trial court's errors violated Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights to due process and a fair trial.

Claim H – The state committed prosecutorial misconduct, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

Claim I – Petitioner's conviction and death sentence violate the First, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments.

Claim J – Tennessee's lethal injection protocol violates the Eighth and Fourteenth Amendments, the Supremacy Clause, and Article VI, Clause 2 of the United States Constitution.

Claim K – Petitioner was indicted by a grand jury from which women and African Americans were systematically excluded as forepersons in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments, and counsel were ineffective for failing to raise this claim at trial or on direct appeal.

Claim L – Petitioner's sentence violates his right to substantive due process and the Eighth and Fourteenth Amendments because it was automatic and mandatory, or because it was arbitrarily and capriciously imposed.

Claim M – Petitioner's sentence violates his rights under international law and treaties.

Claim N – Petitioner's post-conviction counsel were ineffective, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

Claim O – Petitioner's conviction and sentence are unconstitutional due to the cumulative effect of the errors addressed above.

The Court organizes its analysis of Petitioner's claims according to the standard of review applicable to them: (1) exhausted claims; (2) defaulted claims other than ineffective-assistance claims; and (3) defaulted claims of ineffective assistance of counsel.

### III.   EXHAUSTED CLAIMS

A.  STANDARD OF REVIEW

Under our federal form of government, "[t]he States possess primary authority for defining and enforcing the criminal law," and they "hold the initial responsibility for vindicating constitutional rights." Engle v. Isaac, 456 U.S. 107, 128 (1982).  States thus have a legitimate "interest in the finality of convictions that have survived direct review within the state court system." Brecht v. Abrahamson, 507 U.S. 619, 635 (1993).  Since 1867 federal courts have had the statutory "power to grant writs of habeas corpus in all cases where any person may be restrained of his or her liberty in violation of the constitution, or of any treaty or law of the United States." Act of Feb. 5, 1867, ch. 28, §1, 14 Stat. 385, quoted in Williams v. Taylor, 529 U.S. 362, 374 (2000).  But federal courts remained mindful that "[f]ederal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." Engle, 456 U.S. at 128.  As the Supreme Court has repeatedly instructed, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67–68 (1991).

Congress has codified that limitation on federal review of state criminal proceedings in 28 U.S.C. § 2254, which provides that a federal court may grant habeas relief to a state prisoner "only

on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) further limits federal courts' authority to grant relief to a state prisoner. Cullen v. Pinholster, 563 U.S. 170, 181 (2011). "AEDPA recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." Burt v. Titlow, 134 S. Ct. 10, 15 (2013). It was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" Woodford v. Garceau, 538 U.S. 202, 206 (2003) (quoting Williams, 529 U.S. at 436). To that end, AEDPA "create[s] an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." Uttecht v. Brown, 551 U.S. 1, 10 (2007) (citations omitted). AEDPA embodies the rule that federal review of state criminal proceedings serves as a "guard against extreme malfunctions in the state criminal justice systems," rather than "a substitute for ordinary error correction through appeal." Harrington v. Richter, 562 U.S. 86, 102–03 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979)). Accordingly, it imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was correct. Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citing Williams v. Taylor, 529 U.S. at 410).

Under 28 U.S.C. § 2254(b) and (c), a federal court may not grant a writ of habeas corpus to a state prisoner unless, with certain exceptions discussed below in section IV, the prisoner has "exhausted the remedies available in the courts of the State" by presenting the same claim on which he seeks federal relief to the state courts. 28 U.S.C. § 2254(b)(1)(A); Pinholster, 563 U.S. at 181. Section 2254(d) provides the narrow standard of review for claims that have been so exhausted:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that

was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "This is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" Pinholster, 563 U.S. at 181 (quoting Richter, 562 U.S. at 102, and Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam)). The petitioner carries the burden of proof. Pinholster, 563 U.S. at 181.

The "clearly established federal law" required by § 2254(d)(1) refers to "the holdings (as opposed to the dicta) of [the United States Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412; see Barnes v. Elo, 231 F.3d 1025, 1028 (6th Cir. 2000) ("[W]e may only look to decisions of the Supreme Court of the United States when determining 'clearly established federal law.'"). The "contrary to" and "unreasonable application" clauses of Section 2254(d)(1) are independent tests. Hill v. Hofbauer, 337 F.3d 706, 711 (6th Cir. 2003) (citing Williams, 529 U.S. at 412–13).

A state court decision is "contrary to" federal law only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13. This standard does not require the state court to cite applicable Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam).

Even if the state court identifies the "correct governing legal principle," a federal habeas court may still grant the petition if the state court "unreasonably applies that principle to the facts of the particular state prisoner's case." Williams, 529 U.S. at 413. A state-court decision involves an unreasonable application if it unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. Id. at 407; Hill, 337 F.3d at 711. See also Abdul-Kabir v. Quarterman, 550 U.S. 233, 260 (2007) (holding that a state court opinion is unreasonable under § 2254(d) where the state court "ignore[d] [an] entire line" of controlling Supreme Court case law).

As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citing Williams, 529 U.S. at 410). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Richter, 562 U.S. at 102. The reasonableness of the application of a particular legal principle depends in part on the specificity of the relevant rule. Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). While the application of a specific rule may be plainly correct or incorrect, courts may have more leeway in applying more general rules in the context of a particular case. Id.

The Supreme Court reemphasized the very limited nature of review under Section 2254(d)(1) in Cullen v. Pinholster, 563 U.S. 170 (2011), and Harrington v. Richter, 562 U.S. 86 (2011). In Pinholster, the Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits" and that "evidence introduced in federal court has no bearing on § 2254(d)(1) review." Pinholster, 563 U.S. at 181, 185. The

Court further cautioned in <u>Richter</u> that AEDPA requires federal habeas courts to review state-court decisions with "deference and latitude," and that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Richter</u>, 562 U.S. at 101 (quoting <u>Yarborough</u>, 541 U.S. at 664).

In evaluating a claim for "unreasonable determination of the facts" under § 2254(d)(2), the district court is also restricted to the facts that were before the state courts. <u>See</u> 28 U.S.C. § 2254(d)(2) (permitting relief only if the state's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts ***in light of the evidence presented in the State court proceeding***") (emphasis added); <u>Pinholster</u>, 563 U.S. at 185 n.7 (assuming without discussion that review under § 2254(d)(2) is limited to the state-court record, in light of the clear language of the statute). The Supreme Court has held that a "clear factual error" constitutes an "unreasonable determination of the facts in light of the evidence presented." <u>Wiggins v. Smith</u>, 539 U.S. 510, 528–29 (2003). In other words, a state court's determination of facts is unreasonable if its findings conflict with clear and convincing evidence to the contrary. <u>See</u> 28 U.S.C. § 2254(e)(1) ("The [habeas] applicant shall have the burden of rebutting the presumption of correctness [of the state court's factual finding] by clear and convincing evidence."). The Supreme Court has emphasized, however, that "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion." <u>Wood v. Allen</u>, 558 U.S. 290, 301 (2010). Even if reasonable minds reviewing the record might disagree about the state-court factual finding in question, "on habeas review that does not suffice to supersede the trial court's credibility determination." <u>Rice v. Collins</u>, 546 U.S. 333, 341–42 (2006).

## B. ANALYSIS

To the extent possible, the Court addresses Petitioner's claims in the order in which they appear in his petition. However, claims that are so related or intertwined that they should be analyzed together, or were considered together in state court, are grouped together below. The Court also takes some claims out of order as necessary to ensure a more thorough understanding of their factual and legal predicates.

### 1. Claims A.2, G.9 — Excused Jurors

Petitioner asserts that potential jurors Marita Washington and Jeannie Green[4] were improperly excused for voicing general objections to the death penalty, in violation of his Sixth and Fourteenth Amendment rights to due process and an impartial jury. (Doc. No. 14 at 19–20, 56.) He exhausted this claim on direct appeal, and the state courts rejected it:

> Prospective jurors Marita Washington and Jeannie Green were excused for cause by the trial court based on their opposition to the imposition of the death penalty. The defendant argues that the exclusion of these jurors violated his constitutional rights. Specifically, the defendant contends that the state failed to meet its burden of proving that these two jurors' views would substantially impair their ability to carry out the law as required by Wainwright v. Witt, 469 U.S. 412, 424 (1985).

> In determining when a prospective juror may be excused for cause because of his or her views on the death penalty, the standard is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." State v. Austin, 87 S.W.3d 447, 472–73 (Tenn. 2002) (citing Wainwright v. Witt, 469 U.S. 412, 424 (1985)). "[T]his standard likewise does not require that a juror's biases be proved with 'unmistakable clarity.'" [Austin, 87 S.W.3d] at 473. However, the trial judge must have the "definite impression" that a prospective juror could not follow the law.

---

[4] In Claim A.2, Petitioner actually asserts that the improperly excused jurors "included, but are not limited to" Washington and Green. (Doc. No. 14 at 20.) Petitioner uses expressions such as "including" and "not limited to" throughout the Amended Petition. Such vague expressions are inconsistent with Rule 2(c) of the Rules Governing Section 2254 Cases, which provides that "[t]he petition must . . . specify all the grounds for relief available to the petitioner . . . [and] state the facts supporting each ground." Id. at § (c)(1)–(2). The Court will not conjure up un-pled factual allegations implied by such vague expressions, nor will it treat them as open-ended assertions subject to the addition of more claims in subsequent briefing.

State v. Hutchison, 898 S.W.2d 161, 167 (Tenn. 1994) (citing Wainwright, 469 U.S. at 425–26). Finally, the trial court's finding of bias of a juror because of his or her views concerning the death penalty are accorded a presumption of correctness, and the defendant must establish by convincing evidence that the trial court's determination was erroneous before an appellate court will overturn that decision. State v. Alley, 776 S.W.2d 506, 518 (Tenn. 1989), cert. denied, 493 U.S. 1036 (1990).

### A. Prospective Juror Washington

Prospective juror Marita Washington expressed her views on the imposition of the death penalty in responses to a juror questionnaire and during individual voir dire. Ms. Washington stated on the juror questionnaire that she was opposed to the death penalty but willing to consider its imposition under appropriate circumstances. Ms. Washington also stated on the questionnaire that she was strongly opposed to the death penalty and believed it should not be imposed, but she asserted that she could set aside her personal feelings and follow the law as instructed by the court. Ms. Washington further stated on the questionnaire that she thought the death penalty should never be imposed, but as long as the law provided that punishment, she could vote to impose the death penalty if she believed "it was warranted in a particular case, depending on the evidence, the law, and what I learned about the defendant." Her questionnaire reflected that she did not believe that death was too severe a punishment for any defendant convicted of first degree murder.

The following exchange took place between the court and Ms. Washington during voir dire:

> The Court: Okay. And you have already said now—the General asked you to give an example of a kind of case where you think you could vote for the death penalty and you couldn't think of one, but if the evidence in this case was such that you felt like yes, in this case the State has proven beyond a reasonable doubt that there is one or more aggravating circumstances and they have also convinced you beyond a reasonable doubt that those—the aggravating circumstance outweighs the mitigating circumstance, okay? And you are saying to yourself, based on that, what this instruction says is that the verdict of the jury shall be death? At that point in time, if that's how you see the case, are you going to then be saying well, I know that's what the law says and I know that's what the Judge says and we went through all these questions but I just feel so strongly against the death penalty that I just couldn't—I could not sign off on a form and sentence somebody to death? Think you could sign the form if you thought the proof was there?

> Prospective Juror: No.

> . . .

> The Court: So in all honesty then, this is the last thing that I am

going to ask you, I promise you. Do you feel like your personal view on capital punishment would either prevent or substantially impair the performance of your duties as a juror in this case?

Prospective Juror: Substantially impair.

The Court: Substantially impair. Okay.

The defendant contends that Ms. Washington must have misunderstood the last question asked by the court, but there is no proof in the record to substantiate this allegation. Ms. Washington admitted that her personal views on the death penalty would substantially impair the performance of her duties as a juror. Thus, Ms. Washington's responses to the voir dire questioning support her dismissal under Wainwright. After reviewing the record, we conclude that prospective juror Washington met the standard for dismissal. See Hutchison, 898 S.W.2d at 167.

### B. Prospective Juror Green

Prospective juror Jeannie Green responded on the juror questionnaire that she was strongly opposed to the death penalty, but she also responded that she could set aside her personal feelings and follow the law as instructed by the court. Like prospective juror Washington, Ms. Green responded that she could vote to impose the death penalty if she believed "it was warranted in a particular case, depending on the evidence, the law, and what I learned about the defendant." During voir dire, Ms. Green responded to questions regarding the imposition of the death penalty as follows:

> THE COURT: All right. So, if you're a juror on this case, now, Ms. Green, and the State convinces you beyond a reasonable doubt, first of all, that the Defendant is guilty of first degree murder and that there is one or more statutory aggravating circumstances—now, that's legal language, but that's what I'm required to explain to you at this time. And further that they convince you in your mind that the statutory aggravating circumstance or circumstances outweigh any mitigating evidence beyond a reasonable doubt, what the instructions would say to you as a juror is your verdict shall be death. You understand that's what you'd be looking at on the jury instructions?

> MS. GREEN: Uh-huh. Yes.

> THE COURT: Now, you've already told me that you have a personal belief that I would say is against the death penalty.

> MS. GREEN: Right.

> THE COURT: Would your personal belief be so strong that it would interfere with your ability to vote for a death sentence even if the evidence and the law pointed in that direction?

> MS. GREEN: I have to vote against it, sir.

THE COURT: All right.

MS. GREEN: I'm sorry.

THE COURT: All right. Can you think—you don't have to apologize at all. Like I said, it's just—

MS. GREEN: Well, I will.

THE COURT: We just want to know what your view is. Would—can you think of any circumstances where you'd be able to vote for a death sentence?

MS. GREEN: If he actually come out and said he did it himself. Nobody else. No newspaper; no nothing; just him then I'd go for the death penalty.

THE COURT: Okay. So, in your mind what you're—what you're basically saying is if the defendant himself said—

MS. GREEN: Uh-huh.

THE COURT:—I killed somebody,—

MS. GREEN: Uh-huh.

THE COURT:—then you could consider for the—

MS. GREEN: Right.

THE COURT: All right.

MS. GREEN: Uh-huh

THE COURT: And, of course, now, the law doesn't say that a defendant has to admit to it.

MS. GREEN: Right. Right. I realize this.

THE COURT: But you're—I guess, we've got another little conflict here between the law and what you—what your personal beliefs might be?

MS. GREEN: Uh-huh.

THE COURT: That doesn't mean that your personal belief is wrong, but I just need to know if your personal belief would interfere with your ability to follow the law. Do you think it would?

MS. GREEN: I think so, because I am not—I'm not for the death penalty.

THE COURT: Okay.

MS. GREEN: I really am not.

. . .

THE COURT: We've got two more to go. I'll tell you what we're going to do, Ms. Green, I'm going to let the lawyers ask you a few questions.

MS. GREEN: Okay.

THE COURT: And you just keep answering them as honestly as you have to me.

MS. GREEN: Okay.

THE COURT: And then I'll figure out what to do in a few minutes; okay?

MS. GREEN: All right. Fine.

THE COURT: General Brollier?

STATE: Ms. Green?

MS. GREEN: Yes.

STATE: You've said that you're strongly opposed to the death penalty, and you're not for the death penalty. Is that based on a matter of religious faith?

MS. GREEN: Yes, I'm Catholic.

STATE: Okay. And would you say that it would be difficult for you, then, to—as the Court has told you the law in the—

MS. GREEN: Uh-huh.

STATE:—State of Tennessee does impose the death penalty in some situations.

MS. GREEN: Uh-huh.

STATE: And as a Catholic you do not believe the death penalty should be imposed, I assume?

MS. GREEN: Right.

STATE: Now, so, there's a conflict between the law of Tennessee and your faith.

MS. GREEN: Right.

STATE: And you may be asked if you're a juror in this case to make a decision that would bring that conflict right, just right up to you,—

MS. GREEN: Uh-huh.

STATE:—and you'd have to decide whether you're going to follow

the law or are you going to follow your faith?

MS. GREEN: Uh-huh.

STATE: Do you see it in those terms?

MS. GREEN: Yeah, I'm still against the death penalty. If it's—

STATE: Okay. That's what I'm asking.

MS. GREEN:—against the State of Tennessee I'm sorry.

STATE: So, what you're saying is you would follow the faith—your faith, your Catholic faith—

MS. GREEN: Right.

STATE:—above the law of Tennessee?

MS. GREEN: Right.

STATE: Okay.

MS. GREEN: Sure would.

STATE: Ms. Green, as I understand it then, you said—okay. I'm going to leave it at that, Your Honor. Thank you.

THE COURT: All right.

After reviewing the record, we conclude that Ms. Green met the standard for dismissal. See Hutchison, 898 S.W.2d at 167.

State v. Rogers, 188 S.W.3d 593, 623–27 (Tenn. 2006) (appending opinion of the Tennessee Court of Criminal Appeals).

Respondent has moved for summary judgment on the basis that the state court's ruling on this claim was reasonable. (Doc. No. 94 at 132–39.) Petitioner's response addresses only juror Washington,[5] and argues that Washington's voir dire indicates that "although she had strong feelings against the death penalty, she could, and would, consider it." (Doc. No. 111 at 389.) He then blames Washington's disqualification on unethical behavior by the trial judge: "The judge's

---

[5] Petitioner acknowledges that the views expressed by Green, a devout Catholic, would have required education and rehabilitation by counsel to avoid her exclusion. (Doc. No. 111 at 390 n.1864.) He thus effectively concedes that on the record as it existed, Green's exclusion was not constitutional error on the part of the trial court.

final *leading question* to Washington, presenting a Hobson's choice – whether her views against the death penalty *prevented* or *substantially* impaired her ability to sit as a juror – reflected bad faith on the part of the trial judge, a lack of impartiality, and the instrumental use of legal terms to achieve an unconstitutional end with respect to a citizen who was completely unfamiliar with legal jargon." (<u>Id.</u> at 389–90.)  But, as the state court found, there is no evidence in the record that Washington was confused by the question.  The accusation that the trial judge acted in bad faith and intentionally confused a potential juror to elicit an inaccurate response is stark and wholly unsubstantiated.

Moreover, Washington's response that her belief would substantially impair her ability is in keeping with the rest of her voir dire.  When asked if she could vote for each of the three possible punishments, she answered: "Two of them, yes. The death penalty – that's a tough one." (Doc. No. 24-11 at 29.)  After the judge explained the capital sentencing scheme to her in some detail and asked if she could vote for the death sentence under any circumstances, she replied with a noncommittal "I guess so." (<u>Id.</u> at 31.)  Asked about the perceived inconsistency in her questionnaire responses indicating that she strongly opposed the death penalty and did not believe it should be imposed, but could vote to impose it if she believed it was warranted in a particular case, she explained "I wouldn't give it easy. Okay? But not necessarily impossible." (<u>Id.</u> at 34–35.)  And when the prosecutor later asked "But it really seems like you just would have a very hard time if not impossible time, giving somebody the death penalty. Isn't that really the truth?" she said "I can agree with you, yes." (<u>Id.</u> at 37.)  She also was unable to provide any example of a case in which she believed the death penalty would be justified. (<u>Id.</u> at 39.)

Accordingly, the state courts reasonably determined that Washington's general opposition to the death penalty would have substantially impaired her ability to serve as a juror.  Petitioner is

not entitled to relief on this claim.

2. Claims A.5, G.4 — Venue

Petitioner alleges in Claim A.5 that extensive pretrial publicity so infected the jury pool that it denied him a fair trial and rendered his convictions and sentence unconstitutional, and in Claim G.4 that the trial court violated his constitutional rights by denying a change of venue on that basis. (Doc. No. 14 at 23–25, 51–55.) Counsel for Petitioner filed a motion for change of venue on April 3, 1998, asserting that extensive publicity and "undue excitement against the defendant in Montgomery County" would prevent him from receiving a fair trial. (Doc. No. 24-1 at 46.) The motion was supported by counsel's affidavit and more than 80 pages of news clippings about the case from the Tennessean, the Nashville Banner, and the Clarksville Leaf-Chronicle newspapers, dating from July 1996 (the month of the victim's disappearance and Petitioner's arrest) to July 1997. (Doc. No. 24-2 at 45–59, 79–132.) The trial court took the motion under advisement pending voir dire. (Doc. No. 122-23.)[6] On Petitioner's motions, the trial court granted permission to use questionnaires for prospective jurors, granted individual voir dire of prospective jurors "with respect to the issues of Pre-Trial publicity," and ordered sequestration during jury selection, trial, and deliberation. (Doc. No. 24-2 at 150–53; Doc. No. 24-10 at 17.)

While the prospective juror questionnaire process was under way, the court also entered an order restricting pre-trial publicity in the case, due in part to Petitioner's own repeated contacts and voluntary interviews given to members of the media, including his September 8, 1999 phone

---

[6] The trial court's order has been filed in this Court as an exhibit to Petitioner's Response. (Doc. No. 122-23.) Although it was omitted from the state court record filed by Respondent, this document is properly part of that record, and does not constitute new evidence that would be precluded under Cullen v. Pinholster, 563 U.S. 170 (2011).

call from jail to a television station that resulted in the cable broadcast of a telephone interview with him. (Doc. No. 24-3 at 118.)[7]  It also ordered a camera removed from the courtroom before the beginning of voir dire. (Doc. No. 24-10 at 16.)  Before voir dire began, Petitioner's counsel supplemented his motion for change of venue with new evidence of media coverage. (Doc. No. 24-4 at 117.)  The trial court ultimately denied a change of venue, finding that an impartial jury had been successfully seated. (See Doc. No. 24-5 at 144–45.)  In its order denying a new trial on this issue, the court also noted that a majority of the publicity was "a substantial period of time" before trial. (Id.)

Petitioner exhausted a claim on direct appeal that the trial court's refusal to grant a change of venue violated his constitutional rights in light of the extensive pretrial publicity. (Doc. No. 26-1 at 86–90; Doc. No. 26-4 at 87–91.)  The Tennessee Court of Criminal Appeals rejected that claim in an analysis that the Tennessee Supreme Court later adopted:

> The defendant contends that the trial court erred by refusing to change the venue of the trial because of adverse pretrial publicity. A change of venue may be granted if it appears that "due to undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had." Tenn. R. Crim. P. 21(a). A motion for change of venue is left to the sound discretion of the trial court and the court's ruling will be reversed on appeal only upon a clear showing of an abuse of that discretion. State v. Howell, 868 S.W.2d 238, 249 (Tenn. 1993); State v. Hoover, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979). The mere fact that jurors have been exposed to pretrial publicity will not warrant a change of venue. State v. Mann, 959 S.W.2d 503, 531–32 (Tenn. 1997). Similarly, prejudice will not be presumed on the mere showing of extensive pretrial publicity. State v. Stapleton, 638 S.W.2d 850, 856 (Tenn. Crim. App. 1982). In fact, jurors may possess knowledge of the facts of the case and may still be qualified to serve on the panel. State v. Bates, 804 S.W.2d 868, 877 (Tenn. 1991). The test is whether the jurors who actually sat on the panel and rendered the verdict and sentence were prejudiced by the pretrial publicity. State v. Crenshaw, 64 S.W.3d 374, 386 (Tenn. Crim. App. 2001); State v. Kyger, 787 S.W.2d 13, 18–19 (Tenn.

---

[7] Unfortunately, the details of the court's order are unknown, because the subsequent pages of it (the pages of the state's technical record bearing state bates numbers 000422 and 000423) are either missing or buried out of order in the voluminous record of proceedings in state court. (See Doc. No. 24-3 at 118, 119.)

Crim. App. 1989). Furthermore, the scope and extent of voir dire is also left to the sound discretion of the trial court. State v. Smith, 993 S.W.2d 6, 28 (Tenn. 1999). Jurors who have been exposed to pretrial publicity may sit on the panel if they can demonstrate to the trial court that they can put aside what they have heard and decide the case on the evidence presented at trial. State v. Gray, 960 S.W.2d 598, 608 (Tenn. Crim. App. 1997).

In State v. Hoover, 594 S.W.2d 743 (Tenn. Crim. App. 1979), this court set forth the factors which should be considered to determine whether a change of venue is warranted. The Hoover court listed the following seventeen factors: the nature, extent, and timing of pretrial publicity; the nature of the publicity as fair or inflammatory; the particular content of the publicity; the degree to which the publicity complained of has permeated the area from which the venire is drawn; the degree to which the publicity circulated outside the area from which the venire is drawn; the time elapsed from the release of the publicity until the trial; the degree of care exercised in the selection of the jury; the ease or difficulty in selecting the jury; the venire person's familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire; the defendant's utilization of his peremptory challenges; the defendant's utilization of challenges for cause; the participation by police or by prosecution in the release of the publicity; the severity of the offense charged; the absence or presence of threats, demonstrations or other hostility against the defendant; the size of the area from which the venire is drawn; affidavits, hearsay or opinion testimony of witnesses; and the nature of the verdict returned by the trial jury. Again, however, for there to be a reversal of a conviction based upon a claim that the trial court improperly denied a motion for a change of venue, the "defendant must demonstrate that the jurors who actually sat were biased or prejudiced against him." State v. Evans, 838 S.W.2d 185, 192 (Tenn. 1992).

The defendant contends that pretrial publicity concerning his criminal history, including allegations of prior sexual abuse of children, was highly prejudicial and inadmissible. The defendant also asserts that the community from which the jury was drawn was a small community that had three cases of missing children, all young girls, at the time of the victim's disappearance, which caused a climate of undue excitement. Most of the pretrial publicity concerning this case was published during the victim's disappearance. The selection of the jury included questions to determine if any potential juror had been prejudiced by pretrial publicity. The defendant does not cite to any area of the record to support an allegation that the jury panel was prejudiced by pretrial publicity. In fact, he does not even allege that any of the jurors who sat on his case were prejudiced by the pretrial publicity cited. After our review of the record, we cannot find any proof that any of the jurors were prejudiced. Mere speculation that some of the jurors may have been exposed to pretrial publicity does not warrant a new trial. See Crenshaw, 64 S.W.3d at 386. The record fails to support the defendant's allegation that the jury panel was prejudiced by pretrial publicity.

State v. Rogers, 188 S.W.3d 593, 621–22 (Tenn. 2006) (appendix adopting excerpts from the

Tennessee Court of Criminal Appeals' Decision). Respondent argues that this ruling was reasonable. (Doc. No. 94 at 198–200.)

Petitioner complains that the state court did not cite federal authority to support its determination. (Doc. No. 111 at 190–94, 412–15.) But Petitioner overlooks the fact that the Tennessee Supreme Court cases applied in the state court's opinion relied in turn on United States Supreme Court opinions to guide their analyses of whether jurors' exposure to pre-trial publicity had rendered a defendant's trial fundamentally unfair. See Mann, 959 S.W.2d at 531–33 (citing Irvin v. Dowd, 366 U.S. 717 (1961), and Patton v. Yount, 467 U.S. 1025 (1984)); Crenshaw, 64 S.W.3d at 386–88 (citing Dobbert v. Florida, 432 U.S. 282 (1977), and Murphy v. Florida, 421 U.S. 794 (1975)). Petitioner's appellate briefs clearly invoked his federal constitutional rights in connection with this claim (Doc. No. 26-1 at 86–90; Doc. No. 26-4 at 87–91), and the state court's reliance on cases that expressly applied federal constitutional law indicates that it was ruling on Petitioner's federal claim. Johnson v. Williams, 568 U.S. 289, 304 (2013). Petitioner's suggestion that the lack of direct citation to federal case law in the state court's opinion somehow runs afoul of AEDPA has been expressly rejected by the Supreme Court:

> First, the Ninth Circuit observed that the state court "failed to cite . . . any federal law, much less the controlling Supreme Court precedents." 291 F.3d, at 578. If this meant to suggest that such citation was required, it was in error. A state-court decision is "contrary to" our clearly established precedents if it "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." Williams v. Taylor, 529 U.S. 362, 405–06 (2000). Avoiding these pitfalls does not require citation of our cases - indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.

Early v. Packer, 537 U.S. 3, 8 (2002).

Petitioner argues that the state court's decision was contrary to federal law that focuses the pretrial publicity inquiry on "the community and the patterns of thought in the community that

indicate that it is unlikely than an unbiased and impartial jury can be seated," rather than requiring prejudice in the form of an impact on the jurors who were actually seated. (Doc. No. 111 at 190–94, 413.)  Instead, he argues, prejudice must be presumed "[w]hen community attitudes are found to be toxic." (Doc. No. 111 at 172.)   In support of this argument, he relies primarily on four Supreme Court opinions: <u>Irvin v. Dowd</u>, 366 U.S. 717 (1961); <u>Rideau v. State of La.</u>, 373 U.S. 723 (1963); <u>Estes v. State of Tex.</u>, 381 U.S. 532 (1965); and <u>Sheppard v. Maxwell</u>, 384 U.S. 333 (1966).

<u>Rideau</u>, <u>Estes</u> and <u>Sheppard</u> are easily distinguishable from this case.   In <u>Rideau</u>, law enforcement officers participated in the 1961 creation and broadcast of "a moving picture film with a sound track" of a suspect's 20-minute "interview" with authorities, during which he confessed in detail to robbery, kidnapping, and murder, in response to leading questions by the sheriff and without a lawyer present. <u>Rideau</u>, 373 U.S. at 724–25, 727.  The video was broadcast by a local television station for three days in a row, with viewership for each broadcast ranging from 20,000 to 53,000 in a parish with a population of 150,000 people. <u>Id.</u> at 724.  The trial court denied a change of venue, and refused to dismiss for cause three jurors who had seen and heard the video and two others who were local deputy sheriffs. <u>Id.</u> at 724–25.  "[W]ithout pausing to examine a particularized transcript of the voir dire examination of the members of the jury," the Supreme Court held that the denial of a change of venue violated the defendant's right to due process because "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." <u>Id.</u> at 726–27.  Noting "the onrush of an electronic age," the Court explained that "the people of Calcasieu Parish saw and heard, not once but three times, a 'trial' of Rideau in a jail, presided over by a sheriff, where there was no lawyer to advise Rideau of his right to stand mute." <u>Id.</u> at 726–27.  Two years later, the Court explained

that <u>Rideau</u> had "constructed a rule that the televising of a defendant in the act of confessing to a crime was inherently invalid under the Due Process Clause of the Fourteenth Amendment even without a showing of prejudice or a demonstration of the nexus between the televised confession and the trial." <u>Estes</u>, 381 U.S. at 538.  It "did not purport to create a rule that the dissemination of the fact of a defendant's confession through some other, less dramatic and compelling medium, is equally a violation of the Due Process Clause." <u>DeLisle v. Rivers</u>, 161 F.3d 370, 384 (6th Cir. 1998).  Accordingly, it does not control in this case, where the media merely reported Petitioner's statement (and his later recantation) about having accidentally killed the victim and dumping her body, but did not broadcast a video of his "confession" itself or the interrogation that led to it.

    <u>Estes</u> arose from the prosecution of a public figure for crimes so nationally notorious that the matter elicited comment from President Kennedy and landed the defendant on the cover of Time magazine.  [https://www.nytimes.com/2013/05/15/us/billie-sol-estes-texas-con-man-dies-at-88.html](https://www.nytimes.com/2013/05/15/us/billie-sol-estes-texas-con-man-dies-at-88.html).[8]  Over the defendant's objection, a pretrial hearing and portions of the trial itself were broadcast live with sound by television crews. <u>Estes</u>, 381 U.S. at 536–38.  The Supreme Court, ruling on the case in 1965, observed that 48 states and the federal courts at that time prohibited television coverage of courtroom proceedings, and that "[t]elevision in its present state and by its very nature, reaches into a variety of areas in which it may cause prejudice to an accused," including its potential impact on jurors, for whom "the awareness of the fact of telecasting that is felt by the juror throughout the trial" might be a distraction and aggravate the "intense public feeling" created by pretrial publicity. <u>Id.</u> at 544–46.  It acknowledged that some of the dangers associated with television are also posed by other media coverage, but held that "the circumstances

---

[8] Federal courts may take judicial notice of the fact of publicity or media coverage. <u>Staehr v. Hartford Fin'l Servs.</u>, 547 F.3d 406, 425 (2nd Cir. 2008).

and extraneous influences intruding upon the solemn decorum of court procedure in the televised trial are far more serious than in cases involving only newspaper coverage." Id. at 548. Accordingly, the Court found that the televising of "only notorious cases, such as this one . . . invariably focuses the lens upon the unpopular or infamous accused," and thereby violates a defendant's right to a fair trial regardless of whether he demonstrates any "isolatable prejudice." Id. at 542–43, 549–50. Thus, Estes was concerned specifically with the effect of televising court proceedings, rather than with the existence of negative community sentiment against the defendant, who had already been granted a change of venue. See id. at 535.

Similarly, Sheppard involved a case so nationally notorious that it was described as the "trial of the century" and "spawned countless articles, books, documentaries and movies," as well as a television series. https://www.nytimes.com/2003/10/27/business/mediatalk-a-50-year-old-murder-with-choice-of-suspects.html. A coroner's inquest into the murder of the defendant's wife was broadcast with live microphones and attended by "several hundred spectators," including "a swarm of reporters and photographers," in front of whom the defendant was searched and questioned for more than five hours without the assistance of counsel. Sheppard, 384 U.S. at 339–40. Before jury selection began, local newspapers published the names and addresses of prospective jurors, who received letters and calls about the case from anonymous senders as well as friends. Id. at 342, 353. During jury selection, the media published individual photos of prospective jurors. Id. at 345. The court allowed the media to photograph the jurors in the jury box, in the jury room, at lunch during deliberations, and at the scene of the crime, where the jury's visit was watched in person by hundreds of media representatives and others as a helicopter flew overhead. Id. at 345, 347. The jurors' photos were published more than 40 times in local papers as the trial continued. Id. at 345. Media coverage during jury selection and trial was intense and

overtly hostile to the defendant. Id. at 345–49.  Jurors were not sequestered during the trial and were exposed to some of the coverage, but the trial court refused repeated requests from the defense to impose any protections against having the jury affected by the ongoing reports, including requests to ask the jurors about whether they had "read or heard specific prejudicial comment[s] about the case." Id. at 345–49, 357.  The trial judge 'suggested' and 'cautioned' jurors to avoid media coverage of the case, saying that such restraint would make them "feel very much better as the trial proceeds," but he did not actually order them not to read or listen to reports about the case. Id. at 353.  In the trial itself, "bedlam reigned," with a press table inside the bar a few feet away from the jury box, at which around 20 reporters sat "hounding most of the participants in the trial, especially Sheppard," and caused "constant commotion within the bar."  Id. at 355.  The jurors were sequestered during deliberations, but were allowed to call home daily even then. Id. at 349.  The Supreme Court found that the "totality of circumstances" in the case amounted to an inherent due process violation that did not require a showing of actual prejudice. Id. at 352–53.  It explicitly stated, however, that it "[could not] say that Sheppard was denied due process by the judge's refusal to take precautions against the influence of pretrial publicity alone." Id. at 354.  Rather, the basis for its ruling was that the trial court failed to employ "procedures [that] would have been sufficient to guarantee Sheppard a fair trial" even in light of the pretrial publicity. Id. at 358–63.

Petitioner's trial was not televised, and he does not allege facts demonstrating that the atmosphere in the courtroom was impacted by swarming media, as in Estes or Sheppard.  As illustrated above, "a review of those cases leaves no room for doubt that it was that chaos that drove those decisions," DeLisle at 384, and there is no evidence of such chaos in this case.  Moreover, the judge in Petitioner's trial took precautions against undue jury influence that were

not taken in those cases. At the time the jurors filled out their questionnaires, and again months later at the beginning of voir dire, the judge presiding over Petitioner's trial unequivocally instructed prospective jurors: "You are not to read, listen to or view any news reports concerning the case." (Doc. No. 24-10 at 32–33.) He reminded the prospective jurors that they would be sequestered during trial, for "maybe a couple of weeks," "to keep [them] from being exposed to any publicity about this case while it is going on." (Doc. No. 24-10 at 29–30.) After a jury was empaneled, the trial judge again instructed the jurors that they "should not read, listen to or view any news reports concerning this case." (Doc. No. 25-2 at 98.) And as the state courts found, and Petitioner acknowledges (Doc. No. 111 at 183), most of the pre-trial media coverage was published closer to the time of the victim's disappearance and had diminished by the time of the trial three and a half years later; the state court record contains only a single article about the case published in the week before voir dire began. [9] (Doc. No. 24-2 at 45–59, 80–132; Doc. No. 26-4 at 117–23.) The media reports in the state court record clearly implicated Petitioner in the crimes and covered facts that were not admitted at trial. However, they did not reflect a fraction of the open hostility of the "editorial artillery" described in <u>Sheppard</u>, which pronounced the defendant to be a "liar" "protected by a smart lawyer who has made monkeys of the police and authorities," mocked him with cartoons and disparaging headlines, and included public demands for an inquest, for the defendant's arrest and interrogation, and for "Justice to Sam Sheppard." <u>Sheppard</u>, 384 U.S. at 339, 341–42, 346–47. Accordingly, the pervasive, frenzied circumstances that were presumed to

_____

[9] Because this claim was exhausted in state court, the Court has not considered any of Petitioner's new evidence offered in support of it. It does note, however, that Petitioner's exhaustive search for media coverage of his case revealed no print articles or televised reports in the two months before prospective jurors were ordered to avoid any news of the case when they filled out their questionnaires in September 1999, and only eight print articles and no televised reports between then and the day voir dire began on January 5, 2000. (<u>See</u> Doc. No. 122-7 at 156–65; Doc. No. 122-21 at 10–11.)

impact the jury in Estes and Sheppard were not present at Petitioner's trial.

But Rideau, Estes, and Sheppard are not just distinguishable from Petitioner's case. The Sixth Circuit has indicated that they do not reflect current Supreme Court jurisprudence:

> Early in the 1960's the Supreme Court recognized that some instances of pervasive pretrial publicity may render the defendant's trial fundamentally unfair regardless of professions of impartiality on the part of jurors seated during voir dire. In Rideau, a case where the defendant's televised confession was broadcast to the community shortly before his trial, the Court held that "it was a denial of due process of law to refuse the [defendant's] request for a change of venue." 373 U.S. at 726 (1962). In Estes v. Texas, the Court again reversed a conviction where "there had been a bombardment of the community with the sights and sounds," 381 U.S. 532, 538 (1965), of media coverage of an initial pretrial hearing involving the defendant. The Court noted that a showing of actual prejudice "is not a prerequisite to reversal" where "the circumstances [are] held to be inherently suspect." Id. at 542, 544. And in Sheppard, faced with what it called a "carnival atmosphere" wrought by extensive media coverage both before and throughout the trial, the Court held that "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." 384 U.S. at 363. The Court held that "appellate tribunals have the duty to make an independent evaluation of the circumstances," and not defer to the state trial court. Id. at 362. The Court said: "Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused." Id.

> This presumption of prejudice based on pervasive publicity continued into the 1980's. In Patton v. Yount, 467 U.S. 1025, 1031 (1984), the Court acknowledged a presumption of prejudice: the "jurors' claims that they can be impartial should not be believed." These views concerning pretrial publicity and voir dire arose from a concern that human nature is such that a juror may want to conceal his own bias or may not be aware of it.

> In Mu'Min [v. Virginia], 500 U.S. [415,] 433 [(1991)], and Skilling [v. United States, 561 U.S. 358, 386] (2010), the Court replaced the presumption of prejudice based on pervasive publicity and the need for extensive voir dire in such circumstances with a constitutional rule of deference to the trial judge with regard to voir dire and change of venue. Mu'Min, a death penalty case decided 5–4 on this issue, rejected as a constitutional standard the Standards for Criminal Justice of the American Bar Association § 8–3.5 (2d ed. 1980), which called for interrogation of each juror concerning "what the prospective juror has read and heard about the case." 500 U.S. at 430 (internal quotation marks omitted). Rather, the Court "stressed the wide discretion granted to the trial court in conducting voir dire in the area of pretrial publicity and in other areas of inquiry that might tend to show juror

bias." Id. at 427, 111 S.Ct. 1899. The trial court in Mu'Min had conducted the voir dire with four prospective jurors in each group and did not allow counsel to ask about the "content" of the publicity a juror had heard or read about the case. The Supreme Court specifically approved this procedure.

. . .

In Skilling, a 2010 case, the Supreme Court revisited and reaffirmed Mu'Min in a 5–4 opinion. See 561 U.S. at 386, 395. The Court had before it massive, intense, persistent pretrial publicity in Houston, Texas, about the Enron scandal and the culpability of Enron's officials. The defendant was the chief operating officer who became the chief executive of Enron. In denying a change of venue, the Court repeatedly cited and quoted Mu'Min with approval:

> Jury selection, we have repeatedly emphasized, is "particularly within the province of the trial judge." . . . see, e.g., Mu'Min, 500 U.S. at 424.
>
> . . .
>
> When pretrial publicity is at issue, "primary reliance on the judgment of the trial court makes [especially] good sense" because the judge "sits in the locale where the publicity is said to have had its effect" and may base her evaluation on her "own perception of the depth and extent of news stories that might influence a juror." Mu'Min, 500 U.S. at 427. Appellate courts making after-the-fact assessments of the media's impact on jurors should be mindful that their judgments lack the on-the-spot comprehension of the situation possessed by trial judges.
>
> . . .
>
> In reviewing claims of this type, the deference due to district courts is at its pinnacle: "A trial court's findings of juror impartiality may be overturned only for manifest error." Mu'Min, 500 U.S. at 428 (internal citations and quotation marks omitted).

Id. at 386, 396.

Based on Skilling, there seems to be no doubt that the Mu'Min constitutional standard represents the current Supreme Court law of due process that must be applied by lower courts to problems related to change of venue and the questioning of jurors. The older standards articulated in the 1960's and repeated in the 1984 Patton v. Yount case no longer represent the current state of the law, and we are constrained to apply the new standards of Mu'Min.

Jackson v. Houk, 687 F.3d 723, 732–34 (6th Cir. 2012). Any remaining presumption of prejudice arising from extensive media coverage "attends only the extreme case." Skilling, 561 U.S. at 381.

This is not such a case, due to the distinguishing factors discussed above.

The Sixth Circuit's observation of the Supreme Court's shift away from a presumption of prejudice is corroborated by <u>Chandler v. Florida</u>, in which the Supreme Court arguably minimized <u>Estes</u> to the point of silently overturning it. 449 U.S. 560 (1981). The prosecution of the defendants in <u>Chandler</u> had attracted significant media attention because the defendants were all police officers whose walkie talkie conversations during commission of a burglary was recorded by an amateur radio operator. <u>Id.</u> at 567. The trial court permitted portions of the trial to be televised over the defendants' objections. <u>Id.</u> at 568. After being found guilty, the defendants argued in their motion for new trial and subsequent appeals that, under <u>Estes</u>, the television broadcast of the trial had violated their right to a fair and impartial trial. <u>Id.</u> at 568, 570. They did not offer any evidence of actual prejudice. <u>Id.</u> at 568. The Supreme Court held that <u>Estes</u> "does not stand as an absolute ban on state experimentation with an evolving technology, which, in terms of modes of mass communication, was in its relative infancy in 1964, and is, even now, in a state of continuing change."[10] <u>Id.</u> at 573. Instead, the Court focused on whether the media presence actually impacted the jurors hearing the case:

> Any criminal case that generates a great deal of publicity presents some risks that the publicity may compromise the right of the defendant to a fair trial.
>
> . . .
>
> A case attracts a high level of public attention because of its intrinsic interest to the public and the manner of reporting the event. The risk of juror prejudice is present in any publication of a trial, but the appropriate safeguard against such prejudice is the defendant's right to demonstrate that the media's coverage of his case—be it printed or broadcast—compromised the ***ability of the particular jury that heard the case*** to adjudicate fairly.

---

[10] Two concurring opinions in <u>Chandler</u> disagreed, and would have expressly overruled <u>Estes</u>. 449 U.S. at 583 (Stewart, J., concurring) ("I believe now, as I believed in dissent then, that <u>Estes</u> announced a *per se* rule . . .. Accordingly, rather than join what seems to me a wholly unsuccessful effort to distinguish that decision, I would now flatly overrule it."); and at 586 (White, J. concurring) ("I think <u>Estes</u> is fairly read as establishing a *per se* rule against televising any criminal trial if the defendant objects. So understood, <u>Estes</u> must be overruled to affirm the judgment below.").

Chandler, 449 U.S. at 574–75 (emphasis added). Because the defendants had not shown "with any specificity that the presence of cameras impaired the ability of the jurors to decide the case on only the evidence before them," they had not established a constitutional violation. Id. at 581.

Irvin v. Dowd, 366 U.S. 717 (1961), also supports the proposition that prejudice in the form of actual juror bias is required to grant relief where a due process violation is alleged to have arisen from pretrial publicity. The Supreme Court in Irvin discussed the "community pattern of thought" and the "barrage of newspaper headlines, articles, cartoons and pictures . . . unleashed against [the defendant] during the six or seven months preceding his trial." Id. at 725. But it also relied on the evidence that eight of the twelve empaneled jurors had testified during voir dire to believing the defendant was guilty, with some saying it would take evidence to overcome that belief, and one saying that he would not be able to "give the defendant the benefit of the doubt." Id. at 727–28. In that context, the jurors' promise to be fair and impartial was entitled to "little weight" in the calculation to determine whether they were actually biased. Id. The Court made clear, however, that jurors' initial impressions arising from pretrial publicity do not inherently violate due process:

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

Irvin, 366 U.S. at 722–23. Accordingly, the state court did not proceed contrary to federal law when it identified a standard that required a showing of actual prejudice in Petitioner's case.

The Sixth Circuit applied such a standard in Jackson, which involved the murder of three

victims, including a teenaged girl and a three-year-old child. 687 F.3d at 727–28. The case received "considerable media attention," which "constantly identified the defendant and his accomplice . . . as the sole suspects" and covered nearly every development in the case. Id. at 730. The media showed photos of the defendant in a bullet proof vest, referred to the crimes as a "New Year's Massacre" and described the father of the youngest victim begging for his daughter's life before she was shot in the head, all of which resulted in "high running emotions surrounding the case." Id. During the accomplice's trial, reports covered testimony that accused Jackson of being the shooter. Id. Media interest in the case was so high that local television stations interrupted scheduled programming to announce the verdict. Id. Eleven of the empaneled jurors for the defendant's subsequent trial acknowledged knowing about the case through the media, and the twelfth knew one of the victims personally. Id. Nevertheless, the Sixth Circuit held that relief was not warranted where there was no evidence to establish "what effect the publicity had" on the case. Id. at 734. In other words, the court found that extensive pretrial publicity itself, even where jurors had been exposed to it, was not sufficient to establish the prejudice necessary to overturn a verdict pursuant to the prevailing constitutional standard of Mu'Min and Skilling.

The prosecutor in Petitioner's case acknowledged that pretrial publicity had been "greater than in most ordinary criminal cases." (Doc. No. 24-3 at 5.) But the Supreme Court has instructed that the sort of heightened publicity associated with particularly egregious crimes does not automatically violate a defendant's rights: "Any killing that ultimately results in a charge of capital murder will engender considerable media coverage, and this one may have engendered more than most," but that alone did not establish a violation of due process. Mu'Min, 500 U.S. at 429–30. Petitioner has failed to establish that he was tried in such an inflamed, circus-like atmosphere that a fair trial was impossible, or that any of the jurors who decided his case had been actually

prejudiced by pretrial publicity. In light of the material differences between Petitioner's case and those in which the Supreme Court has found due process violations arising from media coverage and related public sentiment, the state court's rejection of this claim was not unreasonable. Petitioner is not entitled to relief on this claim.

3. Claims C.10, C.12, C.29, C.30, D.30, D.33 — Semen/DNA Evidence

The state introduced testimony at trial that there was a semen stain on the inside crotch of the victim's shorts that did not produce a DNA sequence that could be compared to Petitioner, as recounted in Section I, above. Petitioner alleges that trial counsel were ineffective for "fail[ing] to sufficiently investigate the DNA evidence," failing "to sufficiently investigate semen evidence" (Doc. No. 14 at 34), and for failing to file motions to suppress DNA and semen evidence. (Id. at 35, 41.) Petitioner exhausted these claims in post-conviction proceedings, where he argued that counsel failed to investigate serological and DNA evidence sufficiently to seek exclusion of or factually challenge the evidence at trial. (Doc. No. 26-14 at 41–48.)

The Tennessee Court of Criminal Appeals explained the standard of review it used to analyze claims of ineffective assistance of counsel:

> The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial. See U.S. Const. amend. VI; Tenn. Const. Art. I, § 9; see also State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Indeed, the Sixth Amendment right to counsel is so fundamental and essential to a fair trial that the Fourteenth Amendment renders it obligatory upon the States. Gideon v. Wainwright, 372 U.S. 335, 342–45 (1963).
>
> Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter, 523 S.W.2d at 936. The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post Conviction Procedure Act. See Tenn. Code Ann. § 40–30–103; Pylant [v. State], 263 S.W.3d [854,] 868 [(Tenn. 2008)]. "The benchmark for judging any claim of ineffectiveness must be whether

counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. See also, e.g., Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011).

A petitioner's claim that his or her attorneys provided constitutionally deficient assistance is governed by the following two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687; see also Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004) ("To determine whether appellate counsel was constitutionally effective, we use the two prong test set forth in [Strickland]—the same test that is applied to claims of ineffective assistance of trial counsel asserted under the Sixth Amendment to the United Constitution."). Stated simply, a petitioner must prove both that counsel's performance was constitutionally deficient, and that the deficiency actually prejudiced the defense. See Burns, 6 S.W.3d at 461; Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996). A petitioner's "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief." Goad, 938 S.W.2d at 370. Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." Strickland, 466 U.S. at 697.

To establish the first prong of deficient performance, the petitioner must demonstrate that counsel "'made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment.'" Felts, 354 S.W.3d at 276 (quoting Strickland, 466 U.S. at 687). That is, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688). See also Kimmelman v. Morrison, 477 U.S. 365, 386 (1986); King v. State, 989 S.W.2d 319, 330 (Tenn. 1999); Baxter, 523 S.W.2d at 936. In order to satisfy this prong of the test, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Strickland, 466 U.S. at 690. Upon reviewing the identified acts or omissions, the reviewing court must then "make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). "[T]hat is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be

considered sound trial strategy.'" Strickland, 466 U.S. at 689 (emphasis added); see also Felts, 354 S.W.3d at 277.

We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)). Finally, we note that criminal defendants are "not entitled to perfect representation, only constitutionally adequate representation." Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). Therefore, "in considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987) (quoting United States v. Cronic, 466 U.S. 648, 665 n.38 (1984)). Notwithstanding, we recognize that "[o]ur duty to search for constitutional [deficiencies] with painstaking care is never more exacting than it is in a capital case." Id. at 785.

The prejudice prong of the Strickland test requires the petitioner to establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; see also King, 989 S.W.2d at 330. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. In evaluating whether a petitioner has satisfied this prong of the test, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) (citing Strickland, 466 U.S. at 687). In other words, a petitioner must establish that the deficiency of counsel was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome. Pylant, 263 S.W.3d at 869. "A reasonable probability of being found guilty of a lesser charge ... satisfies the second prong of Strickland." Id.

Rogers v. State, No. M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *32–34 (Tenn. Crim. App. Aug. 30, 2012).

The court also summarized the relevant evidence presented at trial and at the post-conviction hearing, including the testimony of Mark Squibb, a serologist formerly with the Tennessee Bureau of Investigation (TBI), and Megan Clement, a forensic serologist at Lab Corporation:

The State's proof at trial that the Petitioner raped the victim was entirely circumstantial and based on Squibb's testimony. Our review of the trial record reveals that Squibb's entire testimony covers only thirty pages of transcript. On direct examination, Squibb explained that, when testing an item for the presence of

semen, he first performed "an initial test." If this preliminary screening test yielded a positive result, he then performed "a confirmatory test." Squibb did not explain the background or details of either of these tests. When asked about testing the victim's shorts for semen, Squibb testified that he "found that semen was present on the shorts." He clarified that three areas in the crotch portion of the shorts yielded "positive semen stains" while a fourth area "was inconclusive for semen." He also explained that, when he received the shorts, they "were very brittle and fell apart eas[ily]." The following colloquy between the prosecutor and Squibb ensued:

> Q: And in reviewing your—reports, you refer to semen fluid and sperm, is there a difference between those?
>
> A: Sperm is a component of semen fluid.
>
> Q: Were both found on these shorts?
>
> A: The presence of sperm indicates that semen was also present since sperm is a component of semen.

Squibb's "reports" were not admitted into evidence. FN5 Squibb testified that he also tested the shorts for blood but his tests "failed to indicate the presence of blood."

> FN5 Trial Exhibit 112, admitted during Squibb's testimony, is a single sheet of paper containing handwritten notes and two diagrams of a pair of shorts. Squibb referred to this document as "a copy of a work sheet that [he] generated in the lab." At the post-conviction hearing, a copy of Squibb's "Official Serology Report" was admitted into evidence as an exhibit.

In addition to testing the victim's shorts, Squibb tested the victim's sandals and shirt for blood and semen. The tests were "inconclusive for the presence of blood" and "failed to indicate the presence of semen."

When asked on direct examination whether the semen on the shorts was human, Squibb responded, "I could not tell. It appeared to be human sperm; however, there are other species which are very close to it, but I did not see any difference between the sperm that I viewed as opposed to a human sperm."

On cross-examination, Squibb stated that he did not attempt to generate a DNA profile from the semen stains on the shorts. He also explained the differences between the three areas of the shorts that he concluded contained semen stains and the fourth "inconclusive" area: "There was some possible sperm heads [in the fourth area], they were not what I would call a 'sperm head,' so I left it as an inconclusive. The other [three areas], I had sperm head present so I called it sperm and therefore, semen is present." Squibb also acknowledged that he tested the Petitioner's white Chevrolet car for semen and blood and that the tests "failed to indicate the presence of blood and semen."

On redirect, Squibb clarified that he tested the inside of the shorts. He also clarified the difference between presumptive and confirmatory tests for semen:

> The presumptive test is acid phosphatase, and that is like quick screening of an exhibit to kind of concentrate on possible semen stains, assuming there is a positive area. If it is negative, then no further testing will be performed on the exhibit. But if I get a positive reaction, I can then come in on that localized area and further test, do my confirmatory tests.

Squibb added that, on the four areas of the shorts that he tested for semen, the presumptive tests were all positive. The confirmatory test was positive on only three of the four areas.

Squibb was not asked to describe what the "confirmatory test" consisted of or how it was conducted. Nor was he asked any detailed questions about the science underlying any of the tests or the level of reliability associated with any of the tests.

Meghan Clement testified at trial that she tested the cuttings from the shorts for DNA but was unable to obtain a sequence. Therefore, she was unable to compare any DNA on the shorts to the Petitioner's DNA sample. She explained that there were four possible reasons for the inability to obtain a DNA sequence: (1) the DNA was "too degraded"; (2) there was an insufficient quantity of DNA on the cuttings; (3) the samples contained "a mixture of more than one DNA . . . so we couldn't get a clean sequence"; and (4) there may have been "chemical inhibitors from environmental insults such as dirt." On cross-examination, Clement acknowledged that, if her inability to obtain a DNA sequence was due to a mixture of sources, it was possible that there were "two donors of semen."

Id., 2012 WL 3776675, at *44–45.

[At the post-conviction hearing] Meghan Clement testified that she worked for Lab Corp. as the technical director in the forensic identity testing department. She was tendered and accepted without objection as an expert in serology and DNA forensics. Clement testified that she was originally contacted by the State in this case in early 1998. She was provided with samples for testing, including stains from a pair of pants. She was provided with four pieces of fabric, designated on the submittal form as "three semen stains and a possible semen stain." DNA tests were requested on the samples. Only one of the samples produced a small amount of DNA, which was not sufficient to compare to any known reference sample.

In December 1999, she received a request for mitochondrial DNA testing, a different type of test. She stated, "we often had very good luck in getting mitochondrial DNA sequences where we couldn't get nuclear DNA profiles." However, the new testing did not produce "any sequence information that could be compared to any known reference sample."

In 2008, she received a request to do additional testing on the Petitioner's behalf. This test was the Y chromosome test, and it was performed on the extract that had originally been obtained from the fabric samples. The remaining extract had been frozen and was available for further testing. The new testing resulted in a "zero quantitation." The cloth samples were subsequently returned to Lab Corp. They

again tried to extract DNA and develop a Y chromosome profile but were unsuccessful.

In addition to trying to extract DNA from the cloth samples in 2009, Clement also performed a "presumptive test for acid phosphatase as well as a test for the presence of P30, which is an antigen found in seminal fluid and those revealed negative results." The laboratory also examined the cloth samples microscopically, but did not find spermatazoa present.

Clement also examined microscopically three slides that had been prepared by Mark Squibb in conjunction with trial preparation. Clement "determined that there were very few visible sperm heads that were identified on the slides."

When asked whether the presence of sperm necessarily implied the presence of semen, Clement explained that tests had been performed demonstrating that sperm heads could be transferred among items of clothing during a washing machine cycle. Accordingly, a finding of spermatazoa did not necessarily imply the presence of semen. Clement also explained that a positive acid phosphatase test did not necessarily indicate the presence of semen. Rather, a weak positive test could be caused by other factors.

. . .

The State's last witness was Mark Squibb, the laboratory supervisor for the trace and DNA sections of the Miami Valley Regional Crime Laboratory in Dayton, Ohio, and the DNA Technical Leader for the DNA section. Squibb testified that he was formerly a forensic DNA analyst at the Tennessee Bureau of Investigation ("TBI") laboratory in Nashville, Tennessee. While employed by the TBI, he performed the original laboratory work on the shorts found with the victim's remains. He performed an "AP spray" test to the crotch of the shorts and obtained a "weak positive" result. He explained that the result was a "weak" positive because of the longer period of time it took for the testing substance to reach the color purple. He took four cuttings from the area testing "weak positive." He examined extractions from the cuttings microscopically and found "rare sperm heads" on three of the samples. Based on the weak positive AP (acid phosphatase) test and the sperm heads in the crotch area of the shorts, he concluded that there was semen on the shorts.

Squibb acknowledged that there was also a lot of dirt, discoloration, and debris in the extractions. He also acknowledged that the AP spray test may result in a false positive and that vaginal fluid can also produce a positive result. He further acknowledged being aware of studies "which pertain to the persistence of sperm as well as semen in washing." Nevertheless, he testified that he stood by his trial testimony.

On cross-examination, Squibb acknowledged that "rare" sperm heads meant that "very few," or less than ten, heads were found in the area being microscopically examined. He also acknowledged that he ran a P30 test on the shorts, which tests for an antigen produced by the male prostate gland and which is present in semen.

The P30 test result was negative for the antigen, meaning "either it wasn't there or it did not reach the level in which [the] test could detect it."

Id. at 29–30, 31. The state court also summarized trial counsel's post-conviction testimony about

his work regarding the semen and DNA evidence:

> Upon being shown a 1996 article in a French Canadian forensic science journal detailing the transfer of sperm on one article of clothing to other clothes washed together in a washing machine, Converse testified that, had he known about the article, "it probably would have been something we certainly would have considered using" because there were other males living in the household with the victim at the time of her death, including her older brother, Jeremy Beard. When asked whether he recalled doing "any independent research" leading up to the Petitioner's trial "on potential semen evidence" like that discussed in the Canadian article, Converse responded that he had, yet he admitted to not having found the particular 1996 article presented to him at the hearing. Converse testified that, once the DNA test results came back as inconclusive regarding the Petitioner's being linked to the sperm found in the victim's shorts, he "wasn't as concerned about [the sperm evidence] at that point." Converse also testified on cross-examination that he was not sure he "could have gotten a jury to swallow" the theory posited in the Canadian article regarding washing machine sperm transfer.

> Converse testified that he recalled talking to Meghan Clement prior to trial regarding the forensic work she did on the case. However, he had no specific recollection of having talked to Mark Squibb prior to trial regarding his forensic work on the case. When presented during his testimony with what was identified as a copy of Squibb's "bench notes" regarding the forensic testing he performed on the case, Converse stated that he had no idea what the notations "AP spray" or "p30" meant in the notes.

Id. at 24–25. And finally, the Tennessee Court of Criminal Appeals addressed the trial court's denial of

post-conviction relief and agreed that Petitioner had not established ineffective assistance:

> In denying relief on the Petitioner's claim that Trial Counsel was ineffective in crossexamining these witnesses and failing to adduce proof that the sperm heads found on the shorts could have been the result of laundering, the post-conviction court relied on the following analysis:

> > The testimony of Ms. Clement and Mr. Squibb at the [post-conviction] hearing reveals certain deficiencies in Mr. Warner's cross-examination of those witnesses at trial. Mr. Squibb's testing produced evidence favorable to the petitioner, but counsel did not present some of this evidence to the jury. For instance, the jury did not hear there were very few (or "rare," the term used by the TBI lab to denote fewer than ten) sperm heads found on the microscopic

43

slides developed from the victim's shorts. Mr. Squibb was also not asked about his testing for semen in great detail; the jury heard no information about the mechanics of the acid phosphatase test (color changes, timing, etc.) or that Mr. Squibb's acid phosphatase test yielded a "weak" positive result. The jury heard nothing about the P30 antigen as it related to seminal fluid or that Mr. Squibb's testing yielded negative results for P30. The jury also did not hear that very little DNA was derived from the stains taken from the victim's shorts. Perhaps most relevant, counsel for the petitioner did not present evidence attacking Mr. Squibb's conclusion that the presence of sperm cells necessarily indicated the presence of semen. Given Ms. Clement's testimony and the publication of the washing machine study in the Canadian forensic journal—an article published some four years before the trial in the instant case—such evidence was available to counsel.

However, although counsel rendered deficient performance in not presenting this evidence to the jury, this deficiency did not prejudice the petitioner. Counsel were still able to present to the jury that the DNA and serology evidence in this case was largely inconclusive. For instance, Mr. Squibb testified that no blood was found in the victim's shorts and that no blood or semen were found on the victim's shirt or inside the petitioner's car. Ms. Clement testified that no DNA sequence could be generated from the victim's shorts—thus, what little DNA evidence that existed could not be connected conclusively to the petitioner. Mr. Squibb also testified that while the sperm cells "appeared" to be human, he could not conclude that the sperm cells were not animal in nature.

The petitioner's attack on the evidence supporting the rape-related offenses in this case was multi-faceted. Counsel argued that the petitioner did not have enough time to commit the offenses, that there was no evidence that he committed these offenses in Montgomery County, and that there was no evidence conclusively establishing that he was the person who committed any sexual offenses against the victim. Although the petitioner's case could have been strengthened by the inclusion of the scientific and technical evidence produced at the [post-conviction] hearing, counsel still presented ample evidence attacking the entirely circumstantial evidence regarding the rape-related offenses. Despite this evidence, the jury still chose to convict the petitioner; even if counsel had presented the additional evidence to the jury, there is not a reasonable probability that the jury's verdict in this case would have been different.

We agree with the post-conviction court's analysis. Certainly, Trial Counsel should have done a more thorough job attacking Squibb's testimony. However, the fact remains that Squibb found sperm heads on the fabric samples taken from the crotch

area of the victim's shorts. Clement agreed at the post-conviction hearing with Squibb's finding of sperm heads. The victim's mother testified at trial that the victim had put the shorts on right before leaving her house and disappearing. While Clement's testimony at the post-conviction hearing established that it is possible for sperm heads to arrive on clothing while being laundered in a washing machine, she also testified that the experiments in which such transfer occurred involved washing new clothing with "a pair of underwear worn by someone who had consensual relations." Thus, proof of these experiments would not have been relevant at trial unless the defense had also been able to establish at least some probability that the victim's shorts had been washed with an item containing semen. No such probability was established at the post-conviction hearing. Therefore, we cannot conclude that Trial Counsel's performance in his cross-examination of Squibb prejudiced the Petitioner.

In sum, Trial Counsel should have attacked the State's proof regarding the semen/sperm issue with more vigor. The Petitioner, however, has not established that the jury's verdicts are unreliable as a result of this failure because there has been no showing that the defense would have been able to eliminate or completely discredit the State's proof that sperm heads were found in the crotch area of the victim's shorts. That proof, together with the substantial proof at trial that the Petitioner was the last person to see the victim alive, leaves us confident in the jury's verdict. Accordingly, the Petitioner is not entitled to relief on this basis.

The Petitioner also asserts that Trial Counsel was ineffective in not challenging the admissibility of the DNA testing and in not pursuing the theory that the DNA testing was inconclusive "because the substance was not human biological material." This issue is without merit. As noted by the post-conviction court, "[t]he inconclusive nature of the DNA evidence went to the evidence's weight, not its admissibility." Moreover, Trial Counsel emphasized through Squibb the possibility that the sperm heads were not human. The Petitioner is not entitled to relief on this basis.

Id., 2012 WL 3776675, at *44–47.

Respondent moves for summary judgment on the basis that the state court's rejection of these claims was not unreasonable. (Doc. No. 94 at 139–40, 142–46, 153.) Petitioner does not acknowledge that the claims are exhausted or identify any unreasonable aspect of the state court's ruling.[11] (Doc. No. 111 at 2–3, 158, 346–51.)

---

[11] Petitioner's briefs often fail to acknowledge state court rulings and or to convey whether any particular claim was even exhausted in state court, and if so, how the state court's ruling was erroneous. (See, e.g., Doc. No. 111 at 398 (asserting that "[t]o the extent that Tennessee courts purported to address" his claims, its decisions were "contrary to, *and/or* an unreasonable

The state court correctly identified and summarized the Strickland standard that applies to federal claims of ineffective assistance of counsel. As indicated above, however, federal habeas review of such a claim requires an even greater level of deference than ordinary Strickland review. Relief may not be granted on an exhausted claim under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of the United States Supreme Court, § 2254(d)(1); Williams v. Taylor, 529 U.S. 362, 412 (2000); or that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2). Thus, when an exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Harrington v. Richter, 562 U.S. 86, 101 (2011). As the Supreme Court clarified in Richter,

> This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

Id. (internal quotation marks and citation omitted).

The Tennessee Court of Criminal Appeals' ruling on this claim was not unreasonable. Squibb was forced to acknowledge at trial that the sperm he found was similar to that of some

---

application of clearly established law, *and/or* reflect an unreasonable determination of the facts," and that his claims are *either* new *or* were deficiently presented in state court) (emphasis added).)

other species. (Doc. No. 25-8 at 173.)  Moreover, the lack of any DNA match to Petitioner was undisputed and apparent to the jury.  Counsel could have forced Squibb to admit that he considered his initial semen test results to be a "weak positive," which he would have explained simply meant that the chemical reaction produced a purple color within the positive time-frame, but not as quickly as a positive control.[12]  (See Doc. No. 26-10 at 111–12.)  Counsel could also have forced Squibb to acknowledge that he had achieved a negative result using the P30 test on the shorts.  But, according to Ms. Clement, a positive presumptive test can be confirmed through *either* a positive P30 test *or* a microscopic examination for sperm. (Doc. No. 26-10 at 60, 92–93.)  And no challenge Petitioner's counsel could have raised to the strength of the semen evidence would have refuted the fact, confirmed by Ms. Clement at the post-conviction hearing, that there were visible sperm heads on the slides prepared by Squibb from material on the inside of the victim's shorts.  In fact, that evidence was further bolstered at the post-conviction hearing with testimony that Squibb's identification of sperm heads was contemporaneously confirmed by his section supervisor and another analyst in his TBI section. (Doc. No. 26-10 at 145.)  The state courts reasonably determined that there was no factual foundation in the state record for the Canadian washing machine study,[13]

---

[12] Ms. Clement testified that her laboratory would designate even a light pink discoloration as a weak positive, and that those lighter pink results could be caused by other body fluids, such as vaginal fluid. (Doc. No. 26-10 at 59–60.)  Her testimony indicated that she would only take issue with Squibb's conclusion that semen was present if he had relied on "just a light pink color." (Id. at 93.)

[13] In an apparent attempt to overcome this ruling, Petitioner has presented new evidence that the victim's brother wiped himself with a pair of her shorts in the bathroom after masturbating. (Doc. No. 130 at 347–48.)  This attempt fails for at least two reasons.  First, new evidence cannot be the basis for granting relief on an exhausted claim. Pinholster, 563 U.S. at 181, 185.  Second, even if the Court could consider such evidence, it would not establish that the shorts the victim was wearing when she disappeared had been recently laundered with the shorts containing her brother's semen, as required to make the Canadian study relevant.

and trial counsel doubted whether a jury would have been persuaded by the study even if he had presented it. And Clement acknowledged that prolonged exposure to environmental conditions outside could account for degradation of the sperm tails and of the level of acid phosphatase in semen. (Id. at 90.) Finally, Petitioner has not established any basis on which counsel might have succeeded in having the evidence of the DNA testing excluded, or any reason to believe that he was prejudiced by evidence that investigators were *unable to match* DNA from the semen stain to his DNA.

In essence, the state courts found that the scientific evidence regarding the semen results could and should have been more thorough, but that such evidence would not have had any reasonable probability of changing the balance of the evidence or the outcome of the case. This Court agrees that trial counsel's failure to contest the semen/DNA evidence as vigorously as he could have constituted objectively deficient performance. But even if this or any another court might disagree with the state court's finding that Petitioner was not prejudiced by that deficiency, that ruling is not erroneous "beyond any possibility for fairminded disagreement." See Burt v. Titlow, 134 S. Ct. 10, 16 (2013) (quoting Richter, 562 U.S. at 103).

Under this tightly constrained standard, Respondent is entitled to summary judgment on these claims. However, the Court recognizes the likely significance of the semen evidence to the jury's verdicts regarding the rape count and the related aggravating factors. The Court also believes it possible that reasonable jurists might place greater weight on the fact that the jury was never informed that Squibb's initial test results were "weak positive" and that one type of confirmatory test yielded negative results. For those reasons, the Court will grant a certificate of appealability with respect to claim C.12.

4.  Claim C.11 — Soil Evidence

Petitioner alleges that counsel were ineffective for "fail[ing] to sufficiently investigate soil evidence." (Doc. No. 14 at 34.)  He exhausted this claim during post-conviction, arguing to the Tennessee Court of Criminal Appeals that the lack of a match between soil samples from the area where the victim's remains were recovered and samples from Petitioner's cars, clothing or shoes constituted "exculpatory forensic evidence" that trial counsel failed "to recognize and use." (Doc. No. 26-14 at 48.)  The state court rejected his claim:

> The Petitioner claims that Trial Counsel was ineffective in failing to adduce "exculpatory soil evidence which excluded [him] as having been present at the crime scene at Land Between the Lakes where the [victim's] remains were found." This assertion is based upon an FBI Report of Examination prepared by Bruce W. Hall on July 15, 1997, and which states, in toto, the following "Results of Examinations":
>
> > Among the soil samples collected from where the victim was last seen, specimens K1 through K5, specimen K3 is characteristic of soil recovered from the subject's vehicle, specimen Q 1. Soil representing the road associated with the body recovery site, specimen K15 through K18, although seeming similar to the soil recovered from the subject's vehicle, is dissimilar. Soil recovered from the subject's shirt, shoes and sandals, specimens Q 13, Q 14, Q 15 and Q27 respectively, is likewise dissimilar and cannot be associated with any of the aforementioned known soil samples as well as those collected from where the victim was found, specimens K12 through K14.
>
> Although this report is certainly intriguing, the Petitioner cannot ask either a post-conviction court or an appellate court to draw from it the conclusion that it excluded the Petitioner as the person who deposited the victim's body where it was found in Land Between the Lakes. The Petitioner called no one at the post-conviction hearing to testify about this report or to explain its conclusions and/or other data necessary for interpreting the significance of the results.
>
> Thus, again, the Petitioner has failed to demonstrate that he was prejudiced by Trial Counsel's "failure" to utilize this information at trial. As noted by the State in its brief to this Court, the soil samples collected by law enforcement personnel from the Petitioner's car were collected after the car had been cleaned, according to the Petitioner's wife's testimony. The State therefore had a ready explanation had Trial Counsel elicited the lack of a match between the soil samples collected from the area in which the victim was found and the soil samples collected from the Petitioner's car. Also, absent proof that the Petitioner's clothing from which

additional soil samples were collected was the same unwashed clothing that the Petitioner was wearing during the afternoon of July 8, 1996, the lack of a match would have been irrelevant. In this regard, we note that a typed report by the FBI, made an exhibit to the post-conviction hearing, relates that, on July 11, 1996, during the search of the Petitioner's residence, the Petitioner's wife "provided . . . clothing she believes was worn by [the Petitioner] on July 8, 1996. A red 'Nike' T-shirt was recovered from the dryer. [The Petitioner's wife] advised the T-shirt had been washed and dried. [The Petitioner's wife] provided a pair of blue jeans from the washer. The blue jeans were still wet from being washed." Therefore, Trial Counsel's "failure" to adduce the proof about the soil samples does not render the jury's verdicts unreliable. The Petitioner is not entitled to relief on this issue.

Rogers v. State, No. M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *47–48 (Tenn. Crim. App. Aug. 30, 2012).

Respondent moves for summary judgment on the basis that this ruling was not unreasonable pursuant to § 2254(d). (Doc. No. 94 at 141–42.) As with Claim C.10, Petitioner has not addressed the state court's ruling. His only references to the soil evidence in his response are the statement that "counsel also failed to thoroughly investigate and challenge the State's forensic evidence – soil, semen/DNA, fiber, and blood," and the undisputed fact that "the soil taken from [Petitioner's] car and the site of the victim's remains did not match." (Doc. No. 111 at 350–51.) This does nothing to refute the state court's conclusion that Petitioner was not prejudiced by any failure by counsel to make more of the soil evidence. For the reasons the state court explained, the lack of matching soil samples did not exclude Petitioner's presence at the site. Trial testimony made clear that samples, including multiple soil samples (Doc. No. 25-8 at 136–37), had been collected for analysis, but the prosecution voluntarily elicited an acknowledgment from Linda Littlejohn, a forensic scientist in the microanalysis section of the TBI, that she did not find any match:

> Q.    Did you ever make any matches of any kind on items or debris found from the victim's clothing?
>
> A.    No, I did not.

(Doc. No. 25-8 at 148.)  Defense counsel later highlighted the absence of such a match in his closing argument:

> You remember everything we processed and forwarded to the FBI lab? Good Lord, we've been over . . . soil samples . . .. All this, all this, and what have they shown you? Nothing. Not a thing.
>
> Linda Littlejohn, the microanalysis, or microanalysts, or whatever they call her, from the TBI, we went over her list she had. She tested a lot of this stuff. Nothing. Nothing matched up.

(Doc. No. 25-11 at 159–60.)  Thus, the FBI report and any related testimony would have simply been further confirmation of the lack of a match and would not have changed the balance of the evidence.

Accordingly, the state court's ruling on this claim was not unreasonable, and Petitioner is not entitled to relief on this claim.

5.  Claim C.13 — Fiber Evidence

Petitioner alleges now, as he did on post-conviction, that "Counsel failed to sufficiently investigate fiber evidence." (Doc. No. 14 at 34; Doc. No. 26-7 at 184.)  The Tennessee Court of Criminal Appeals summarized the relevant evidence and rejected the claim as follows:

> TBI forensic scientists examined the articles of clothing found at the site, but fibers from the clothing could not be matched to fibers taken from the defendant's vehicle.
>
> . . .
>
> FBI scientist Max Michael Houck tested fiber samples vacuumed from the defendant's car and the defendant's carpet at his residence and compared them with fibers taken from the victim's shorts. He identified light yellow carpet fibers in the samples taken from the defendant's car and residence that "exhibited the same microscopic characteristics and optical properties" as fibers taken from the victim's shorts. Although he could not identify the source of the fibers, the fibers appeared to have the same properties and characteristics as samples taken from the living room carpet in the defendant's residence. Agent Houck testified that either the victim's shorts had been in the defendant's living room, or the fibers had been transferred to the shorts through contact. He explained that the fibers could have been transferred to the defendant's car via the defendant's shoes or clothing and

51

then transferred to the victim's shorts if she came into contact with the defendant's car. Additionally, FBI chemist Ronald Menold tested the fibers forwarded to him by Agent Houck. He found the fibers from the victim's shorts and the vacuumings of the defendant's car and residence to be consistent in polymeric composition.

. . .

Converse explained that the defense hired an expert to look at the carpet fiber evidence. However, her analysis uncovered evidence not noticed by the State's experts "that would have been a shot to the head for us, . . . a killer shot." He explained:

> There was some question about the fibers from [the Petitioner's] living room floor carpet being consistent with some fibers found on the victim or the victim's clothing[.] And she said yea[h]—I remember her looking at that but something that was—nobody else took any further than here, but there were some stains on that particular fiber—grease or dirt or something on that same fiber that matched up.

Converse testified that, upon hearing this, he told the expert "thank you," "[d]on't write that down," and "have a nice day."

. . .

The Petitioner contends that Trial Counsel was ineffective in failing to exploit discrepancies in some of the State's proof regarding fibers found on the victim's clothing and in the Petitioner's cars and home. The Petitioner asserts in his brief to this Court that "[t]hese discrepancies were not utilized in cross-examination of any of the State's witnesses, and the jury was left with the State's unchallenged yet dubious story of 'fiber transfer' which tied [the victim] to [the Petitioner's] car."

To the contrary, testimony by the State's own witnesses during both direct and crossexamination established discrepancies in the fiber evidence and created questions about the fiber transfer. TBI Agent Linda Littlejohn testified at trial that the fibers she found on the victim's clothing did not match the fibers from the carpet and seat standards taken from the Petitioner's cars. FBI scientist Max Michael Houck testified that fibers found in vacuumings from the Petitioner's two vehicles and on the victim's shorts "exhibited the same microscopic characteristics and optical properties as the known fibers from the [Petitioner's] living room carpet." Trial Counsel conducted a thorough cross-examination of Houck, eliciting testimony that established that the fibers on the victim's shorts could have resulted from a transfer that involved neither the victim's presence in the Petitioner's living room or in either of his cars. Trial Counsel also attacked the reliability and validity of the asserted consistencies by pointing out that the fibers from the Petitioner's living room carpet were not obtained until mid–1997. Trial Counsel also obtained Houck's admission that a fiber examination "is not like a fingerprint or a six probe DNA match." FBI chemist Ronald Menold testified that the fibers "were consistent with each other in polymeric composition and that that composition was consistent

with polyethylene carasylate (phonetic), which is a sub-class of a polyester fiber." Trial Counsel also conducted a thorough cross-examination of this witness, eliciting, among other things, Menold's admission that the FBI's Handbook of Forensic Science stated that such consistency was "not positive evidence but good circumstantial evidence."

The Petitioner has failed to demonstrate how the absence of further attacks on the State's fiber proof renders the jury's verdicts unreliable. We note, in particular, that the Petitioner admitted to law enforcement officers that the victim had been in his car. The Petitioner is not entitled to relief on this basis.

Rogers v. State, No. M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *8, 25–26, 48–49 (Tenn. Crim. App. Aug. 30, 2012).

Respondent argues that he is entitled to summary judgment on this claim because the state court's rejection of it was not unreasonable. (Doc. No. 94 at 146–47.) Petitioner does not acknowledge, or identify any flaw in, the state court's ruling. His only mention of fiber evidence in that section of his response amount to wholly unsupported assertions that counsel failed to thoroughly investigate and challenge fiber evidence that he characterizes as "junk science." His only "factual" assertion in connection with that argument relates to a DOJ Task Force report that is not in the state court record and does not pertain to the validity of the techniques or testimony of anyone who gave evidence in this case. (See Doc. No. 111 at 350 n.1727; Doc. No. 43-2.) Even if the Court were not prohibited by AEDPA from considering this new evidence, it would be completely unpersuasive.

Later in his response, in connection with Claim C.24—his more generic claim that counsel failed to effectively cross-examine prosecution witnesses—Petitioner argues that counsel "failed to thoroughly investigate the State's fiber evidence and thus failed to effectively cross examine Max Houck." (Doc. No. 111 at 357.) But in support of that allegation, he relies primarily on testimony the jury heard about weaknesses in the evidence, and motions that defense counsel diligently filed. (Doc. No. 111 at 357–58 and notes.) He argues that "counsel failed to capitalize

53

on the State's inadequate and questionable testing methods" (Doc. No. 111 at 358), but there is nothing in the record establishing that the methods employed in this case were inadequate or questionable. He also refers to the fiber analysis's "lack of accuracy" (id.), but never offered any evidence to the state court that the analysis *was* inaccurate, or that trial counsel could have proven it so through additional effort. To the contrary, the post-conviction record establishes that trial counsel did retain their own expert in an effort to challenge the fiber evidence, and learned that a more careful comparison of fibers was even more damaging to Petitioner than the analysis offered by the State.[14] Finally, as the state court correctly suggested, attacking fiber evidence that the victim had been in his car had no reasonable likelihood of changing the verdict, when Petitioner had admitted that she had been in his car.

The state court reasonably rejected this claim, and Petitioner is not entitled to relief on it.

6. Claims C.19, E.6–E.11 — Caruso Claims

Petitioner asserts that, during the sentencing phase, counsel "failed to adequately investigate defense expert mitigation evidence," (C.19), and presented evidence that undermined the adversarial process (E.6). (Doc. No. 14 at 34, 45.) Specifically, he claims that counsel was ineffective at sentencing for: presenting testimony from Dr. Keith Caruso that was "inaccurate, prejudicial, and presented a false and misleading picture" of Petitioner to the jury at sentencing (E.7); "fail[ing] to sufficiently review Dr. Keith Caruso's final report in advance of the sentencing hearing in order to mitigate the damaging and inaccurate information contained within the report" (E.8); and introducing inaccurate and prejudicial evidence that Petitioner had been diagnosed with

_____

[14] Converse's testimony to that effect is corroborated by the trial court's order to provide the defense expert with the fiber and carpet samples for independent testing. (Doc. No. 24-3 at 23–24.)

Antisocial Personality Disorder (E.9), that he was a child sexual abuser (E.10), and that he "was not 'very far along in the pattern or remorse or feeling sorry for what he has done yet.'" (E.11). (Doc. No. 14 at 45–46.)  In his state post-conviction petition, these allegations were presented as two claims: (1) that "Counsel failed to adequately investigate defense expert mitigation evidence, and presented evidence damaging to Petitioner at sentencing" (Doc. No. 26-7 at 185),[15] and (2) that "Counsel presented at sentencing the expert testimony of Keith Caruso, M.D. whose opinion was highly damaging to the petitioner's defense." (Id. at 190.)  On post-conviction appeal, he condensed these two claims into a single claim that "Trial counsel failed to adequately investigate its own expert's opinion, resulting in the introduction of evidence which supported the State's case for the death penalty." (Doc. No. 26-14 at 4.)  He supported that claim with argument about Dr. Caruso's diagnoses of Antisocial Personality Disorder and Borderline Personality Disorder, and his testimony about the state of Petitioner's remorse process. (Id. at 56–57.)[16]

On post-conviction appeal, the Tennessee Court of Criminal Appeals summarized Dr. Caruso's trial testimony:

> Dr. Keith Caruso, a forensic psychiatrist, testified . . . [that he] interviewed the defendant, his sister, his father, his estranged wife, and his high school principal. He also reviewed the defendant's prison records, school records, medical records, mental health records, military records, police reports, and witness statements. Dr. Caruso diagnosed the defendant with anti-social personality disorder and borderline personality disorder. Dr. Caruso testified that people with borderline personality disorder are sensitive to abandonment with a tendency to feel empty. He testified that the defendant felt abandoned by his biological father and rejected when his sister left home. He said the defendant felt rejected when his first marriage ended

---

[15] In support of this post-conviction claim, Petitioner relied on Dr. Caruso's report. (Doc. No. 26-7 at 185.)  Accordingly, the Court treats Claim C.19, which utilizes the same language, as a Caruso claim.

[16] The Court's work has been complicated by Petitioner's pattern of spiraling what amounts to a single issue into two, three or—in this instance—*seven* claims for relief.  That difficulty is compounded by his response, which (as noted above) rarely directly addresses whether or when he considers any particular claim to have been exhausted.

and feared his marriage to Mrs. Rogers was in jeopardy. At the time of the crimes in this case, the defendant was in an abandonment crisis. Not only was the defendant fearful of his marriage ending, he was fearful that he was going to lose the renewed relationship he had built with his biological father. According to Dr. Caruso, Mrs. Rogers, the defendant's current wife, was a mother figure to him. At the time of the crimes, the defendant was symbolically being abandoned by both his mother and father again. Dr. Caruso theorized that the murder of the victim was a response to feeling so abandoned, which caused the defendant to act out in ways that had been modeled for him.

Dr. Caruso did not diagnose the defendant with post-traumatic stress disorder because he did not exhibit all of the symptoms. Also, Dr. Caruso did not believe that psychotic or dissociative symptoms played a role in the crimes committed in this case.

Rogers v. State, No. M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *14–15 (Tenn. Crim. App. Aug. 30, 2012). As relevant to Petitioner's current claims, Dr. Caruso also testified that he did not find in Petitioner the diagnostic criteria of lack of remorse:

Well, I think one of the things about remorse is that it is a process, it's not an event. . . . I saw at times that Mr. Rogers did not have remorse for things that he had done in the past, but I also saw times when he did, and I was kind of surprised about one example. He spoke of being remorseful and feeling badly about a fight that he had gotten into with his stepfather when he became old enough to defend himself. Apparently, he injured his stepfather and apparently they injured each other in the fight but he actually hurt his stepfather and despite what we have heard here about all the abuse that Mr. Rogers endured at his hands, he actually felt very badly about having injured him. Well, he's still my Dad, or Step Dad I think was what he had said and I shouldn't have done that and I was kind of surprised about that. I think here also with regard to the instant offense or the offense that is here, I think Mr. Rogers hasn't been able to admit to himself that he did these things yet, so it is difficult to say whether or not—I don't see that he entirely lacks remorse. I don't see him as being very far long in the pattern or remorse or feeling sorry for what he has done yet.

(Doc. No. 25-16 at 11–12.)

The Tennessee Court of Criminal Appeals also summarized trial counsel's post-conviction hearing testimony about using Caruso as a witness:

Converse testified that Dr. Keith Caruso, the defense psychiatrist who testified at sentencing, was one of the witnesses "handled" primarily by attorney Warner at trial. Converse had no "independent recollection of Dr. Caruso at all in the sentencing hearing." Converse also could not say what the defense team was

"thinking at the time, one way or the other" regarding any particular reason why they chose Dr. Caruso to testify at sentencing. However, on cross-examination, after reviewing Dr. Caruso's written report, Converse testified that it was "certainly . . . very possible" that the defense put Dr. Caruso on the stand in order to get before the jury the following conclusions contained within his written report:

> [A]t the time of the alleged offenses, the defendant was in a state of extreme emotional disturbance brought on by his sensitivity to abandonment and his fears that the two most significant persons in his life were on the verge of rejecting him.

> Should the jury determine that the defendant is guilty, it appears that his crimes were committed in response to this extreme emotional disturbance. In this scenario, it is likely that the defendant acted in a manner that had previously been enacted on him: he victimized a child sexually and violently.

Converse also testified on cross-examination that Dr. William Bernet had "brought up pedophilia" as a possible motivating factor for the Petitioner's crimes, a conclusion ruled out by Dr. Caruso's statement in his report that "gratifying pedophilic desires with a child" failed to explain the Petitioner's behavior at the time of the crime.

Rogers, 2012 WL 3776675, at *27. The state court then analyzed and rejected Petitioner's claim

on the merits:

> Finally, the Petitioner contends that Trial Counsel "failed to adequately investigate its own expert's opinion, resulting in the introduction of evidence which supported the State's case for the death penalty." The Petitioner refers to Dr. Keith Caruso's testimony and report presented by the defense during the sentencing phase of his trial, particularly Dr. Caruso's testimony, "I think [the Petitioner] hasn't been able to admit to himself that he did these things yet, so it is difficult to say whether or not—I don't see that he entirely lacks remorse. I don't see him as being very far long [sic] in the pattern of remorse or feeling sorry for what he has done yet." The Petitioner argues that Dr. Caruso impliedly endorsed the jury's finding of guilt, "thereby crippling any residual doubt argument as a mitigating factor." He asserts, "Surely it cannot be disputed that a careful reading of Dr. Caruso's report, particularly in light of the far more favorable report of Dr. Neilson . . ., would cause a lawyer exercising reasonable professional judgment to decline to present Dr. Caruso as an expert."

> To prove the prejudice prong of ineffective assistance of counsel during the capital sentencing phase of the petitioner's trial, the petitioner must establish that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695. In determining whether defense counsel was ineffective in its investigation of and/or presentation of mitigating evidence, the reviewing court must "analyze[ ] the nature and extent of the

mitigating evidence that was available but not presented," determine "whether substantially similar mitigating evidence was presented to the jury during either the guilt or penalty phase of the proceedings," and consider "whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination." Goad, 938 S.W.2d at 371. When the petitioner argues, as here, that prejudicial "mitigation" evidence was presented, we construe the first of these factors as referring to the nature and extent of the allegedly prejudicial evidence presented and the third factor as referring to whether the evidence of the applicable aggravating factors was so strong that the absence of the allegedly prejudicial mitigating evidence would not have affected the jury's verdict.

After reviewing the trial testimony of both Dr. Caruso and Dr. Neilson, who also testified in mitigation for the Petitioner at trial, the post-conviction court found that

> Dr. Caruso's assessment of the petitioner [was not] significantly less favorable to the petitioner than Dr. Neilson's assessment. Although Dr. Caruso did not diagnose the petitioner with the same (or as many) disorders as did Dr. Neilson, Dr. Caruso testified that the petitioner' actions were affected by—although if not caused by—the extreme emotional distress resulting from the petitioner's upbringing.

> Furthermore, the evidence of the four aggravating circumstances was substantial, so even if Dr. Caruso's testimony had not been presented to the jury, Dr. Neilson's testimony, standing alone, would not have affected the jury's sentencing decision.

We agree with the post-conviction court on this issue. Moreover, while the Petitioner has couched this contention in terms of inadequate investigation, the real thrust of his complaint is that Trial Counsel made a poor tactical decision in calling Dr. Caruso to testify. The record, however, does not support the conclusion that Trial Counsel's strategic choice in this regard fell so far below the level of reasonable performance as to constitute deficient performance. For instance, we note that Converse testified that one of the reasons the defense called Dr. Caruso was to counteract the State's claim that the Petitioner suffered from pedophilia. The Petitioner is not entitled to relief on this basis.

Id. at *50–51.

Respondent originally characterized some of these claims as defaulted due to the above-noted multiplicity in their presentation here as compared to Petitioner's state court filings,[17] but

---

[17] See, e.g., Doc. No. 94 at 75, where Respondent first asserts that Claim E.6 was defaulted, but goes on to state that "[i]t appears the petitioner takes issue with the mental health testimony presented at the sentencing hearing," and to rely on the state court's determination that counsel were not ineffective for calling Dr. Caruso as a witness.

now seeks summary judgment on all of Petitioner's claims arising from Dr. Caruso's testimony on the basis that the state court's rejection of the comprehensive Caruso claim was not unreasonable. (Doc. No. 94 at 149–51, 176–79; Doc. No. 134 at 38–41.) Petitioner's response ignores that the state courts rejected his claim that counsel were ineffective for insufficiently reviewing Dr. Caruso's opinion and presenting his testimony, and he addresses all of the Caruso claims as "meritorious new claims." (Doc. No. 111 at 2–3, 309–26.) The Court considers the claims to have been exhausted in Petitioner's post-conviction proceedings.

The parties disagree about whether the Court may consider new evidence Petitioner has submitted in support of his Caruso claims. Respondent expressly argues in his reply that, "[b]ecause [the Caruso] claim was properly exhausted, this Court's review of the state court's decision is limited to the record that was before the state court," and that, pursuant to Pinholster, "this Court may not consider the additional evidence the petitioner has presented in support of this claim." (Doc. No. 134 at 38.) In his surreply, Petitioner again ignores the collective exhaustion of his Caruso claims, arguing in the abstract, without reference to any particular claim, that he is permitted to present new evidence on procedurally defaulted ineffective-assistance claims pursuant to Martinez v. Ryan, 566 U.S. 1 (2012.) (Doc. No. 137.)

Martinez creates a narrow exception allowing some claims that were not raised in state court to be reviewed by a federal habeas court. But, as explained in more detail in Section V.A, the Sixth Circuit has repeated held that Martinez has no bearing on a petitioner's attempt to present new evidence on a claim that was exhausted in state court. See, e.g., West v. Carpenter, 790 F.3d 693, 698–99 (6th Cir. 2015) ("When the state court denies a petitioner's ineffective-assistance claim on the merits, Martinez does not apply."); Moore v. Mitchell, 708 F.3d 760, 785 (6th Cir. 2013) ("Pinholster plainly bans such an attempt to obtain review of the merits of claims presented

in state court in light of facts that were not presented in state court. <u>Martinez</u> does not alter that conclusion."). Accordingly, this Court must review Petitioner's exhausted Caruso claims "through the lens of AEDPA deference" to the state court's ruling, and cannot consider any new evidence in connection with that review. <u>Moore</u>, 708 F.3d at 758.

Viewed through that lens, there is nothing unreasonable about the state court's rejection of the Caruso claims. The Tennessee Court of Criminal Appeals correctly identified the applicable <u>Strickland</u> standard.[18] It also reasonably concluded that there were strategic benefits to presenting Dr. Caruso's testimony, despite its potential for adverse impact. Although Petitioner views the personality disorder diagnoses as devastating, Dr. Caruso's testimony tied the severe physical and emotional abuse Petitioner suffered as a child to the development of those disorders, and thus to the extreme emotional disturbance he was experiencing at the time of the crimes. That Petitioner or other experts might disagree with Dr. Caruso's diagnoses does not, as he asserts repeatedly, make them false or inaccurate, and does not detract from the possibility that a jury might have seen the extreme emotional disturbance as a mitigating factor, particularly in the context of the abusive background that contributed to it.

The rest of Petitioner's argument about the Caruso evidence is flatly contradicted by the record. Dr. Caruso did not, as Petitioner asserts, diagnose Petitioner with "pedophilic desires."

_____

[18] The standard for ineffective assistance under <u>United States v. Cronic</u>, 466 U.S. 648 (1984), is only implicated where: (1) there is a complete denial of counsel at a critical stage of the case; (2) "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; or (3) circumstances are such that competent counsel "very likely could not" render assistance. <u>Bell v. Cone</u>, 535 U.S. 685, 695–96 (2002). For <u>Cronic</u> to apply, "the attorney's failure must be complete." <u>Cone</u>, 535 U.S. at 696–97. It plainly does not apply here, where counsel retained and presented multiple expert mitigation witnesses. Allegedly deficient performance is not the same as the complete failure to perform. The Court therefore rejects Petitioner's argument that <u>Cronic</u> applies to his Caruso claims. (Doc. No. 111 at 309.)

(See Doc. No. 111 at 317.)  To the contrary, he opined in his report that any such desires were ***not*** the cause of the crimes:

> Although one may seek to explain Rogers' behavior simply as an Antisocial individual gratifying pedophilic desires with a child, this fails to explain Rogers' behavior in a manner consistent with his developmental history and the psychosocial stressors that he was experiencing at the time of the crime.

(Doc. No. 25-24 at 87.)  Petitioner's assertion that his trial counsel "Larry Warner elicited testimony from Dr. Caruso that Glenn had 'pedophilic desires'" (Doc. No. 111 at 318) is likewise inaccurate.  The portion of the sentencing hearing transcript to which he cites is not from Warner's direct examination of Dr. Caruso, but part of the prosecution's cross-examination. (Doc. No. 25-16 at 25, 40.)  Even then, Dr. Caruso still maintained that pedophilic desires did not explain Petitioner's behavior, while acknowledging that others might think it did. (Doc. No. 25-16 at 40.)

Finally, as quoted above, Dr. Caruso did not testify that Petitioner was incapable of or completely lacking in remorse.  To the contrary, Dr. Caruso testified that Petitioner exhibited a surprising capacity for remorse at times.  Petitioner now faults Dr. Caruso for stating that, at the time of sentencing, Petitioner had not admitted to the crimes and begun to feel sorry for them.  But it is not likely that assessment had any impact on the jury because Petitioner himself maintained (and in fact continues to maintain in the pending action) his actual innocence of the crimes.

Petitioner has not carried his burden of proving that counsel's decision to present Caruso's testimony was not a reasonable strategy at the time it was made, or that the absence of Caruso's testimony would have had any likely beneficial impact on the jury's decision.  More importantly, he has not established that the state court's determination of those issues was so unreasonable that it was beyond fair-minded debate.  He is not entitled to relief on these claims.

### 7. Claim C.24 — Cross-examination

Petitioner alleges that "Counsels' inadequate investigation compromised counsels' abilities to effectively cross-examine the State's witnesses, and/or counsels' ability to present a viable defense." (Doc. No. 14 at 35.)  As pleaded, this claim is too vague and overly broad even to determine the extent to which it is exhausted.  It falls short of satisfying Rule 2(c) of the Rules Governing Section 2254 Cases, which requires that a habeas petition must "specify" the grounds for relief and "state the facts supporting each ground." Rule 2(c)(1) and (2).  Petitioner was adamant about the form of his amended petition (Doc. No. 18), and the Court gave him a great deal of leeway to present his claims in the manner he deems appropriate (see Doc. No. 21, Order denying motion to require supplemental or second amended petition), but this Claim is simply not amenable to review on its face.

In his Response, Petitioner identifies "for example" three failures by counsel relevant to this claim: (1) failure to investigate and present "a more nuanced picture" of Petitioner at sentencing through the testimony of his wife, mother and half-brother; (2) failure to thoroughly investigate and properly challenge Squibb's serology/sperm testimony; and (3) failure to thoroughly investigate fiber evidence to cross-examine Houck. (Doc. No. 111 at 356–57.)  The exhausted serology and fiber evidence claims have already been considered above in Claims C.12 and C.13, and the defaulted claim of failures with regard to Petitioner's family members is addressed below in connection with Claims C.3 and C.4.  In all other respects, this claim will be dismissed as insufficiently pled.

### 8. Claims D.1, D.4, D.7–D.11, D.13–D.15, D.18–D.20, E.1 — Voir Dire/Jury Selection

In all of these claims, Petitioner asserts essentially that trial counsel were ineffective during

voir dire and jury selection. (Doc. No. 14 at 36–40, 44.) He raised a similar host of claims on post-conviction, under the headings "Counsel rendered ineffective assistance with respect to the jury selection process" and "Counsel Rendered Ineffective Assistance by Failing to Utilize Both Counsel During Jury Selection." (Doc. No. 26-7 at 178–81 (capitalization in original).) He also raised those claims in his post-conviction appeal. (Doc. No. 26-14 at 3.) Because the jury selection claims are exhausted, the Court's review is confined to the state court record. Cullen v. Pinholster, 563 U.S. 170, 181, 185 (2011).

The Tennessee Court of Criminal Appeals analyzed the jury selection claims at great length:

> In his first issue on appeal, the Petitioner argues that the post-conviction court erred in denying his claims that his trial lawyers (individually and collectively, "Trial Counsel") provided constitutionally ineffective assistance during the jury selection process. The Petitioner alleges numerous deficiencies on Trial Counsel's part during the jury selection process, which he summarizes in his brief to this Court as (1) failing to conduct an adequate voir dire; (2) failing to object to the trial court's voir dire process and juror excusals; (3) failing to meaningfully exercise peremptory challenges; (4) failing to utilize both defense lawyers during voir dire; and (5) failing "to object, preserve, raise, and appeal the voir dire issues stated herein." The post-conviction court determined that the Petitioner failed to carry his burden of proving that he suffered prejudice as a result of Trial Counsel's performance during jury selection. We agree with the post-conviction court's conclusion and hold that the Petitioner is entitled to no relief on the basis of Trial Counsel's performance during jury selection.
>
> Jury selection implicates an accused's state and federal constitutional rights to a competent, fair-minded, and unbiased jury. See Smith v. State, 357 S.W.3d 322, 347 (Tenn. 2011) (recognizing that "[b]oth the United States and the Tennessee Constitutions guarantee a criminal defendant the right to a trial by an impartial jury."); see also Irvin v. Dowd, 366 U.S. 717, 722 (1961) ("[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."); Mahdi v. Bagley, 522 F.3d 631, 636 (6th Cir. 2008) ("The Sixth and Fourteenth Amendments guarantee a criminal defendant an impartial jury in state court."); State v. Akins, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993) (recognizing that, under the Tennessee Constitution, every accused is guaranteed "'a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation'") (quoting Toombs v. State, 270 S.W.2d 649, 650 (Tenn. 1954)). The process of voir dire is aimed at enabling a

defense lawyer (as well as a prosecutor) to purge the jury of members not meeting these criteria. See United States v. Nell, 526 F.2d 1223, 1229 (5th Cir. 1976) ( "[T]he principal way this right [to an impartial jury] is implemented is through the system of challenges exercised during the voir dire of prospective jurors."); Smith, 357 S.W.3d at 347 (recognizing that "'[t]he ultimate goal of voir dire is to ensure that jurors are competent, unbiased and impartial.'") (quoting State v. Hugueley, 185 S.W.3d 356, 390 (appx) (Tenn. 2006); see also Tenn. Code Ann. § 22–3–101 (1994) ("Parties in civil and criminal cases or their attorneys shall have an absolute right to examine prospective jurors in such cases, notwithstanding any rule of procedure or practice of court to the contrary."); Tenn. R. Crim. P. 24(b)(1) ("The court may ask potential jurors appropriate questions regarding their qualifications to serve as jurors in the case. It shall permit the parties to ask questions for the purpose of discovering bases for challenge for cause and intelligently exercising peremptory challenges."). As emphasized by the United States Supreme Court,

> The process of voir dire is designed to cull from the venire persons who demonstrate that they cannot be fair to either side of the case. Clearly, the extremes must be eliminated—i.e., those who, in spite of the evidence, would automatically vote to convict or impose the death penalty or automatically vote to acquit or impose a life sentence.

Morgan v. Illinois, 504 U.S. 719, 734 n.7 (1992) (quoting Smith v. Balkcom, 660 F.2d 573, 578 (5th Cir. 1981)).

As the United States Court of Appeals for the Sixth Circuit has asserted, "[a]mong the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using voir dire to identify and ferret out jurors who are biased against the defense." Miller v. Francis, 269 F.3d 609, 615 (6th Cir. 2001). By posing appropriate questions to prospective jurors, a defense lawyer is able to exercise challenges in a manner that ensures the jury passes constitutional muster. See United States v. Blount, 479 F.2d 650, 651 (6th Cir. 1973).

Despite its significance, a trial lawyer is "accorded particular deference when conducting voir dire" and his or her "actions during voir dire are considered to be matters of trial strategy." Hughes v. United States, 258 F.3d 453, 457 (6th Cir. 2001). Also, "[a] strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." Id. Thus, it is imperative for a petitioner claiming ineffective assistance of counsel during jury selection to demonstrate that the resulting jury was not impartial. See Smith, 357 S.W.3d at 348 (citing James A. Dellinger v. State, No. E2005–01485–CCA–R3–PD, 2007 WL 2428049, at *30 (Tenn. Crim. App. Aug. 28, 2007)). We conclude that the Petitioner has failed to make such a demonstration in this case.

In Smith, the Tennessee Supreme Court recently dealt with a post-conviction claim of ineffective assistance of counsel during voir dire in another capital case. Smith, 357 S.W.3d at 346–49. The petitioner claimed that he was due a new trial because

his lawyer did not ask the jurors during voir dire about their past experiences as a victim of crime or with a victim of crime. Id. at 346. One of the jurors who sat on the petitioner's trial testified at the post-conviction hearing that, shortly before the trial, his daughter's boyfriend had been murdered. Id. The juror also testified that "the impact of [the victim's] death on his own family had been great." Id. at 347.

First noting that the "'proper fields of inquiry [during voir dire] include the juror's occupation, habits, acquaintanceships, associations and other factors, including his [or her] experiences, which will indicate his [or her] freedom from bias,'" id. (quoting State v. Onidas, 635 S.W.2d 516, 517 (Tenn. 1982)), the Smith court then emphasized that "potential bias arises if a juror has been involved in a crime or incident similar to the one at trial." Id. (citing Ricketts v. Carter, 918 S.W.2d 419, 422 (Tenn. 1996); Durham v. State, 188 S.W.2d 555, 558 (Tenn. 1945)). Accordingly, the court held, "questions to cull the jury for persons who might be biased due to their past experiences with the criminal justice system are a critical part of a competent voir dire in criminal cases," and "the failure to ask the prospective jurors about their past experiences as victims or associates of victims is objectively unreasonable." Id. at 347–48[19] (citing Hughes, 258 F.3d at 460). Clearly, then, it is possible for defense counsel to be deemed deficient in their performance during voir dire based on a failure to ask critical questions aimed at revealing bias against the defense, "absent a showing that counsel had a strategic reason for not asking the question." Id. at 347. We also note as significant, however, that the record in Smith reflected that, not only did the petitioner's lawyer fail to ask these critical questions, but neither did the trial court or the prosecution. Id. at 346.

However, even if a petitioner is successful at demonstrating deficient performance during voir dire, as was the petitioner in Smith, relief will not be granted unless the petitioner also demonstrates "that the deficiency resulted in having a juror seated who was actually biased." Smith, 357 S.W.3d at 348 (citing James A. Dellinger, 2007 WL 2428049, at *30); see also Goeders v. Hundley, 59 F.3d 73, 75 (8th Cir. 1995). Recently, considering a claim of ineffective assistance of counsel during jury selection, the United States Court of Appeals for the Sixth Circuit clarified that

> [b]ias may be actual or implied. Actual bias is bias in fact—the existence of a state of mind that leads to an inference that the person will not act with impartiality. The doctrine of presumed or implied, as opposed to actual, bias provides that, in certain "extreme" or "exceptional" cases, courts should employ a conclusive presumption that a juror is biased. We may presume bias only where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances. Examples of such a relationship are that the juror is an actual employee of the prosecuting agency, that the juror is a close relative

---

[19] The Westlaw version of this opinion inserts an extraneous "188 S.W.2d 555" here, which does not appear in the actual Tennessee Court of Criminal Appeals opinion. (See Doc. No. 26-17 at 47.)

of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction.

Treesh v. Bagley, 612 F.3d 424, 437 (6th Cir. 2010) (internal quotation marks and citations omitted).

The Smith court denied the petitioner's claim for relief on the basis of trial counsel's deficient performance during jury selection because the petitioner had "introduced no evidence of actual bias or partiality." Smith, 357 S.W.3d at 348. Indeed, the subject juror in the Smith case testified at the post-conviction hearing that he "recalled telling the trial judge in response to questioning that there was no reason he could not give [the petitioner] a fair trial." Id. The Tennessee Supreme Court categorically rejected the petitioner's claim that bias should be presumed under the circumstances, holding that it had "never presumed bias absent either an affirmative statement of bias, willful concealment of bias, or failure to disclose information that would call into question the juror's bias, and we decline to do so now." Id. Because the petitioner failed to adduce proof that his jury contained a biased juror, the court held that he was "not prejudiced by counsel's failure to ask the . . . prospective jurors whether they or anyone close to them had ever been the victim of a crime," and denied relief on this basis. Id. at 348–49.

In this case, the Petitioner adduced no testimony at the post-conviction hearing establishing juror bias. The Petitioner attempts to rely on responses to the jury questionnaire, particularly the response by some of his jurors that the death penalty "should be automatic for anyone who is convicted of murdering a child." The questionnaires were simply preliminary tools to foster appropriate voir dire, however, and were not designed as mechanisms to eliminate potential jurors solely on the basis of answers given without the benefit of legal instruction from a trial judge. See State v. Sexton, 368 S.W.3d 371, 392–95 (Tenn. 2012). In Sexton, our supreme court recognized that excluding jurors on the basis of a response to a single question in a jury questionnaire was "not permissible." Id. at 392–93. Instead, "[p]rior to disqualification of a prospective juror, the trial court should develop a process designed to definitively ascertain whether the juror is predisposed to a certain result [in a capital sentencing trial] regardless of the law." Id. at 393. And, in conjunction with implementing such a process,

> [o]nly a definitive answer that the prospective juror would either always vote for the death penalty or never vote for the death penalty regardless of the instructions of the trial court is the kind of predisposition which might "prevent or substantially impair the performance of [their] duties" as jurors and result in disqualification.

Id. (quoting Wainwright v. Witt, 469 U.S. 412, 424 (1985)). In sum, our supreme court has cautioned that,

> eliminating prospective jurors based solely on an answer to one written question may result in the exclusion of those who are entirely capable of rendering a proper verdict, and, if a defendant is found guilty in a capital case, imposing a sentence based on the law and

the facts. Thus, trial courts must consider all of a juror's answers on a questionnaire, rather than giving just one answer dispositive weight, and should permit counsel to examine prospective jurors who provide inconsistent responses to pertinent questions.

Id. at 395.

Thus, absent other proof adduced at the post-conviction hearing, a petitioner claiming a biased jury must rely upon the transcript of the voir dire. See Holder v. Palmer, 588 F.3d 328, 339 (6th Cir. 2009) (where defendant is alleging ineffective assistance of counsel in jury selection, defendant "must show through a review of voir dire testimony that a 'fair trial was impossible'") (quoting Ritchie v. Rogers, 313 F.3d 948, 952 (6th Cir. 2002)). Our close review of the voir dire in this case belies the Petitioner's claim of a constitutionally infirm jury.

First, although the Petitioner claims in his brief to this Court that Trial Counsel was ineffective by failing "to adequately voir dire prospective jurors regarding their respective beliefs on capital punishment and the impact of pretrial publicity," the trial record reveals that the trial court questioned each of the jurors individually about pretrial publicity and their commitment to consider each of the three potential sentences should the Petitioner be found guilty of first degree murder. The prosecutor asked further questions of each juror individually about their commitment to consider each of the three potential punishments upon conviction. Moreover, Trial Counsel also asked questions in these areas. Unlike defense counsel in Smith, then, Trial Counsel in this case had adequate information upon which to determine whether further questioning was necessary on these points and whether to exercise challenges on these bases.

Moreover, our review of the voir dire of each of the twelve jurors who decided the Petitioner's case reflects that each juror met the constitutional standard of fairness and impartiality, i.e., each could lay aside any prior opinion about the case he or she may have held and render a verdict based on the evidence adduced in court. See Patton v. Yount, 467 U.S. 1025, 1037 n.12 (1984) (citing Irwin, 366 U.S. at 723); see also Wainwright, 469 U.S. at 424 (recognizing that the "proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath") (internal quotation marks omitted). "A qualified juror need not be 'totally ignorant of the facts and issues involved.'" Miller v. Webb, 385 F.3d 666, 673 (6th Cir. 2004) (quoting Murphy v. Florida, 421 U.S. 794, 800 (1975)). "Rather, '[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" Id. (quoting Irwin, 366 U.S. at 723). While the Petitioner asserts that jurors Richardson, Brown, Shuffield, Spangenberger, Baggett, and Milliken had each "provided written or oral statements showing obvious bias regarding imposition of the death penalty and the impact of cases with child victims," the record of the actual voir dire demonstrates that each of these jurors was ably rehabilitated through explanations of the relevant law applicable to the imposition of the death penalty in Tennessee.

Richardson, who indicated on her jury questionnaire that she thought the death penalty should be automatic for anyone convicted of murdering a child, told the trial court that she had formed no opinion about guilt or punishment and that she could keep an open mind and be fair to both the Petitioner and the State. She also stated that she would be open to considering all three of the possible punishments should the Petitioner be convicted. When the prosecutor asked if she could set aside her earlier opinion that the death penalty should be automatic for the murder of children on being told by the trial judge that that was not the law in Tennessee, she answered affirmatively. She reiterated that she could consider all three possible punishments.

Brown, who also indicated on the questionnaire her belief that the death penalty should be automatic for the murder of children, likewise told the trial court that she had not formed an opinion about the case and would follow the law regarding the three possible penalties upon conviction of first degree murder. When the prosecutor explained that Tennessee law did not provide for the death penalty solely on the basis that a child was murdered, Brown stated that she would follow the law and consider all possible punishments.

Shuffield, who also indicated on the questionnaire his belief that the death penalty should be automatic for the murder of children, told the prosecutor that he could set this opinion aside and follow the law requiring that all three possible punishments be considered. He indicated to defense counsel that he would not automatically vote for the death penalty just because the victim was a child.

Spangenberger, who also indicated on the questionnaire his belief that the death penalty should be automatic for the murder of children, stated that he would follow the law requiring that all three punishments be considered. He stated that he had not formed any opinion about the case and noted that there were circumstances in which each of the three punishments would be appropriate.

Baggett, who also indicated on the questionnaire his belief that the death penalty should be automatic for the murder of children, stated during questioning that he would approach the case with an open mind and decide it solely on the evidence and the law. He asserted that he would consider all three possible punishments and that he would set aside any personal feelings and follow the law.

Milliken stated during voir dire that she thought a case in which a life had been taken should carry the death penalty. After being told by the prosecutor that Tennessee law did not provide for the automatic imposition of the death penalty upon a first degree murder conviction, Milliken stated that she understood and that she could follow the law. She affirmed that she could be fair and impartial.

Trial Counsel challenged none of these jurors for cause. Moreover, the trial court did not excuse any of these jurors for cause on its own motion. See David Robert Ruderman v. Ryan, No. CV–09–0887–PHX–GMS, 2010 WL 2757282, at *5 (D. Ariz. July 13, 2010) (recognizing that, "[i]n cases where neither counsel requests that the juror be dismissed for cause, a trial court has a duty to dismiss the juror *sua sponte* where 'the evidence of partiality before the [trial] court' is highly 'indicative of impermissible juror bias.'") (quoting United States v. Mitchell, 568 F.3d 1147,

1151 (9th Cir. 2009)). Obviously, neither Trial Counsel nor the trial court was concerned that any of these jurors was biased against the defense, and the record before us does not demonstrate that any of these jurors was biased, either in fact or impliedly. Moreover, a trial court's assessment of a "juror's ability to adhere to [his or] her oath ..., based upon not only the answers to questions posed by counsel but also nonverbal responses, is owed deference." State v. Odom, 336 S.W.3d 541, 559 (Tenn. 2011) (citing Uttecht v. Brown, 551 U.S. 1, 9 (2007)). Also, where "the record shows that jurors were duly elected, empaneled, tried, and sworn, it is presumed that they were fair and impartial jurors, since the trial judge has the exclusive right to pass on their selection." Letner v. State, 512 S.W.2d 643, 649 (Tenn. Crim. App. 1974). "To overthrow this presumption of competency, a clear case must be made out against it." Id. We also note that the Tennessee Supreme Court has already determined that the Petitioner's jury was not prejudiced by pretrial publicity. See Rogers, 188 S.W.3d at 622 (appx). The Petitioner has failed to demonstrate that he is entitled to relief on this basis.

The Petitioner also argues that Trial Counsel was ineffective in failing to ask any of the jurors about "any mitigation concepts." While we acknowledge that Trial Counsel did not pursue this line of inquiry during voir dire, this Court has recognized that "[t]he failure to make certain inquiries to determine how receptive the jury would be to specific mitigation factors during voir dire does not necessarily constitute ineffective assistance of counsel." Steven Ray Thacker v. State, No. W2010–01637–CCA–R3–PD, 2012 WL 1020227, at *53 (Tenn. Crim. App. Mar.23, 2012) (citing State v. Goodwin, 703 N.E.2d 1251, 1257 (Ohio 1999)). In Thacker, rejecting a similar argument, this Court noted that the jurors had been "questioned as to their ability to follow the law" and that "[t]he trial court instructed the jury of the applicable legal burdens and on mitigating circumstances." Id. This Court emphasized that, "'where a juror is not legally disqualified or there is no inherent prejudice, the burden is on the [petitioner] to show that a juror is in some way biased or prejudiced.'" Id. (quoting State v. Caughron, 855 S.W.2d 526, 539 (Tenn. 1993)). Because the petitioner had "offered no evidence to establish that the jury ultimately empaneled was biased or unfair," this Court denied relief. Id.; see also Christa Gail Pike v. State, No. E2009–00016–CCA–R3–PD, 2011 WL 1544207, at *59 (Tenn. Crim. App. Apr. 25, 2011), perm. app. denied (Tenn. Nov. 15, 2011) (affirming trial court's denial of post-conviction relief where petitioner claimed trial counsel was ineffective in failing to inform the jury during voir dire that the petitioner's youth was a statutory mitigating factor, in failing to discuss mitigation themes of mental illness, psychology, and mental health experts, and in failing to question the venirepersons about their beliefs on interracial dating and Satanism). The same result, for the same reasons, applies in this case.

The Petitioner also makes numerous assertions regarding Trial Counsel's performance during voir dire with respect to venirepersons who were not eventually seated on the Petitioner's jury. However, the obvious corollary to the prerequisite that a post-conviction petitioner alleging ineffective assistance of counsel during jury selection must prove that the eventual jury was biased, is that the trial lawyer's performance with respect to jurors who were not ultimately seated on the jury is irrelevant.

Therefore, we emphasize that a post-conviction petitioner raising this issue must focus the proof and argument on the jurors who actually sat and passed judgment on the petitioner. In this case, the Petitioner makes numerous claims of ineffective assistance of counsel during jury selection by pointing to Trial Counsel's questions (or lack thereof) and/or challenges (or lack thereof) to venirepersons who eventually were eliminated from the jury pool. Trial Counsel's voir dire and challenges as to these venirepersons are simply irrelevant to the Petitioner's claim of ineffective assistance of counsel. The Petitioner cannot prove that he was judged by a constitutionally infirm jury by reference to persons who were not on the jury. Accordingly, we need not address the Petitioner's specific claims in this case arising from Trial Counsel's performance regarding potential jurors who did not actually sit in judgment of the Petitioner at trial.

The Petitioner also claims that Trial Counsel "wholly abandoned his role as an advocate, and failed to act as an adversary during the voir dire process" such that this Court should consider his performance ineffective per se. The Petitioner relies on United States v. Cronic, 466 U.S. 648 (1984), for this proposition. We, however, disagree that Cronic supports his position. Cronic makes clear that there are exceptional circumstances "that are so likely to prejudice the accused" that a violation of the Sixth Amendment right to counsel is presumed. Id. at 658. Such exceptional circumstances include "the complete denial of counsel" during "a critical stage of [the] trial," id. at 659; the complete failure by counsel "to subject the prosecution's case to meaningful adversarial testing," id.; the denial of the right to cross-examination, id.; and where "counsel labors under an actual conflict of interest," id. at 662 n.31. The instant case does not present any such exceptional circumstances. Contrary to the Petitioner's claims, Trial Counsel actively participated during voir dire, even to the extent of utilizing the services of a jury consultant. The Petitioner is not entitled to relief on this basis.

To the extent that the Petitioner claims that Trial Counsel was ineffective because only one of them participated in the jury selection process, allegedly in violation of Tennessee Supreme Court Rule 13, section 3, we agree with the State that the cited rule does not require the participation of both attorneys in all decisions related to the representation. Rule 13, section 3(b)(1) simply states that the trial court "shall appoint two attorneys to represent a defendant at trial in a capital case." Moreover, as noted earlier, post-conviction relief is warranted only when a petitioner establishes that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40–30–103. As such, any violation of Rule 13 arising from any failure on attorney Converse's part to participate in the jury selection process would not entitle the Petitioner to post-conviction relief.

. . .

Although we have determined that the Petitioner is not entitled to relief on the basis of Trial Counsel's performance during jury selection because he has failed to demonstrate the prejudice prong of his ineffective assistance of counsel claim, we choose also to address his assertion that, "[i]nasmuch as 'trial strategy' is the state's

defense to a claim of ineffective assistance articulated in a petition for post-conviction relief, the burden of proving strategy is on the [State], not on the [P]etitioner." (Emphasis added.) Not surprisingly, perhaps, the Petitioner cites us to no authority for this novel assertion, and we expressly reject the Petitioner's assertion on this point. It is well-established that a trial lawyer is presumed to have represented his or her client pursuant to sound trial strategy. See Strickland, 466 U.S. at 689. Accordingly, "[j]udicial scrutiny of [an attorney's] performance is highly deferential," Combs v. Coyle, 205 F.3d 269, 278 (6th Cir. 2000) (emphasis added), and a petitioner alleging deficient performance bears the heavy burden of proving that his or her lawyer's performance was not within the realm of competent trial strategy. See Strickland, 466 U.S. at 689; Tracy F. Leonard v. State, No. M2006–00654–CCA–R3–PC, 2007 WL 1946662, at *20 (Tenn. Crim. App. July 5, 2007). Thus, the fact that the State did not call attorney Warner to the stand to explain his performance during jury selection does not accrue to the Petitioner's benefit.

Nor do we agree with the Petitioner that this Court's decision in Timothy Terell McKinney v. State, No. W2006–02132–CCA–R3–PD, 2010 WL 796939 (Tenn. Crim. App. Mar. 9, 2010), perm. app. denied (Tenn. Aug. 25, 2010), supports his argument. In McKinney, the capital post-conviction petitioner alleged ineffective assistance of counsel at trial but was unable to adduce testimony from one of his trial lawyers at the post-conviction hearing because the trial lawyer was ill. See id. at *29. The petitioner nevertheless adduced proof through other sources that his trial lawyers failed to utilize significant and substantial evidence at trial that they "knew of or should have known of" and which was damaging to the State's case, thereby "fail[ing] to subject the prosecution's case adequately to the adversarial process." Id. at *36. Noting that the evidence against the petitioner at trial "was not overwhelming," id., this Court concluded that trial counsel's demonstrated deficiencies "undermined confidence in the outcome of the trial." Id. at 37. Therefore, this Court granted relief. Id. at *56.

In McKinney, this Court determined that relief was appropriate based upon the extensive testimony presented at the post-conviction hearing from one of the petitioner's trial attorneys, the owner of the private investigation firm and one of his employees who were hired by counsel to assist the defense, and numerous lay witnesses who testified at the postconviction hearing but not at trial on the subject of whether others may have had motive for the crime and whether the eyewitness descriptions of the perpetrator matched the petitioner. See id. at *5–18. In fact, the attorney who testified at the post-conviction hearing in McKinney stated that the defense theory in that case was that "the victim was shot and that there was very little evidence as to who committed this crime, so the defense for the [defendant] was mistaken identity or that essentially that he was not the person who committed this crime." Id. at *12. In other words, the combination of all the proof presented at the post-conviction hearing, including one of the defense lawyer's testimony, negated the presumption that the identified deficiencies on counsel's part were the result of trial strategy. With regard to the claimed deficiency attributable only to the attorney who did not testify at the post-conviction hearing in McKinney, this Court noted that no proof had been presented "as to the basis of [that attorney's]

decision," and that, "[a]bsent such proof, this Court will not conclude that counsel blindly refused to engage in the adversarial process." Id. at *29. In sum, McKinney clearly is distinguishable from this case and does not control the outcome of this post-conviction proceeding.

In his reply brief, the Petitioner reiterates this approach, arguing that his burden is limited to proving "by clear and convincing evidence the fact of counsel's alleged error" and that the post-conviction court must thereupon determine whether the "alleged error" fell below an objective standard of reasonableness. Notably, the rest of the Petitioner's argument reveals his interpretation that, by simply proving that trial counsel committed or omitted some action during trial preparations and/or at trial and by then labeling same an "error," the burden then shifts to the State to demonstrate that the alleged "error" was reasonable trial strategy. Again, this is not the law. A post-conviction petitioner must establish both that the action was taken (commission) or not (omission) and that the same was erroneous within the context of the proceeding. We acknowledge that a very few commissions or omissions by trial counsel can be "objectively unreasonable" on their face. See, e.g., Smith, 357 S.W.3d at 347–48. Such errors are rare, however, and the Petitioner has identified no such errors during the voir dire of his trial. Therefore, we hold that the post-conviction court committed no error in its application of the burden of proof in this case.

In summary, the Petitioner has failed to establish that any of the jurors who actually sat on his case were biased, partial, or incompetent. The record before this Court, including both the record from the Petitioner's trial and the record of the post-conviction proceeding, simply does not establish that Trial Counsel's performance during jury selection led to a constitutionally infirm jury. Accordingly, we hold that the Petitioner has failed to establish that Trial Counsel rendered ineffective assistance of counsel during jury selection, and he is entitled to no relief on this basis.

Rogers v. State, No. M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *34–44 (Tenn. Crim. App. Aug. 30, 2012).

Respondent moves for summary judgment on the basis that this ruling was not unreasonable. (Doc. No. 94 at 155–66.) Despite characterizing these claims as new claims and invoking Martinez (Doc. No. 111 at 2–3, 243), Petitioner acknowledges the state court's decision "affirming the dismissal of the IATC claims relating to voir dire," and proceeds to challenge it as contrary to clearly established law and an unreasonable determination of the facts. (Doc. No. 111 at 243–44.)

Because these claims are exhausted, Martinez is inapplicable, and the Court's review is confined to the state court record. On that record, the Court finds that there is no basis in § 2254(d) to overturn the state court's decision. "An attorney's actions during voir dire are considered to be matters of trial strategy . . . [that] cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." Hughes v. United States, 258 F.3d 453, 457 (6th Cir. 2001).

Petitioner's first complaint about the state court's decision is that it addressed only the prejudice prong of Strickland. (Doc. No. 111 at 244.) Even if true, that would be accepted procedure in reviewing ineffective-assistance claims. Strickland, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."). But in this case the state court did not so limit its analysis. After determining that Petitioner had failed to demonstrate prejudice, the state court continued its review, stating "we choose also to address" whether counsel's performance was properly deemed to be a matter of strategy, and that "a petitioner alleging deficient performance bears the *heavy* burden of proving that his or her lawyer's performance was *not* within the realm of competent trial strategy." Rogers, 2012 WL 3776675, at *42 (emphasis in original). The state court went on to conclude that Petitioner had not identified any objectively unreasonable errors by counsel during jury selection, id. at *43, thus rejecting the argument that counsel's performance was deficient.

Petitioner now disagrees with his counsel's approach to jury selection, but it was clearly an approach adopted consciously, with the advice and assistance of an expert jury consultant. (See Doc. No. 26-9 at 36–37, 39.) In fact, Petitioner acknowledges that it was defense counsel who successfully moved to conduct the individual voir dire of potential jurors in the first place. (Doc.

No. 111 at 239.) Where a seasoned attorney has affirmatively sought special voir dire and has retained and utilized a jury expert, there is no basis to presume that he subsequently took a certain course in voir dire due to neglect, rather than strategy.[20] Indeed, the presumption should be that counsel's actions during voir dire are matters of trial strategy. Miller v. Francis, 269 F.3d 609, 615 (6th Cir. 2001); see also, e.g., Knese v. Roper, No. 4:03CV1082 CEJ (TIA), 2006 WL 2506005, at *6–8 (E.D. Mo. Aug. 28, 2006) (method of voir dire is a matter of trial strategy). To the extent Petitioner claims that counsel should have raised the state's aggravating factors himself during voir dire to ask prospective jurors what they thought of them, or gone into detail about potential mitigation evidence to gauge their responses, his own Response concedes that such an approach is a matter of "strategy." (Doc. No. 111 at 237, referring to the "strategy" of frontloading mitigation). For Petitioner to prevail with this argument would require the Court to hold that any strategy other than "frontloading" sentencing issues during voir dire in a capital case is objectively deficient performance. He does not cite any Supreme Court precedent for that position, and this Court will not adopt it in this case. Moreover, the jury questionnaires did address at some length the prospective jurors' views on potential sentencing issues, including brain injury, mental illness and child abuse (see, e.g., Doc. No. 120-1 at 15–18), so counsel could have already obtained whatever information he wanted from the jurors about those topics before voir dire began. The state court's conclusion that counsel's performance was not objectively deficient was not unreasonable.

---

[20] Even if the Court were to consider the 2016 statement of attorney Warner that Petitioner has submitted, it does not defeat the presumption that counsel was prepared and making strategic decisions about how to approach voir dire. In the affidavit, Warner states that he reviewed every juror's questionnaire and prepared notecards for each juror, noting issues including the juror's views on the death penalty, psychological evidence and mitigation. (Doc. No. 119-4 at 3.) During voir dire, he utilized those cards and took suggestions from the jury expert who was there to assist with jury selection. (Id. at 3–4.) That he believes in hindsight that he "should have" made different choices does not outweigh all the evidence indicating that his choices were deliberate and strategic at the time he made them.

Moreover, it was also not unreasonable for the state court to determine that any alleged deficiencies did not result in prejudice to Petitioner. When a petitioner claims that his counsel was ineffective on voir dire for "failing to examine [the venire] more carefully," he must demonstrate that one of the jurors seated was actually biased against him in order to establish prejudice. Tinsley v. Million, 399 F.3d 796, 804–05 (6th Cir. 2005). Petitioner asserts that the state court unreasonably "discounted" the jury questionnaire evidence in order to find his jury impartial. (Doc. No. 111 at 245.) But the court did not, as Petitioner maintains, hold that the questionnaires "had no weight"; it simply observed that the questionnaires *alone* could not be the basis for excusing a juror for bias, and that the only other evidence in the record regarding potential bias was in the transcript of voir dire. Petitioner does not cite any Supreme Court precedent to the contrary. All but one of his citations in this section of the argument pertain to jurors' allegedly dishonest questionnaire responses, which is a separate issue not implicated by these claims. Petitioner cites only United States v. Shepard, 739 F.3d 286 (6th Cir. 2014), as precedent for reversal of a conviction "triggered by questionnaire response" suggesting bias (Doc. No. 111 at 245), but Shepard involved far more than a potentially biased questionnaire response. In that case, a seated juror informed the court by phone message that "there [was] just no way" he could bring himself to view the evidence in the case due to his personal aversion to child pornography, and later testified that he would close his eyes rather than look at the evidence and that he did not think he could be a juror on the case. Id. at 290. The Sixth Circuit found that the record reflected an "indication by Juror 29 that he could not decide the case fairly and impartially, as well as a clear indication that he could not perform his constitutional duty to 'lay aside his impression or opinion and render a verdict *based on the evidence presented in court*.'" Id. at 293–94 (quoting Irvin, 366 U.S. at 723) (emphasis in Shepard). Petitioner has not pointed to any equally clear indications in

the state court record in this case.

Next, Petitioner claims that the Tennessee Court of Criminal Appeals unreasonably relied on the jurors' voir dire responses as proof of their impartiality, because they were in response to questions that were "general, untethered to the prospective juror's questionnaires." (Doc. No. 111 at 245–46.) That assertion is plainly contradicted by the record. During the individual voir dire of Rebecca Sue Brown, the only juror Petitioner addresses "as an example" in his Response (Doc. No. 111 at 246–48), the prosecutor's first request was that Brown turn to a particular page of her questionnaire, saying "let's start there and work through the questionnaire." (Doc. No. 24-11 at 56–57.) He then proceeded to ask her follow-up questions about several specific questionnaire responses, including questions about her exposure to pretrial publicity and her views on the death penalty. (Doc. No. 24-11 at 56–62.) Petitioner's counsel then followed with additional questions about her exposure to pretrial publicity and knowledge that this was a death penalty case, and elicited her agreement that "it takes a real big factor to condemn a man to death." (Doc. No. 24-11 at 62–63.) The state court accurately summarized her responses to those questions, and its determination that Brown was an impartial juror was not unreasonable.

The voir dires of Richardson, Shuffield, Spangenberger, Baggett, and Milliken all took a similar tack, and all included questions tied directly to their questionnaire responses.[21] (Doc. No.

---

[21] Petitioner has also listed Paula Jo Reynolds and Martin Logsdon among those who "expressed bias in their questionnaires." (Doc. No. 111 at 227.) Although he did not specifically identify these jurors in his state court claim (see Doc. No. 26-14 at 28, listing only Richardson, Brown, Shuffield, Spangenberger, Baggett and Milliken), the Court considers the claim exhausted as to both of them in light of the state court's conclusion that "the voir dire of ***each of the twelve jurors*** . . . reflects that each juror met the constitutional standard of fairness and impartiality." Rogers v. State, No. M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *38 (Tenn. Crim. App. Aug. 30, 2012) (emphasis added). Reynolds's questionnaire indicated that: she strongly favored the death penalty, but that she was open to considering all three available punishments (although she was unsure about life with the possibility of parole); she believed whether the death penalty should be

24-10 at 67–82, 180–90; Doc. No. 24-11 at 80–88; Doc. No. 24-15 at 181–95.)  Petitioner faults counsel for not asking certain questions (Doc. No. 111 at 247), but he fails to acknowledge that the judge and prosecutor had already asked most of those questions, or that counsel had even commented on his belief that little additional questioning was needed by the time it was his turn on voir dire: "By going last, I get to ask the least amount of questions." (Doc. No. 24-11 at 37.) Information gathered through the questioning that preceded his own voir dire is relevant to the sufficiency of counsel's performance. Tinsley, 399 F.3d at 804.  Moreover, counsel did follow up with questions about specific questionnaire responses when he deemed it necessary. (See Doc. No. 24-10 at 78.)  Petitioner's assertion that "[i]n five days of voir dire, Warner obtained no information from the seated jurors" about pretrial publicity or impartiality is simply false.

The Court observes that Petitioner's response might be read to suggest that these jurors' questionnaire responses cannot be credibly reconciled with their ability to consider the full range of punishments as expressed during voir dire.  But a juror's initial opinion about what the law should be does not establish that he or she is incapable or unwilling to follow the law as it is

"automatic" for the murder of a child depended on the circumstances of the case; she believed the death penalty is appropriate in some, but not all, murder cases and could return a verdict of death if the facts and the law warranted it; she could not determine which sentence to impose without knowing the facts; and she could set aside her personal feelings and follow the law. (Doc. No. 26-11 at 70–74.)  Similarly, Logsdon wrote that: he strongly favored the death penalty, but that it would not go against his nature to vote for a lesser penalty because "each case is different"; he believed the death penalty is appropriate for some, but not all, murder cases and should not be automatic for the murder of a child; he could consider all three punishments and believed them each to be a severe punishment; and he would consider factors including the defendant's childhood in deciding the appropriate penalty. (Doc. No. 26-11 at 142–45.)  Both jurors testified during voir dire that they did not have any strong personal beliefs that would interfere with their ability to consider all three punishments, and that they could be open-minded about the case. (Doc. No. 24-13 at 43–44, 58.)  The state court's finding that neither juror was impermissibly biased based on that record was not unreasonable.

explained to him or her.  Mr. Shuffield explained that distinction during his voir dire: "Before I came in here not knowing what your rules and stuff were in Court, I have never been in a Court, but if the law says I have to consider certain things, then I have to consider certain things." (Doc. No. 24-11 at 87.)  And, as the Tennessee Court of Criminal Appeals pointed out, reviewing courts owe deference to a trial court's determination of a juror's ability to be impartial. Uttecht v. Brown, 551 U.S. 1, 9 (2007).  The Sixth Circuit has explained that such deference is appropriate because "the transcript we review captures only the *dire* part of *voir dire*," and because trial judges have expertise in the jury selection process and the responsibility to assess the juror's credibility. United States v. Gabrion, 719 F.3d 511, 527 (6th Cir. 2013).  The state court record contains no evidence of jury bias so clear that it is beyond fairminded disagreement, so upending the state court's rejection of this claim is not warranted under AEDPA.

Petitioner is not entitled to relief on these claims.

9.  Claim D.27 — More Cross-Examination

Petitioner asserts that "[c]ounsel failed to adequately prepare and present proper and adequate cross-examination of State witnesses regarding DNA, bone, soil, and fiber evidence." (Doc. No. 14 at 40–41.)  Respondent asserts that, to the extent this claim pertains to counsel's handling of the prosecution's DNA, soil and fiber evidence, it is subsumed by Claims C.10–C.13 and does not constitute an independent claim. (Doc. No. 94 at 168.)  Petitioner groups all of these claims together in his response, incorrectly identifies them as new, unexhausted claims, and discusses them without identifying which pieces of his argument are tied to which claim. (Doc. No. 111 at 346–51.)  The Court agrees with Respondent, and concludes that Claim D.27 has been adequately addressed in the Court's ruling above on Claims C.10–C.13 with regard to DNA, soil and fiber evidence.  The amended petition does not identify the bone evidence in question, and

there is no mention of bone evidence anywhere in Petitioner's response. To the extent this claim raises any issues not denied on the merits in connection with other claims, the Court finds that it is insufficiently pleaded in the amended petition and waived in the response. Accordingly, Petitioner is not entitled to relief on this claim.

### 10. Claims G.21–G.24, G.26, G.44 — Jeremy Claims

All of these claims relate to evidence that Petitioner was not allowed to present at trial, concerning reports of previous sexual activity between the victim and her brother Jeremy. In all of these claims, Petitioner alleges in slightly different ways that the trial court erred in preventing counsel from entering those reports into evidence and cross-examining the victim's brother and mother about them in the presence of the jury. (Doc. No. 14 at 57–58.) Petitioner exhausted his claim about the exclusion of this evidence on direct appeal, when the Tennessee Supreme Court recounted the relevant facts and ruled as follows:

> During a pre-trial hearing in December 1999, the trial court agreed to order the Harriet Cohn Mental Health Center and the Department of Children's Services to submit their records pertaining to Jeremy Beard to the court "under seal" so that the parties could inspect, review, and copy them. Just prior to opening statements at trial, the State informed the trial court of the existence of several reports in those records indicating that Jeremy had "allegedly told psychologists that his biological father taught him to have sex with his sister." The State asked the court to extend its prior ruling, restricting cross-examination of Jeremy about two incidents that occurred after the victim's death, to cover the allegations in the reports. The trial court took the matter under advisement.
>
> After direct and cross-examination of Jeremy Beard, the trial court conducted a jury-out hearing for defense counsel to make an offer of proof regarding the additional questions he wanted to ask Jeremy about the allegations in the reports. Objecting to the hearsay nature of the reports, the prosecutor stated:
>
>> It's going to be real easy to try and play games and confuse this witness on this because a lot of these reports—there are tons of them. There is a whole big box that the Court is aware of, all these records from every different social agency you can think of, and a lot of times they have repeated reports from some other social worker, counselor or psychologist and [it] just keeps getting repeated in

different places and a lot of times.

Defense counsel told the trial court that if Jeremy denied making the statements in the reports, counsel intended to present the testimony of the persons to whom the statements allegedly were made. FN5 Following a brief recess, the trial court ruled that the defense would not be able to cross-examine Jeremy about the allegations in the reports because, "based on the evidence that [the court had] heard so far in the trial," the alleged incidents were too remote in time and irrelevant. The trial court advised the parties that its ruling might change based on additional legal research or additional evidence.

> FN5 At a subsequent jury-out hearing, Rogers presented testimony of the victim's mother concerning the statements. No other witnesses testified about the statements.

. . .

Rogers asserts that the trial court violated his constitutional rights by limiting cross-examination of the victim's brother, Jeremy Beard, regarding Jeremy's alleged sexual activity with the victim, his treatment for mental illness, incidents of inappropriate sexual behavior, and solicitation of another to kidnap and rape him. Rogers sought to introduce the evidence to show that someone other than himself was responsible for the semen stain on the victim's shorts.

Prior to trial, the State filed a motion seeking to limit cross-examination of Jeremy Beard about two incidents: a letter Jeremy sent to Quinton Donaldson, one of the early suspects in this case, asking Donaldson to kidnap and rape him; and contact between Jeremy and an adult male he had met in an internet chat room. The State argued that these incidents were irrelevant to the case because they occurred after the victim's murder. The trial court agreed and tentatively granted the State's motion. However, the trial court indicated that the court would reconsider its ruling if the defense established relevance during the trial. As discussed earlier under the supplementation issue, just before opening statements at trial, the State asked the trial court to extend its ruling to include statements made by Jeremy that his biological father had taught him to have sex with the victim. Rogers responded that the evidence was relevant because it showed that Jeremy could have been the source of the semen found on the victim's shorts. The trial court withheld its ruling on the issue.

During the jury-out hearing on this matter, defense counsel asked sixteen-year-old Jeremy Beard FN7 if he had told mental health professionals during treatment at certain facilities in February 1997 that his biological father had taught him how to have sex with his sister and that his father had watched them engage in sexual acts. Jeremy repeatedly stated that he could not remember if he had ever made such comments. FN8 Jeremy testified at trial that he was living in a residential treatment facility and previously had lived in several mental hospitals, detention centers, group homes, and foster homes. Jeremy acknowledged numerous contacts with

counselors and therapists at the various facilities where he had received treatment following his sister's murder, but he remembered only one time when he had talked about his sexual behavior. He denied that he was prohibited from being placed in a foster home where small children were present, but he admitted that during an April 1999 psychological evaluation he had stated that he thought about sex all the time. He acknowledged that he had been accused of inappropriate behavior toward his stepfather, but he did not remember the nature of the accusation. Finally, Jeremy admitted writing the letter to Quinton Donaldson several months after the victim's murder. Although defense counsel specifically submitted the Donaldson letter as an exhibit, no other documents were entered into evidence during the jury-out hearing.

> FN7 As noted earlier, Jeremy was twelve years old at the time of his sister's disappearance.

> FN8 Rogers subsequently made an offer of proof as to the testimony of the victim's mother regarding the allegations. Mrs. Meyer testified that Jeremy had told her that he had been taught by his natural father how to have sex with his sister. Mrs. Meyer passed this statement along to Jeremy's therapists and social workers so that they could determine if Jeremy was telling the truth. Mrs. Meyer indicated that Jeremy had last made such a statement about six months or a year after the victim's death. She stated that although Jeremy had not indicated when this alleged sexual activity occurred, he had not seen his natural father since April of 1991. The trial court ruled that Rogers would not be allowed to cross-examine Mrs. Meyer about the allegations. Rogers has not appealed that ruling.

The trial court ruled that Jeremy could not be cross-examined about alleged sexual activity with the victim because, even if it happened, it was "remote in time and irrelevant and possibly confusing to the jury and inadmissible."

. . .

[W]e next review the trial court's exclusion of the evidence on relevancy grounds. Evidence is relevant if it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence that meets the test of relevance may yet be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Generally, a trial court's exclusion of evidence based on irrelevance will not be overturned on appeal except upon a clear showing of abuse of discretion. Powers, 101 S.W.3d at 395.

To the extent that the defense claimed that Jeremy Beard was a "third party"

responsible for the semen stain on the victim's shorts, evidence of Jeremy's sexual conduct with the victim would be relevant. Rogers offered no evidence, however, substantiating a claim that Jeremy Beard had ever engaged in sexual relations with his sister. When questioned during the jury-out hearing, Jeremy stated that he did not recall telling mental health professionals that his biological father had taught him how to have sex with his sister. Even if Rogers had offered evidence confirming that Jeremy made the statements, such proof would not establish that Jeremy had actually had sex with the victim versus simply reporting that he had.

Moreover, no proof connects Jeremy to the semen stain found on the victim's shorts. Rogers asserts that if Jeremy and the victim had engaged in sexual activity the night prior to or the morning of the day she disappeared, then semen would have remained inside her vagina and could have continued to seep out after she had changed her shorts immediately before her disappearance. No such inference can be drawn from the proffered evidence; the defense theory is mere speculation. When given the opportunity outside of the presence of the jury to ask Jeremy whether he had sex with his sister the evening before or the morning of her disappearance, defense counsel did not pursue this crucial line of questioning. Without some proof that the statements attributed to Jeremy resulted from actual sexual activity with his sister and that such conduct continued until her disappearance, it cannot be said that evidence concerning Jeremy's alleged sexual history with the victim makes the existence of any fact of consequence more or less probable than it would be without the evidence. See Tenn. R. Evid. 401. We agree with the trial court that this evidence was irrelevant. Furthermore, any probative value of the evidence would be substantially outweighed by the risk of confusing and misleading the jury. See Tenn. R. Evid. 403. FN10 Therefore, we conclude that the trial court did not abuse its discretion in limiting cross-examination of Jeremy Beard about his alleged sexual history with the victim.

> FN10 Because we conclude that the evidence was inadmissible under Rules 401 and 403, we need not determine whether the statements attributed to Jeremy were inadmissible hearsay. However, we note that, contrary to the State's assertion, Powers did not suggest that Rules 401 and 403, standing alone, are sufficient bases upon which to determine the admissibility of third-party defense evidence. Rather, admissibility is governed by all the Rules of Evidence, including the rule against hearsay.

As we noted in Powers, an evidentiary ruling ordinarily does not rise to the level of a constitutional violation. 101 S.W.3d at 397. In determining whether the constitutional right to present a defense has been violated by the exclusion of evidence, a court should consider whether: 1) the excluded evidence is critical to the defense; 2) the excluded evidence bears sufficient indicia of reliability; and 3) the interest supporting the exclusion is substantially important. Id.; see Chambers v. Mississippi, 410 U.S. 284 (1973). In Chambers, the defendant was precluded from introducing evidence that another person had confessed to the crime. Rogers'

proffered evidence concerning Jeremy Beard's alleged sexual activity with the victim lacks sufficient indicia of reliability and falls far short of the type of critical evidence considered in <u>Chambers</u>. We further hold, therefore, that even if exclusion of the evidence constituted error, it would not amount to a constitutional violation. Moreover, we are convinced that, even if a constitutional harmless error standard were applicable, any error would be harmless beyond a reasonable doubt in light of the overwhelming evidence of Rogers' guilt.

Rogers also contends that the trial court erred in excluding testimony and evidence of a letter written by Jeremy Beard asking Quinton Donaldson to kidnap and rape him. In denying the motion for a new trial, the trial court concluded that the Donaldson letter was inadmissible as irrelevant. FN11 The letter was sent in January 1997, approximately two months after the victim's body was discovered. Upon receiving the letter, Donaldson contacted the authorities, who then questioned Jeremy about it. The written record of that interview reflects that Jeremy heard Donaldson's name from his mother, Mrs. Meyer, and sent the letter because he was angry at his parents. We agree that the letter was irrelevant under Tennessee Rule of Evidence 401. The letter does not have any tendency to make the assertion that Donaldson was involved in the victim's disappearance and murder more probable. Therefore, we conclude that the trial court did not abuse its discretion in limiting cross-examination of Jeremy Beard about the Donaldson letter. We further conclude that any error, constitutional or otherwise, from excluding this evidence would be harmless.

> FN11 The trial court also ruled that Rogers waived any argument concerning admissibility of the evidence concerning Jeremy's relationship with the man from the internet chat room because Rogers did not raise the issue at trial. Rogers has presented no argument in this Court regarding that issue.

Finally, Rogers argues that the limitation on cross-examination of Jeremy Beard deprived him of a constitutionally reliable sentencing determination. First, he asserts that the absence of evidence that Jeremy might have been the source of the semen "necessarily impacted" the sentence because two of the aggravating circumstances depended upon a finding that Rogers had committed or attempted to commit rape and lingering doubt that Rogers' was guilty of rape would be a mitigating circumstance. Second, he contends that the lack of evidence regarding Jeremy's history of sexual abuse prevented a proper evaluation of Mrs. Meyer's victim impact testimony which implied that Jeremy had no psychological and emotional problems before his sister's murder. Rogers did not present either argument at the sentencing hearing. Furthermore, because we have concluded that the trial court erred in supplementing the appellate record with Jeremy's mental health and social services records, these assertions are not supported by any evidence properly before us. Moreover, even if these records had been offered as evidence, any error as a result of limiting cross-examination about them would be harmless beyond a reasonable doubt as to sentencing in light of the overwhelming

evidence supporting the aggravating circumstances.

State v. Rogers, 188 S.W.3d 593, 608–09, 611–15 (Tenn. 2006).

Respondent moves for summary judgment on the basis that this disposition of Petitioner's claim by the state court was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. (Doc. No. 94 at 201–05; Doc. No. 134 at 86–90.) In his response, Petitioner acknowledges that his claim is "controlled directly by Chambers," just as the state court indicated. (Doc. No. 111 at 427.) But he argues that the state court's decision was either contrary to or an unreasonable application of Chambers. (Doc. No. 111 at 428.)

In Chambers, Gabe McDonald, a friend of the defendant's, met with the defendant's lawyers and gave a sworn confession that he had shot the police officer for whose murder the defendant was being prosecuted. Chambers, 410 U.S. at 287. The statement included a description of the weapon McDonald claimed to have used and identified another friend to whom McDonald said he had confessed. Id. McDonald later recanted his confession and was never prosecuted for the officer's murder. Id. at 288. At Chambers' trial, there were conflicting eyewitness accounts of whether Chambers had shot the officer, and Chambers was allowed to present testimony from other witnesses about seeing McDonald shoot the officer and seeing McDonald holding a pistol immediately after the shooting. Id. at 289. He was also allowed to call McDonald as a witness, lay "a predicate for the introduction of his sworn out-of-court confession, had it admitted into evidence, and read it to the jury." Id. at 291. But on cross-examination, McDonald testified that he was not involved in the shooting and that he had recanted his confession, and gave a plausible explanation for why he had falsely confessed. Id. The trial court then ruled that Chambers' counsel could not re-examine McDonald as an adverse witness, and ruled that testimony from three other witnesses about three separate occasions on which McDonald confessed to the crime was

inadmissible hearsay. Id. at 291–93.

The Supreme Court observed that McDonald's testimony was clearly adverse to the defendant's:

> The State's proof at trial excluded the theory that more than one person participated in the shooting of Liberty. To the extent that McDonald's sworn confession tended to incriminate him, it tended also to exculpate Chambers. And, in the circumstances of this case, McDonald's retraction inculpated Chambers to the same extent that it exculpated McDonald.

Chambers, 410 U.S. at 297. Accordingly, the Court held that in not allowing Chambers to cross-examine McDonald as an adverse witness—not allowing him "to test the witness' recollection, to probe into the details of his alibi, or to 'sift' his conscience so that the jury might judge for itself whether McDonald's testimony was worthy of belief"—the trial court's ruling had "plainly interfered with Chambers' right to defend against the State's charges." Id. at 295, 298.

The Court expressly did not decide that such interference alone warranted reversal of Chambers' conviction, but shifted its focus to the trial court's refusal to let Chambers call his other witnesses to testify about McDonald's verbal confessions to them. Chambers, 410 U.S. at 298. It observed that McDonald's confessions were made spontaneously shortly after the murder and were corroborated by his sworn confession, eyewitness testimony, and proof that he had owned a gun of the same type that was used in the murder. Id. at 300. The confessions were also "in a very real sense self-incriminatory and unquestionably against interest," because McDonald had nothing to gain from his verbal confessions and was risking disclosure and prosecution. Id. at 301. Accordingly, the Court determined that the circumstances of the hearsay confessions "provided considerable assurance of their reliability." Id. at 300. Coupled with the refusal to allow adverse cross-examination of McDonald, the exclusion of this testimony that "bore persuasive assurances of trustworthiness" and "was critical to Chambers' defense," violated the defendant's

constitutional right to due process. Id. at 302.

The excluded evidence in Petitioner's case is very different in several respects that are material to its reliability. First, Jeremy's reports of sexual activity with his sister were not made by a grown man in control of his faculties. They were made by a 13-year-old boy known to be suffering from mental illness. Second, the reports in question were not made close in time to the events reported. Jeremy's statements about past sexual behavior with his sister were made in February 1997, seven months after his sister's July 1996 murder. More importantly, they related activity compelled by the children's father, whom Jeremy had not seen since April 1991, more than five years before Jackie disappeared and almost six years before Jeremy reported it. (Doc. No. 25-4 at 215–16.) Petitioner argues repeatedly that Jeremy had an ongoing sexual relationship with his sister until her death,[22] but not a single piece of evidence in the state record supports that claim. At the time of the trial, Jeremy did not even recall having made the reports, and was never even asked whether the reports were true or whether or when he had ever engaged in any sexual activity with his sister. (Doc. No. 24-5 at 47–62.) Finally, it is not even clear that Jeremy's 1997 reports could be considered statements against his interest. They referenced events occurring when he was at most seven years old. Even assuming they were accurate, they were not confessions to a crime; they were statements of a child to a parent and mental health providers that he had been the victim of sexual abuse perpetrated by his father. Jeremy made the reports to his mother and mental health professionals, all of whom had an interest in his well-being. Unlike McDonald in

---

[22] See Doc. No. 111 at 420 ("It was known that Jeremy had been having sex with Jackie for years before her death[.]"), 421 ("there is clear documentation that Jeremy admitted that he and Jackie had sex, had done so for years"), 423 ("Jeremy started having sex with Jackie at least five (5) years before Jackie's death.").

Chambers, therefore, Jeremy had no reason to fear disclosure or prosecution for any crime.[23]

Petitioner argues that Jeremy's 1997 reports should be deemed reliable because his mother considered them "to be highly credible and truthful," as evidenced by her relaying them to mental health providers. (Doc. No. 111 at 424.) But one could as easily argue that a concerned parent would have considered Jeremy's reports to be significant to his mental health treatment regardless of whether she believed them to be true or to indicate delusional thinking. And his mother's actual testimony during a jury-out session at trial was that she had passed along the report to mental health providers "[t]o see if he really had or, you know, if he was telling the truth." (Doc. No. 25-4 at 213.) She was never asked whether she believed the report or had ever witnessed anything that would corroborate it. (Id.)

The lack of "persuasive assurances of trustworthiness," which were material to the outcome in Chambers, is not the only thing that distinguishes this case from Chambers. The lapse of five years and three months—at the minimum—between the reported sexual activity and the victim's death also greatly diminishes any "critical" value of the reports to the defense. Jeremy did not

---

[23] Because these claims are exhausted, the Court's review is confined to the state court record. However, even if Petitioner's newly submitted evidence were considered, it only supports the state court's determination. The records, which the state supreme court did not consider, confirm that at the time Jeremy made the reports he was suffering from mental health problems, exhibiting irrational, disturbing behavior, and was "obviously and understandably stunned and overwhelmed" by grief over his sister's death. (Doc. No. 81-10 at 6.) He acknowledged that he was suicidal and having hallucinations, and was deemed to be a significant risk to himself. (Doc. No. 81-9.) His diagnoses at the time included post-traumatic stress disorder and major depression. (Doc. No. 81-11 at 3.) The records also confirm the number of years that elapsed between his last contact with his father and his sister's disappearance (Doc. No. 81-8 at 2 ("Ct. reportedly has had 0 contact with his biological father in 7 years.")), and make very clear that the father was present for the reported sexual activity (Doc. No. 81-8 at 2 ("fr. *made* ct. and sister have sexual interactions and then fr. *would observe* them"); Doc. No. 81-9 at 2 (father "had *made* him perpetrate sexual acts against his sister *while he watched* them"); Doc. No. 81-11 at 2 (disclosed to mother "that his biological father had taught him how to have sex with his sister and that his *father watched* while he had sex with his sister") (emphases added).) Finally, the records establish that Jeremy repeatedly recanted the reports within days of making them. (Doc. No. 81-10 at 5; Doc. No. 81-11 at 6.)

confess to the July 1996 crimes for which Petitioner was on trial, and his reports did not have nearly the same level of significance to the case as McDonald's confessions did in <u>Chambers</u>.

In light of all of these material differences in the facts, the state court's determination was clearly not "contrary to" <u>Chambers</u> for AEDPA's purposes. <u>See</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 412–13 (2000) (holding that a state court decision only fails this test "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts"). Petitioner can only prevail, therefore, by establishing that the state court's ruling was an "unreasonable application" of <u>Chambers</u>, meaning that the state court unreasonably refused to extend <u>Chambers</u> to a new circumstance in which it should apply. <u>Williams</u>, 529 U.S. at 413. Petitioner attempts to demonstrate that the Tennessee Supreme Court's ruling was unreasonable by comparing it to rulings in three other cases.

First, Petitioner argues that <u>House v. Bell</u>, 547 U.S. 518 (2006), establishes that "proof that Jeremy was the victim's sex partner was likewise highly relevant to whether Rogers was guilty or whether, instead, Jeremy 'could have been the murderer.'" (Doc. No. 111 at 425.) But new proof of another sex partner was not the issue in <u>House</u>, where it was obvious at the time of trial that the alternative suspect—the victim's husband—had been her sex partner. The newly presented "substantial evidence pointing to a different suspect" in <u>House</u> included DNA evidence establishing that the semen found on the victim's clothing when her body was discovered was her husband's (and not, as suggested by the evidence at trial, the defendant's), coupled with several verbal confessions by her husband to having killed her. <u>House</u>, 547 U.S. at 540–41, 549–50, 554. There is no such DNA evidence or confession in this case tying Jeremy to the semen on the victim's clothing or to her murder. Reports of Jeremy or anyone else engaging in sexual activity with Jackie

years before her death simply does not rise to that level.

Next, Petitioner relies on <u>Kubsch v. Neal</u>, 838 F.3d 845 (7th Cir. 2016), which involved an eyewitness statement, given four days after a multiple homicide, that two of the murder victims were alive at a time that made the prosecution's timeline for the defendant to commit the murders impossible, and <u>Lunberry v. Hornbeak</u>, 605 F.3d 754 (9th Cir. 2010), which involved a hearsay statement, made shortly after a murder, that partners of the declarant (who died before trial) had committed the murder for which the defendant was convicted. (Doc. No. 111 at 428.)  The statements in both cases were timely and went directly to whether the defendants had committed the murders in question.  By contrast, Jeremy's reports in this case were made months after his sister's death, pertained to events many years before her death, and had no direct connection with her murder whatsoever.

Faced with these materially different circumstances, it was not unreasonable for the state court to reach a different result in its application of <u>Chambers</u>.  Petitioner is not entitled to relief on this claim.  The Court believes this outcome is dictated by the applicable federal law and by the deference owed to the state court in applying it.

The Court recognizes, however, that the theory that rape was the motivation for the victim's abduction and murder was likely significant to the outcome of Petitioner's case, and that the exclusion of this evidence was a damaging blow to Petitioner's efforts to refute that theory or to contest the source of the semen at trial.  Accordingly, reasonable jurists might debate whether this issue warrants further consideration.  The Court will therefore grant a certificate of appealability on these claims.

11. Claims D.40, D.41, F.5 — Counsel's Handling of the Jeremy Claims

Petitioner alleges that counsel was ineffective because: "Counsel [at trial] failed to

introduce the DHS/DCS [Department of Human Services/Department of Children's Services] records for Jeremy Beard, the victim's brother, into evidence" (D.40); "Counsel [at trial] failed to make an offer of proof of Jeremy Beard's prior statements regarding his sexual contact with the victim" (D.41); "Counsel [on motion for new trial and on appeal] failed to introduce the DHS/DCS records for Jeremy Beard, the victim's brother, into evidence, thereby precluding appellate review." (F.5) (Doc. No. 14 at 42, 50.)  Some background about Petitioner's direct appeal is relevant to these claims.  As discussed in greater detail above, the trial court prohibited Petitioner's counsel from introducing or questioning the victim's brother about DHS/DCS records that included reports of deviant behavior, including prior sexual relations with the victim.  When Petitioner appealed the trial court's exclusion of the evidence, the Tennessee Supreme Court refused to consider the records themselves, because they had not been properly included in the record on appeal. State v. Rogers, 188 S.W.3d 593, 610–11 (Tenn. 2006).  However, it went on to rule on the merits of Petitioner's claim, based on the jury-out examinations of both the brother and the mother. Id. at 611–15.

In post-conviction proceedings, Petitioner raised the claim that his counsel were ineffective in connection with the failure to introduce the records or make an offer of proof about the reports of the brother's sexual contact with the victim. (Doc. No. 26-14 at 5.)  The Tennessee Court of Criminal Appeals summarized the relevant testimony and background and rejected his claim:

> Converse testified that part of the defense theory at trial was that the source of the semen found in the victim's shorts was possibly the victim's older brother or Quinton Donaldson, a friend of the Petitioner's who was considered a suspect by law enforcement early in the investigation. Converse stated that, in order to support the possibility that the victim's older brother was the source, the defense attempted to get before the jury some Department of Children's Services (DCS)/Department of Human Services (DHS) records in which there was a statement from Jeremy Beard "to the effect that his father—natural father, had taught him—something about taught him how to have sex with his sister or something to that effect." Converse testified that the statements were made "to some sort of case worker or

something along that line." Converse admitted that the defense tried to get these records introduced into evidence at the Petitioner's trial, but that the trial court ruled that they were inadmissible. Converse also testified that the trial court's decision not to allow the records to be presented to the jury was raised as an issue in the Petitioner's direct appeal. However, Converse admitted that there was a problem with the appellate issue because the records had never been made part of an offer of proof at trial.

Post-conviction counsel then introduced under seal through Converse excerpts from the DCS/DHS record on Jeremy Beard that defense counsel attempted to have introduced during the Petitioner's trial. A review of these documents makes clear that they are from treatment Beard received in 1997, after the victim's death. These records contain statements from Jeannie Meyer, the victim's and Jeremy's mother, indicating that Jeremy Beard "was close to his sister," that Jeannie Meyer divorced the children's biological father after "the DHS investigated physical abuse reported by the children," and that Jeremy's medical file indicated that his biological father taught him "how to have sex with his sister and that his dad watched while he had sex with his sister (who died 8 months ago)." The records contain the following excerpts from a February 1997 psychological evaluation of Jeremy:

> Jeremy maintained that he experiences guilt related to his sister's death, "I didn't go over that day," "I didn't go with her" (he did not explain the actual events that led up to his sister's death, but he is apparently referring to him not being with her and being unable to prevent the murder). He said that if he had went with his sister, he could have possibly prevented her death, but when asked how he could have done that, he replied "I don't know." As one might expect, Jeremy is experiencing extensive difficulty trusting others and is particularly suspicious of others' motives.

> Information contained within Jeremy's medical file suggested that he has allegedly sexually acted-out with his sister and others. Jeremy was asked if he has ever sexually acted-out to which he responded (after a long pause), "I don't know." . . . When asked if he ever sexually acted-out with Jackie (sister), he said "No"; when asked if he can be trusted, he replied "Yeah." Jeremy was asked if he has experienced sexual abuse to which he answered "No."

The records also contain the following excerpts from a psychological evaluation of Jeremy in March of 1997:

> According to Mrs. Meyer, Jeremy has disclosed to the family therapist, Vonda St. Amant, that Mr. Beard taught Jeremy "how to have sex with his little sister, Jackie." It has not been determined if any inappropriate activity occurred between Jeremy and Jackie, although it is suspected based on what Jeremy disclosed. Mrs. Meyer continued to say that on one other occasion, Jeremy told her his father physically and sexually abused him. Jeremy refuses to discuss this issue any further when it is brought into the open.

. . .

With regard to Trial Counsel's alleged failure to proffer the DCS records as an exhibit during the jury-out hearing at trial, the post-conviction court determined that Trial Counsel had made an offer of proof in the form of testimony from the victim's mother concerning the substance of the statements attributable to Jeremy Beard as reflected in the DCS records. As such, the post-conviction court concluded that the Petitioner could not prove prejudice to the outcome of his case resulting from the asserted deficiency in Trial Counsel's performance in not proffering the DCS records containing the same statements from Jeremy Beard.

The record supports the post-conviction court's conclusion in this regard. As the supreme court noted in its opinion in the Petitioner's direct appeal, the Petitioner proffered testimony from Jeannie Meyer during a jury-out hearing concerning the statements Jeremy Beard had made to her, which in turn she had reported to medical personnel as reflected in the DCS records. See Rogers, 188 S.W.3d at 609 n.5. Therefore, when the supreme court concluded on direct appeal that evidence from Jeremy Beard confirming that he had made the statements "would not establish that Jeremy had actually had sex with the victim versus simply reporting that he had," id. at 613, the supreme court had before it the proffer of Jeannie Meyer's testimony concerning the substance of the statements, see id. at 609 n.5, even though it declined to consider as having been improperly included in the record on appeal the DCS records which also included the statement. See id. at 611. As such, as the post-conviction court concluded, there is no reasonable probability that the outcome of the Petitioner's direct appeal would have been different had the records themselves been proffered. Accordingly, this entire issue is without merit.

Rogers v. State, No. M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *26–27, 58 (Tenn. Crim. App. Aug. 30, 2012). Respondent argues that the state court's determination of this claim was reasonable. (Doc. No. 94 at 171–72, 185–86; Doc. No. 134 at 53.)

Petitioner's response addresses Claims D.40 and D.41 along with sixteen others he characterizes as his "meritorious new claims" and does not discuss or identify any error in the state court's determination. (Doc. No. 111 at 2–3, 346–51; Doc. No. 130 at 2–3, 346–51.) Specifically, Petitioner does not dispute the conclusion that he was not prejudiced by the omission from the record of additional evidence of the brother's previous statements because there was already testimony in the record about the same facts.

The Court cannot find any substantive discussion of Claim F.5 in Petitioner's response. In the portion of his response addressing Claims F.3–F.8 collectively, only a single clause of a single

sentence might constitute a vague reference to this claim: "With respect to the Amended New Trial Motion and the issues on direct appeal, Mehler acknowledges that among other things, he . . . did not conduct adequate research or properly complete the record with information or evidence presented at trial or seek to supplement the record with new evidence that needed to be included in support of claims presented in the new trial motion and in the record on direct appeal." (Doc. No. 111 at 372–73.) This argument fails for two reasons: (1) Mehler's "acknowledgment" is outside the record that was before the state court when it reviewed this claim and is therefore barred from consideration by <u>Pinholster</u>;[24] and (2) Petitioner's argument does not raise any flaws in the state court's disposition of the claim.

In a separate section of his Response devoted to seventeen other claims, Petitioner asserts that "[a]t a minimum, counsel should have submitted Jeremy Beard's DCS/DHS records into evidence via ***an offer of proof at trial for the jury's consideration***." (Doc. No. 111 at 349 (emphasis added).) He argues that "[h]ad counsel ***presented this evidence to the jury*** – that Jeremy had sexual contact with his sister and that Jeremy was the person who deposited semen on her shorts – there is little question that the jury would have had reasonable doubt about Glenn Rogers' guilt." (<u>Id.</u> (emphasis added).) But counsel attempted and were prohibited by the trial court from presenting the records to the jury, which is a completely separate issue from whether placing the documents in the record as an offer of proof for appellate purposes would have had any likelihood of affecting the outcome on appeal. The Tennessee Court of Criminal Appeals ruled on post-conviction that there was "no reasonable probability" of such a result, and Petitioner does not make

---

[24] Treating Claim F.5 as a separate, unexhausted claim pertaining only to the failure to introduce the records as an exhibit to the motion for new trial would not benefit Petitioner. Even assuming (without deciding) that such a defaulted claim could be reviewed pursuant to <u>Martinez</u>, Petitioner's failure to establish any prejudice with regard to Claims D.40 and D.41 applies equally to this claim.

any effort to demonstrate that that ruling was unreasonable.

This Court easily concludes that counsel's failure to introduce the excluded records as an offer of proof so they could be reviewed on appeal was objectively deficient. But the state court ruled that Petitioner was not prejudiced by that omission, because the substance of the information in the records was presented through the jury-out testimony of the victim's mother and was considered on direct appeal. That ruling is not an unreasonable application of <u>Strickland</u> or an unreasonable determination of fact. To the contrary, as the Court noted in its preceding analysis, the records in question supported the state supreme court's ruling on direct appeal. Petitioner is not entitled to relief on these claims.

12. Claims D.42, D.44, E.15, E.16 — Collected Ineffective-Assistance Claims.

The Tennessee Court of Criminal Appeals rejected many of Petitioner's ineffective-assistance-of-trial-counsel claims on the basis that he had not offered trial counsel's testimony about his performance or strategy in connection with the claims. That ruling included claims raised in the instant action that counsel was ineffective for: failing to object to "improper demeanor evidence" (Claim D.42) (Doc. No. 14 at 42); conceding Petitioner's involvement in the crimes during closing argument of sentencing hearing (Claim D.44) (Doc. No. 14 at 42); and failing to review Dr. William Bernet's report and therefore failing to move in limine or object to his testimony that Petitioner is a pedophile (Claims E.15 and E.16) (Doc. No. 14 at 47). The state court found that Petitioner had failed to establish ineffectiveness in connection with these and other claims:

> In his fourth issue on appeal, the Petitioner argues that the post-conviction court erred in denying his claims that Trial Counsel provided constitutionally ineffective assistance during the course of trial. Specifically, the Petitioner alleges that Trial Counsel: (1) failed to object to the trial court's statement to prospective jurors during jury selection to the effect that a finding of not guilty as to the murder counts would result in no sentencing hearing; (2) failed to object to the victim impact

testimony presented by the State at sentencing as unduly prejudicial; (3) failed to object to and move for a mistrial based upon the State's tactic of posing speaking objections in the presence of the jury; (4) failed to object to and move for a mistrial based upon the State's asking leading questions of its own witnesses; (5) failed to object to and move for a mistrial based upon the State's mischaracterization of the Petitioner's statement to law enforcement as a "confession to murder"; (6) failed to object to the State's presenting improper evidence from the nurse who drew Petitioner's blood for forensic testing prior to trial concerning the Petitioner's demeanor as being "upbeat" and "joking" [Claim D.42]; (7) conceded the Petitioner's involvement in the crimes during closing argument at sentencing [Claim D.44]; (8) failed to object with sufficient legal argument to the admissibility of the pedophilia propensity testimony presented by Dr. William Bernet [Claims E.15 and E.16]; (9) failed to proffer as an exhibit during the jury-out hearing at trial the DCS records documenting that the victim's brother, Jeremy Beard, had told psychologists approximately six to twelve months after the victim's disappearance that his biological father had some years earlier "taught him to have sex with his sister"; (10) failed to utilize the DCS records pertaining to Jeremy Beard during cross-examination of the victim's mother, Jeannie Meyer, at sentencing when she attributed Jeremy's mental health problems entirely to the victim's disappearance and death; and (11) failed to object to certain irrelevant and inconclusive evidence and testimony introduced by the State at trial.

The post-conviction court denied all but one of these claims, in part, because the Petitioner failed to question attorney Converse regarding these claims and thereby present any evidence in support of these claims. The record supports the post-conviction court's findings in this regard. Converse did not testify at the post-conviction hearing about any of the specific acts or omissions identified in this issue and alleged by the Petitioner in support of his claims that Trial Counsel's trial performance amounted to ineffective assistance. We recognize that Converse was questioned generally at the hearing regarding his belief in the overwhelming guilt of the Petitioner and about Dr. William Bernet's conclusion that the Petitioner had pedophilic tendencies. However, the Petitioner never asked Converse why he conceded the Petitioner's involvement in the crimes during closing argument at sentencing and never asked Converse to elaborate on his thought process regarding the objection he made to Dr. Bernet's pedophilia propensity testimony at sentencing. In short, the Petitioner has failed to overcome the strong presumption that Trial Counsel's performance as to these matters was the result of a strategic or tactical decision and has therefore failed to establish deficient performance as to these allegations. See Gdongalay P. Berry, 366 S.W.3d 160, 2011 WL 5326280, at *8.

Rogers v. State, No. M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *57–58 (Tenn. Crim. App. Aug. 30, 2012). Respondent moves for summary judgment on these claims on the basis that this determination was not unreasonable. (Doc. No. 94 at 173, 180.)

In Petitioner's response, his discussion of Claim D.42, about demeanor evidence, is subsumed by a separate claim that "defense counsel were ineffective during closing argument." (Doc. No. 111 at 359–62.)  The Response does not discuss the actual evidence referenced in Claim D.42 or the state court's analysis in rejecting the claim about counsel's failure to object to the evidence.  Accordingly, Petitioner has failed to establish that there was anything unreasonable about the state court's determination, and Respondent is entitled to summary judgment on this claim.

Similarly, Claim D.44 is nominally addressed along with sixteen other claims Petitioner's response groups together concerning counsel's alleged failure "to conduct adequate voir dire." (Doc. No. 111 at 222–49.)  But Petitioner does not address counsel's closing argument concession anywhere in this discussion, and limits his critique of the state court's ruling to the separate portion "affirming the dismissal of the IATC claims relating to voir dire." (Doc. No. 111 at 244 and n.1230.)  Because Petitioner has failed to establish that the state court's ruling on this claim was unreasonable and effectively failed to respond to Respondent's motion with respect to this claim, Respondent is entitled to judgment on Claim D.44.

Petitioner does discuss Claims E.15 and E.16 in his response, but he does not address the state court's disposition of these claims; instead, he categorizes them as newly presented claims subject to review pursuant to an exception to the procedural default bar. (Doc. No. 111 at 2–3, 331–34.)  Consequently, Petitioner does not identify any unreasonable error in the state court's determination.  His chief complaint seems to be that Dr. Bernet's pedophilia opinion was based on information that had been ruled inadmissible, but there is no federal constitutional requirement that expert opinions be based only on admissible evidence. See Taylor v. Invacare Corp., 64 F. App'x 516, 522 (6th Cir. 2003)  (quoting Fed. R. Evid. 703 on the point that "the facts or data

need not be admissible in evidence in order for the opinion or inference to be admitted").[25]

Moreover, in addition to the lack of evidence cited by the state court, its rejection of these claims is supported by the fact that Petitioner's trial counsel did, in fact, file a motion in limine before the sentencing hearing began, seeking to exclude Dr. Bernet's testimony about pedophilia. (Doc. No. 24-5 at 44–47.) The motion discussed Dr. Bernet's report in detail. It complained that the report "raises the specter of 'pedophilia,'" which was "a horribly prejudicial term," and argued that Dr. Bernet's "unsupported, unreliable and prejudicial accusations" would mislead the jury in violation of his right to a fair hearing. (Doc. No. 24-5 at 46.) The trial court denied that motion. (Doc. No. 25-13 at 7–9.) Accordingly, the state court record establishes that Petitioner's claims that counsel had failed to review Dr. Bernet's report or failed to move that his opinion about pedophilia be excluded are without merit.

It is not unreasonable for a state court to reject ineffective-assistance claims where the petitioner did not present evidence to support them. See Dorsey v. Steele, No. 4:08-CV-2005 CEJ, 2012 WL 966818, at *6 (E.D. Mo. Mar. 21, 2012) (state court decision that petitioner had failed to present evidence of ineffective assistance where "petitioner did not ask trial counsel during his post-conviction evidentiary hearing why he did not object" to certain testimony was reasonable). Courts reviewing ineffective-assistance claims "will not presume deficient performance based on

---

[25] Petitioner also insists repeatedly that the historical reports of his sexually abusing other minors, which contributed to Dr. Bernet's diagnosis of pedophilia, were "false" or "unsubstantiated" and that he had been "falsely accused." (Doc. No. 111 at 316, 332.) In support of that theory, he submits new evidence, which the Court may not consider in connection with these exhausted claims. But even if the evidence were properly before the Court, it simply does not prove Petitioner's point. Dr. Bernet relied on explicit details reported to him about multiple instances of Petitioner's sexual abuse of three different young victims. (Doc. No. 124-16 at 7–8.) Petitioner's evidence that one of those victims was ultimately found to have been molested by two other men and apparently gave inconsistent accounts of whether Petitioner was involved (Doc. Nos. 124-17–124-20) does not even call into question the accounts of the other two victims.

a silent record because we presume counsel made reasonable strategic choices unless the defendant presents evidence rebutting that presumption." United States v. Traeger, 289 F.3d 461, 472 (7th Cir. 2002) (citing Strickland, 466 U.S. at 689–90). Accordingly, Petitioner is not entitled to relief on these claims.

### 13. Claim D.43 — Failure to Object During Guilt-Phase Closing

Petitioner alleges that counsel failed to object to improper closing argument by the prosecutor at the guilt/innocence stage of trial. (Doc. No. 14 at 42.) The state courts rejected this claim during post-conviction proceedings:

> The Petitioner also includes in this claim that Trial Counsel was ineffective in failing to object to improper remarks by the prosecution during opening statements and closing arguments. The post-conviction court determined that the prosecution did make some improper comments, to which Trial Counsel did not object. The post-conviction court concluded that Trial Counsel's performance was deficient in this regard but that the Petitioner had failed to establish prejudice. We agree with the post-conviction court's determinations in this regard.

Rogers v. State, No. M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *59 n.8 (Tenn. Crim. App. Aug. 30, 2012). The post-conviction court's determination, which the Tennessee Court of Criminal Appeals effectively adopted, addressed the claim in greater detail:

> The petitioner identifies numerous examples of what he considers inappropriate comments during the State's closing argument during the guilt/innocence phase, including: (1) references to the "little" victim; (2) vouching for the State's witnesses; (3) describing the petitioner as "confident," "cocky," and "arrogant"; (4) statements that the petitioner was inclined to offer "half-truths" and "lies" and that a diagram the petitioner included with one of his written statements to police was "ridiculous"; (5) describing the victim's mother identifying the victim's clothing as "powerful" evidence; (6) making improper comments regarding the petitioner supposedly pointing the finger of blame at the victim's mother and Quinton Donaldson; (7) arguing facts not in evidence regarding tobacco harvesting; (8) improper arguments regarding the law and facts; (9) improper reference to the victim not testifying; and (10) comments that the defense was a "smokescreen" to confuse the jury.
>
> In reviewing the record, the Court notes that the State did make several improper comments during its closing statement. For example, the State's comment that the petitioner's claim that he had been in a tobacco field was untrue because tobacco is

not harvested in July improperly referenced facts not in evidence, as there was no testimony introduced at trial regarding the tobacco harvest. Also, it is well established that the State may not use epithets to characterize a defendant, see generally State v. Thomas, 158 S.W.3d 361, 414 (Tenn. 2005), so the State's describing the petitioner as "arrogant" and "cocky" was improper.

The petitioner identifies three instances in which the State vouched for the credibility of its witnesses. In one instance, Mr. Baker said that FBI Agent Steven Hooker "did a good job on the stand." In another, Mr. Baker said that TBI agent J. Russell Davis was a "good guy" and "honest as the day is long[.]" Finally, Mr. Baker told the jury, "think about how powerful Juanita [Rogers] was. Do you think she's going to get up here lie and perjure herself, subject herself to possibl[y] going to prison herself just because she wants a divorce?" Such comments were improper, given that a prosecuting attorney may not vouch for the credibility of State's witnesses. See Goltz. 111 S.W.3d at 7.

Regarding the petitioner's assertions that the State's references to the petitioner telling "lies" and "half-truths" were improper, the Court notes that generally, "A lawyer should not assert his personal opinion as to the credibility of a witness, or as to the guilt or innocence of the accused." Lackey v. State, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); see also Goltz, 111 S.W.3d at 6. However, remarks of counsel referencing "lying" defendants may be permissible if based upon evidence in the record. See State v. West, 767 S.W.2d 3 87, 394 (Tenn. 1989); State v. Beasley, 536 S.W.2d 328, 330 (Tenn. 1976). Applying these principles to the instant case, Mr. Baker's comments that the petitioner was prone to offering "lies" and "half-truths" was improper, but his references to several factual instances in which the petitioner lied and changed his story to police were permissible in that they were based upon evidence produced at trial.

Finally, the Tennessee Supreme Court has held that an argument in which the prosecuting attorney told the jury "that defense counsel was 'trying to throw sand in the eyes of the jury' and 'blowing smoke in the face of the jury'["] was improper. West, 767 S.W.2d at 395. Similarly, the [sic] Mr. Baker's comments that the defense strategy was a "smokescreen" designed to confuse the jury was improper.

However, to any extent that trial counsel were deficient for not objecting to these and other objectionable portions of the State's closing argument, counsel's decision did not prejudice the petitioner. Mr. Baker's lengthy closing argument on behalf of the State was not composed exclusively of inflammatory or otherwise improper statements. In fact, most of the State's argument was temperate and focused on the facts of the case, as is required. Furthermore, Mr. Converse was not asked about the State's guilt phase closing argument during the evidentiary hearing, so this Court can only speculate as to why trial counsel did not object during the State's closing argument. If Mr. Converse's strategy represented a trial tactic, this Court cannot second-guess that strategy. Thus, the petitioner has not established that trial counsel rendered ineffective assistance by not objecting to the State's guilt/innocence phase closing argument.

(Doc. No. 26-8 at 149–52.) Respondent argues that the determination of this claim in state court

was not unreasonable. (Doc. No. 94 at 173–74.)

In his response, Petitioner confines his discussion of this claim to an argument of the merits with regard to the prosecutor's improper characterizations of Petitioner and vouching for the credibility of prosecution witnesses.[26] (Doc. No. 111 at 359–62.) Incorrectly including this argument under his heading about "meritorious new claims," Petitioner fails to discuss or establish any unreasonable error in the state court's determination that he was not prejudiced by counsel's failure to object to these comments, or that counsel's decision not to object during closing could have been strategic.

Petitioner relies on Hodge v. Hurley, 426 F.3d 368 (6th Cir. 2005), in support of his argument for relief, but a court of appeals decision is not "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), and therefore "cannot form the basis for habeas relief under AEDPA." Parker v. Matthews, 567 U.S. 37, 48–49 (2012). Moreover, a careful reading of Hodge does not support Petitioner's position. Petitioner is correct that the Sixth Circuit found in Hodge that counsel's failure to object to improper argument that attacked the defendant's credibility and bolstered another witness's credibility was reasonably likely to have affected the jury's verdict. Hodge, 426 F.3d at 387. But it did so for reasons that are not present in this case. In Hodge, the testimony of the complaining witness was "the only evidence sufficient to sustain a conviction," and the outcome of the case "depended primarily on the jury's determination of whether Hodge—who took the stand in his own defense— was more or less credible than his ex-girlfriend, Fenn, who testified against him." Id. at 371, 386–

---

[26] Even if Petitioner had continued to press a claim about the prosecutor's use of allegedly improper descriptors regarding the victim, the trial transcript indicates that counsel was conscious of the prosecutor's use of such language to "push [the jury's] emotion button," and strategically chose not to object. (Doc. No. 25-3 at 57.)

87.  The court expressly explained that it only found the state court's rejection of the ineffective-assistance claim unreasonable because the trial outcome "depended almost entirely" on the jury's credibility assessment, and cautioned that "it might be a reasonable application of <u>Strickland</u> for a state court to hold that statements such as these were not prejudicial in a case involving stronger evidence of guilt." <u>Id.</u> at 388–89.  It noted:

> Our conclusion that the state court's application of <u>Strickland</u> was unreasonable, rather than merely incorrect, is driven by the extremely close nature of the credibility determination that was the key issue in this case. Had there been any basis, other than Fenn's eyewitness testimony, upon which a reasonable jury could have found Hodge guilty, we would be more hesitant to conclude that the state court's application of <u>Strickland</u> was unreasonable.

<u>Id.</u> at 388 n.28.

Petitioner's case, in contrast, did not depend on the credibility of any single witness and did not depend exclusively on eyewitness testimony at all; fiber evidence and Petitioner's own admission that the victim had been in his car the day she disappeared also tied him to the crimes. While the prosecutor's characterizations of Petitioner were improper, it is not likely that they did more damage to the jury's view of Petitioner's credibility than his own inconsistent versions of events did.  Thus, the improper remarks about which Petitioner complains did not bear on issues as critical to the outcome of Petitioner's case as those in <u>Hodge</u>.  Under these circumstances, the state court's rejection of this claim was not unreasonable, even if another court might have decided it differently.   Accordingly, Petitioner is not entitled to relief on this claim.

14. Claims D.45(c)–(f), E.21 — Failure to Object to Jury Instructions

In his post-conviction proceedings, Petitioner exhausted claims D.45(c)–(f) that counsel were ineffective for failing to object to the trial court's instructions to the jury defining reasonable doubt and defining "knowingly" in connection with several counts at the guilt/innocence phase of trial. (Doc. No. 14 at 43; Doc. No. 26-14 at 6.)  He also exhausted claim E.21 that counsel were

ineffective for failing to object to the following instruction given to the jury at the sentencing phase of his trial: "You can have no prejudice, or sympathy, or allow anything but the law and the evidence to have any influence upon your verdict. You must render your verdict with absolute fairness and impartiality as you think justice and truth dictate." (Doc. No. 14 at 48; Doc. No. 24-5 at 108; Doc. No. 26-14 at 116–17.)

> The state court rejected these claims:
>
> In his fifth . . . issue[] on appeal, the Petitioner argues that the post-conviction court erred in denying his claims that Trial Counsel provided constitutionally ineffective assistance by failing to object to various jury instructions given by the trial court during the Petitioner's trial . . .. Once again, the post-conviction court denied these claims, in part, because the Petitioner failed to present any testimony in support of the claims at the postconviction hearing. As the State argues in its brief, the record supports the post-conviction court's findings in this regard.
>
> During his testimony at the post-conviction hearing, Converse did not address any of the specific acts or omissions the Petitioner refers to in his briefs to this Court on these issues. Indeed, Converse was asked no questions during the post-conviction hearing about any of the jury instructions given in the Petitioner's trial. . . . Accordingly, and once again despite his arguments to the contrary, the Petitioner failed to prove any of the claims forming the basis of this issue on appeal. See Gdongalay P. Berry, 366 S.W.3d 160, 2011 WL 5326280, at *8 (rejecting claim of ineffective assistance of counsel where petitioner did not question his attorneys about the claimed deficiencies, leaving the court to speculate as to their performance). Therefore, the Petitioner is entitled to no relief on his fifth and sixth issues.

Rogers v. State, No. M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *59 (Tenn. Crim. App. Aug. 30, 2012). Respondent has moved for summary judgment on the basis that this ruling was not unreasonable. (Doc. No. 94 at 175–76, 182–83.)

Petitioner does not acknowledge or identify any error in the state court's decision. He categorizes these claims among his "meritorious new claims," and asserts that he is entitled to an evidentiary hearing pursuant to an equitable exception to the procedural default bar. (Doc. No. 111 at 2–3, 362–68, 370–71.) He has thus effectively failed to respond to Respondent's motion with regard to these claims. The state court's finding that Petitioner had failed to prove ineffective

assistance by not examining counsel about these issues is not unreasonable, see Dorsey v. Steele, No. 4:08-CV-2005 CEJ, 2012 WL 966818, at *6 (E.D. Mo. Mar. 21, 2012) (state court decision that petitioner had failed to present evidence of ineffective assistance where "petitioner did not ask trial counsel during his post-conviction evidentiary hearing why he did not object" to certain testimony was reasonable), and Petitioner is not entitled to relief on these claims.[27]

15. Claim E.20 — Failure to Object to Closing at Sentencing

Petitioner alleges that counsel were ineffective for failing to object to the following improper remarks by the prosecutor during closing argument of the sentencing phase:

(a) That Petitioner's mitigation evidence was a "list of excuses" to blame his family, schools and mental health providers;

(b) Comments about how the jury should weigh the aggravating factors against the mitigation evidence;

(c) That the entire case boiled down to Petitioner's motivation for "gratification from a nine-year-old child"; and

(d) That the death penalty was "the only reasoned, moral response to this crime . . . under Tennessee law."

(Doc. No. 14 at 47–48.)

As quoted above in connection with Claim D.43, the Tennessee Court of Criminal Appeals simply adopted the post-conviction trial court's determinations with regard to Petitioner's claims about counsel's failure to object to the prosecutor's arguments. Rogers v. State, No. M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *59 n.8 (Tenn. Crim. App. Aug. 30, 2012). The post-

---

[27] Moreover, it appears that these claims would fail even if Petitioner had questioned counsel at the post-conviction hearing about why he did not object, because the instructions were not improper. See Austin v. Bell, 126 F.3d 843, 846–47 (6th Cir. 1997) (finding nearly identical reasonable doubt instruction was constitutional); Greer v. Mitchell, 264 F.3d 663, 688 (6th Cir. 2001) ("no sympathy" instruction was constitutional in capital sentencing hearing). The lack of objection to proper instructions is not deficient performance and does not prejudice the defendant.

conviction court's determinations regarding failure to object to comments during closing at the sentencing phase were:

> [N]ot all errors in closing argument necessitate a new trial. When a prosecutor's argument goes beyond the latitude afforded, the test for determining if reversal is required is whether the improper statement was so inflammatory that it "affected the verdict to the prejudice of the defendant." Harrington, 385 S.W.2d at 759; see also State v. Gann, 251 S.W.3d 446,459 (Tenn. Crim. App. 2007). Factors relevant to that determination include: (1) the disputed conduct viewed in light of the circumstances and facts in the case; (2) any curative measures taken by the trial court and the prosecution; (3) the prosecutor's intent in making the improper statements; (4) the cumulative effect of the prosecutor's statements and other errors in the record; and (5) the relative strength and weakness of the case. Gann, 251 S.W.3d at 460 (citing Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).
>
> . . .
>
> Regarding the State's closing arguments during sentencing, the Court recognizes that several parts of the State's closing argument, particularly portions of Mr. Brollier's rebuttal argument, were improper. For instance, Mr. Brollier's series of comments that the petitioner's mitigation evidence was merely a "list of excuses" and a ploy to blame the petitioner's family, schools, mental health providers represented the prosecutor's personal opinion and an appeal to the jury's emotions, both of which were improper. Mr. Brollier's comments on how the jury was to weigh the mitigating factors against the petitioner's mitigation proof violated the Tennessee Supreme Court's prohibition against such practices. See State v. Middlebrooks, 978 S.W.2d 872, 894 (Tenn. 1998). Furthermore, the State's assertion that the petitioner's actions represented his "want[ing] his gratification from a nine-year-old child" and the comment that the death penalty was "the only reasoned, moral response to this crime as done by this man under Tennessee law" was an inappropriate appeal to the jury's passions or prejudices.
>
> However, despite these instances of inappropriate conduct, the Court cannot conclude that the State's closing argument was so inflammatory that it "affected the verdict to the prejudice of the defendant." The closing argument was not composed entirely of inflammatory or otherwise inappropriate statements. Mr. Carney began the opening portion of the State's closing argument by arguing that the petitioner should be sentenced to death not based on the jury's emotions or sentiment, but because the law justified the sentence. Mr. Brollier's comments that the evidence did not support the petitioner's proposed mitigating evidence, as well as his comments that other members of the petitioner's family with a similar upbringing did not participate in criminal activity, were proper. Furthermore, the trial court properly instructed the jury regarding the role of victim impact testimony in the jury's sentencing decision and the role of counsel's arguments generally, and the jury is presumed to follow its instructions. Finally, the Tennessee Supreme Court concluded that the evidence supporting the four enhancement factors was

sufficient—in fact, the petitioner did not challenge the "overwhelming" evidence supporting the "age of victim" and "prior criminal history" enhancement factors—and that

> The sentence of death [was] not imposed arbitrarily, that the evidence support[ed] the jury's finding of the statutory aggravating circumstances, that the evidence support[ed] the jury's finding that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

Rogers, 188 S.W.3d at 617-18, 620.

In addition to finding that the State's penalty phase closing argument, while inappropriate at times, did not prejudice the petitioner, this Court also notes that Mr. Converse was not asked during the evidentiary hearing about the State's penalty phase closing argument. This Court can only speculate as to counsel's reasons for not objecting to the State's closing argument; perhaps counsel's actions represented a tactical decision. The Court therefore concludes that the petitioner has failed to establish that counsel provided ineffective assistance by not objecting to the State's closing argument during the penalty phase.

(Doc. No. 26-8 at 148–49, 152–54.)

Respondent asserts that the state court's rejection of this claim was not unreasonable. (Doc. No. 94 at 180–81.) He reiterates the absence of prejudice to Petitioner in light of the fleeting nature of the objectionable comments within an otherwise proper argument, the ameliorating instructions to the jury, and the strong evidence of the aggravating factors. Petitioner does not address the state court's ruling or respond to Respondent's argument about its reasonableness. (Doc. No. 111 at 368–70.) He also never identifies any prejudice arising from the failure to object during the prosecution's closing. (See Doc. No. 111 at 378–84.)

Where "fairminded jurists could conclude that it is not reasonably probable that the outcome of the trial would have changed had . . . counsel objected," a state court's finding of lack of prejudice from failure to object cannot be disturbed on habeas review. Wallace v. Sexton, 570 F. App'x 443, 457 (6th Cir. 2014). That is the case here, and Petitioner is not entitled to relief on this claim.

16. Claims F.4, F.8 — Ineffective Assistance on Appeal

Petitioner alleges that appellate counsel rendered ineffective assistance on direct appeal

(F.4). (Doc. No. 14 at 50.)  He raised the same claim in the post-conviction trial court (Doc. No.

26-7 at 194–95), and included it in his post-conviction appeal. (Doc. No. 26-14 at 6–7.)  The state

courts rejected the claim:

> [In his] sixth issue[] on appeal, the Petitioner argues that the post-conviction court
> erred in denying his claims that Trial Counsel provided constitutionally ineffective
> assistance . . . by failing to raise various issues on appeal during the Petitioner's
> direct appellate proceedings. Once again, the post-conviction court denied these
> claims, in part, because the Petitioner failed to present any testimony in support of
> the claims at the postconviction hearing. As the State argues in its brief, the record
> supports the post-conviction court's findings in this regard.
>
> During his testimony at the post-conviction hearing, Converse did not address any
> of the specific acts or omissions the Petitioner refers to in his briefs to this Court
> on these issues. . . . With regard to the Petitioner's direct appeal, Converse testified
> that Brock Mehler, his co-counsel on the appeal, handled most of the work,
> including the drafting of the amended motion for new trial. Converse testified no
> further about the Petitioner's direct appeal. Mehler did not testify at the
> postconviction hearing. The Tennessee Supreme Court has made clear that, when a
> petitioner alleges ineffective assistance of appellate counsel, factors for
> consideration include (1) whether appellate counsel testified at the post-conviction
> hearing "as to his appeal strategy and, if so, were the justifications reasonable?";
> (2) whether the petitioner and appellate counsel met and discussed possible issues;
> (3) whether the record establishes that appellate counsel reviewed all of the relevant
> facts; and (4) whether appellate counsel's decision to omit an issue was "an
> unreasonable one which only an incompetent attorney would adopt." Carpenter,
> 126 S.W.3d at 888. The Petitioner failed to adduce proof at the post-conviction
> hearing on these factors. Accordingly, and once again despite his arguments to the
> contrary, the Petitioner failed to prove any of the claims forming the basis of this
> issue on appeal. See Gdongalay P. Berry, 366 S.W.3d 160, 2011 WL 5326280, at
> *8 (rejecting claim of ineffective assistance of counsel where petitioner did not
> question his attorneys about the claimed deficiencies, leaving the court to speculate
> as to their performance). Therefore, the Petitioner is entitled to no relief on [this
> issue].

Rogers v. State, No. M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *59 (Tenn. Crim. App.

Aug. 30, 2012).   Respondent asserts that this disposition of Petitioner's claim was not

unreasonable. (Doc. No. 94 at 184–85.)

Petitioner does not dispute that the evidence presented at the post-conviction hearing was insufficient to prevail on the claim presented in state court. Instead, he responds that he never raised his current claim on post-conviction at all. (Doc. No. 111 at 373.) Apparently, Petitioner would construe the claim about ineffective appellate assistance raised at post-conviction to be limited to attorney Converse, rather than attorney Mehler, who actually bore primary responsibility for the appeal. (Id.) But that distinction does not exist in the record. Petitioner's post-conviction petition and post-conviction appellate brief referred to the failures of "counsel" on appeal (Doc. No. 26-7 at 194–95; Doc. No. 26-14 at 6, 123–34), just as his amended petition in this case does.[28] (Doc. No. 14 at 50.) There is no logical reason to assume that Petitioner limited his post-conviction claim about ineffective appellate assistance to Converse when Mehler did most of the work on appeal. Accordingly, this claim was exhausted in state court, and Petitioner is not entitled to have this Court consider any evidence outside the state record in reviewing it. Cullen v. Pinholster, 563 U.S. 170, 181, 185 (2011).

As discussed above, reviewing courts must presume that attorneys have represented their clients pursuant to sound strategy, and petitioners alleging deficient performance bear the heavy burden of proving otherwise. See Strickland, 466 U.S. at 689. This rule applies equally to counsel's performance on appeal, where "it is clear that appellate counsel is not required to raise every non-frivolous issue" and "[s]trategic and tactical choices regarding which issues to pursue on appeal are 'properly left to the sound professional judgment of counsel.'" Williams v. Lafler, 494 F. App'x 526, 533 (6th Cir. 2012) (quoting United States v. Perry, 908 F.2d 56, 59 (6th Cir. 1990)). The state court reasonably determined that, having failed to present any evidence at the

---

[28] Moreover, even if Petitioner were correct that this claim was defaulted, Martinez does not apply to claims of ineffective assistance on appeal. Davila v. Davis, 137 S. Ct. 2058 (2017).

post-conviction hearing about appellate counsel's strategy with regard to the selection of issues on appeal or his opinion of the relative merits of the issues Petitioner faults him for omitting, Petitioner did not bear his burden. Accordingly, he is not entitled to relief on Claim F.4.

Petitioner also alleges that "[c]ounsel failed to raise, preserve and present on appeal the errors complained of throughout this petition" (F.8). (Doc. No. 14 at 50-51.) To the extent that this claim is not wholly subsumed by F.4, it is not a cognizable claim. This vague attempt at a catch-all ineffective-assistance claim does not state a claim for relief as required by Rule 2 of the Rules Governing Habeas Corpus Cases Under Section 2254, and will be dismissed on that basis. See Clemons v. Luebbers, 212 F. Supp. 2d 1105, 1135 (E.D. Mo. 2002) (holding that "Ground 15 is a catch-all claim that any failure to preserve claims or exhaust remedies was caused by ineffective assistance of counsel. This claim presents no grounds for habeas relief, and none will be granted."), rev'd in part on other grounds, 381 F.3d 744 (8th Cir. 2004); Griffey v. Hubbard, C 01-3483 FMS, 2004 WL 941234 (N.D. Cal. Apr. 29, 2004) (rejecting as "conclusory catchall" petitioner's claim that "To the extent defense counsel failed to further develop the factual basis and to preserve the record with regard to the foregoing errors, petitioner was deprived of effective assistance of counsel as guaranteed by the Sixth Amendment").

17. Claim G.5 — Petitioner's Statements to Law Enforcement

Petitioner alleges that the trial court violated his constitutional rights by not suppressing the statements he made to law enforcement on July 11 and 12, 1996. (Doc. No. 14 at 55.) He exhausted this claim on direct appeal, where the Tennessee Supreme Court analyzed it at length:

> Rogers asserts that the admission into evidence of the oral and written statements he gave law enforcement officers on July 11 and 12, 1996, violated his rights under the federal and state constitutions. Specifically, he argues that his statements should have been suppressed because of the failure to re-administer Miranda FN3 warnings when he was subjected to custodial interrogation after a polygraph examination.

<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

The evidence at the suppression hearing showed that on July 11, 1996, Sergeant Clifton Smith of the Montgomery County Sheriff's Department spoke with Rogers at his place of employment. Rogers agreed to go to the Montgomery County Criminal Justice Center for an interview. Rogers drove himself to the Criminal Justice Center, where he was questioned by Brett Murray, a special agent with the F.B.I., and Billy Batson, an investigator with the Montgomery County Sheriff's Department. Sergeant Smith also was present in the interview room. Soon after arriving, Rogers stated that he was the person they were looking for, i.e., the person in the composite drawing published in the newspaper. Sergeant Smith advised Rogers of his <u>Miranda</u> rights and, at 11:18 a.m., Rogers signed a form waiving those rights. Rogers also signed forms consenting to a search of his vehicle and a search of his residence. After further questioning, Rogers went with Agent Murray and other officers to his residence for the search. While at his residence, Rogers consented to take a polygraph examination. Rogers then accompanied Agent Murray to an F.B.I. office in the federal building in Clarksville for administration of the polygraph examination.

The polygraph examiner, F.B.I. Special Agent Steven Hooker, obtained Rogers' written consent for the examination but did not re-administer <u>Miranda</u> warnings. Agent Hooker testified that he did not advise Rogers of his <u>Miranda</u> rights before the examination or during the interview afterward because Rogers was not in custody and had been advised of his rights earlier that day. Agent Hooker conducted the polygraph examination at approximately 2:35 p.m. After the examination, Agent Hooker informed Rogers that some of his answers indicated deception. Rogers then made a statement that he "had hit [the victim] with [his] car and driven over her and killed her." At that time, Agent Hooker called in Agent Murray and Investigator Batson to question Rogers. During the interrogation that followed, Rogers made further incriminating statements. He said that he had accidently run over the victim, that she was breathing when he placed her in the passenger side of his car, and that he had driven to a bridge over the Cumberland River where he threw her body into the water. At around 4:00 p.m., Rogers reduced these oral statements to writing and signed the document. No additional <u>Miranda</u> warnings were given before the statements were made. Investigator Batson testified that he had felt that Rogers fully understood his <u>Miranda</u> rights based on the warnings given four to five hours earlier.

On July 12, 1996, the day after the polygraph examination, Agent Murray and Investigator Batson interviewed Rogers again. Agent Murray re-advised Rogers of his <u>Miranda</u> rights. Rogers waived his rights and gave a second written statement. He corrected his earlier statement by adding that the victim had been in his car for about five minutes before the accident. Later that same day, accompanied by his appointed attorney, Rogers showed officers the site where he had allegedly run over the victim and the bridge where he had allegedly thrown her body into the river. His account of the victim's death was consistent with his written statement from

the previous day.

In denying the motion to suppress, the trial court stated that the evidence was clear that Rogers had been advised of his <u>Miranda</u> rights and had signed a written waiver of those rights and that there was no evidence indicating that Rogers' statements were involuntary. The trial court found that "maybe as much as five or even six hours, at the outside," could have passed between when Rogers waived his <u>Miranda</u> rights and gave his statement, but that this was not "an unusual amount of time." The trial court concluded that the interrogation changed from non-custodial to custodial when Rogers made incriminating statements to Agent Hooker after the polygraph examination. The trial court ruled, however, that the attachment of custody did not trigger a requirement for additional <u>Miranda</u> warnings.

A trial court's findings of fact on a suppression issue are binding upon an appellate court unless the evidence preponderates against those findings. <u>State v. Sawyer</u>, 156 S.W.3d 531, 533 (Tenn. 2005). We, however, review the trial court's conclusions of law de novo. <u>Id.</u>

The Self–Incrimination Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." FN4   The corresponding provision of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Encompassed within these constitutional provisions is the right to the presence of counsel during police-initiated custodial interrogation. <u>See</u> <u>State v. Saylor</u>, 117 S.W.3d 239, 244 n.3 (Tenn. 2003) (contrasting the Sixth Amendment right to counsel which guarantees the accused the assistance of counsel after adversarial proceedings have begun).

> FN4   This privilege against self-incrimination applies to the states through the Fourteenth Amendment. <u>Malloy v. Hogan</u>, 378 U.S. 1, 6 (1964).

In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the United States Supreme Court established procedural safeguards to protect an accused's privilege against self-incrimination. These safeguards require that the police warn any person subjected to custodial interrogation

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

<u>Id.</u> at 479. If the police fail to provide these warnings, any statement obtained as a result of custodial interrogation will not be admissible at trial during the prosecution's case-in-chief. Although the warnings must be given prior to custodial

interrogation, the Court did not indicate whether or when the warnings must be renewed.

In <u>Wyrick v. Fields</u>, 459 U.S. 42 (1982), the United States Supreme Court rejected a per se rule requiring the police to re-advise a suspect of his <u>Miranda</u> rights before questioning him about results of a polygraph examination. Such a rule would be "an unjustifiable restriction on reasonable police questioning." <u>Id.</u> at 49. A valid waiver of <u>Miranda</u> rights remains valid unless the circumstances change so seriously that the suspect's answers to interrogation are no longer voluntary or unless the suspect is no longer making a knowing and intelligent waiver of his rights. <u>Id.</u> at 47. Courts must examine the totality of the circumstances to determine whether renewed warnings are required. <u>Id.</u> at 48.

Factors to be considered when assessing the totality of the circumstances include: 1) the amount of time that has passed since the waiver; 2) any change in the identity of the interrogator, the location of the interview, or the subject matter of the questioning; 3) any official reminder of the prior advisement; 4) the suspect's sophistication or past experience with law enforcement; and 5) any indicia that the suspect subjectively understands and waives his rights. <u>See</u> <u>People v. Mickle</u>, 814 P.2d 290, 305 (1991). Because of the infinite variety of circumstances a case may present, the list of factors is by no means exhaustive. The weight to be accorded different factors will vary depending on the particular facts of the case.

In this case, the custodial interrogation resulting in the first written statement occurred approximately five hours after Rogers had been advised of and waived his <u>Miranda</u> rights. Tennessee cases have upheld the admissibility of statements made the day after administration of <u>Miranda</u> warnings. <u>See</u> <u>Reaves v. State</u>, 523 S.W.2d 218, 220 (Tenn. Crim. App. 1975); <u>Mitchell v. State</u>, 458 S.W.2d 630, 633 (1970). Other jurisdictions have approved of time spans of similar lengths. <u>See</u>, <u>e.g.</u>, <u>United States v. Rodriguez–Preciado</u>, 399 F.3d 1118, 1128–29 (9th Cir. 2005) (sixteen hours); <u>People v. Dela Pena</u>, 72 F.3d 767, 770 (9th Cir. 1995) (fifteen hours); <u>State v. Trostle</u>, 951 P.2d 869, 879 (Ariz. 1997) (seven hours); <u>Osborne v. State</u>, 430 S.E.2d 576, 578–79 ( Ga. 1993) (next day); <u>State v. Rowe</u>, 479 A.2d 1296, 1299 (Me. 1984) (nine hours). We conclude that the five hours between the waiver of <u>Miranda</u> rights by Rogers and his subsequent custodial interrogation did not constitute a significant time lapse.

The custodial interrogation was conducted by Agent Murray and Investigator Batson, the same two officers who had interviewed Rogers after the initial advisement of <u>Miranda</u> rights. The change in the location of the questioning did not mandate repeated <u>Miranda</u> warnings. <u>See</u> <u>State v. Aucoin</u>, 756 S.W.2d 705, 709–10 (Tenn. Crim. App. 1988) (defendant made initial statement at scene following waiver of <u>Miranda</u> rights and then gave subsequent statement at police station without receiving additional warnings); <u>State v. Pride</u>, 667 S.W.2d 102, 104 (Tenn. Crim. App. 1983) (same). Nor is it determinative that Rogers accompanied officers to his residence for the search before the interrogation continued at the F.B.I. office.

*See* Shane v. State, 615 N.E.2d 425, 427–28 (Ind. 1993) (holding that where defendant had been advised of Miranda rights at police station before being transported to hospital for taking of blood and hair samples, re-advisement of rights was not required upon return to police station). The polygraph examination and post-polygraph questioning were part of one continuous interrogation that had been preceded by Miranda warnings and execution of a waiver. The questioning throughout the day covered the same subject matter. Although Rogers received no official reminder of the prior advisement, he was continuously in the company of law enforcement officers. Rogers was familiar with the criminal justice system. Nothing in the record indicates that Rogers was incapable of remembering the advisement of his rights given just a few hours earlier.

Rogers asserts that new Miranda warnings were required when the interrogation changed from non-custodial to custodial. The overwhelming majority view, however, is that early, non-custodial Miranda warnings may be effective and that re-warnings are not ipso facto required when formal custody attaches. *See*, *e.g.*, Dela Pena, 72 F.3d at 769 (Miranda warnings given at night were effective the following day, approximately fifteen hours later, and defendant's subsequent custodial status was not the "determining factor" in the analysis); Jarrell v. Balkcom, 735 F.2d 1242, 1254 (11th Cir. 1984) (defendant's rights were not violated by the failure to reissue Miranda warnings at the time of arrest, notwithstanding that defendant confessed approximately three hours after receiving warnings when not in custody and by a different officer); Upton v. State, 36 S.W.3d 740, 744 (Ark. 2001) (Miranda warnings and waiver were continually effective even though defendant's status changed from that of voluntary, potential witness to that of a suspect in custody); State v. Burge, 487 A.2d 532, 543 (Conn. 1985) (defendant's waiver of Miranda rights was adequate when he was neither a suspect nor in custody, and his confessions which were made four hours later when he was in custody were admissible); State v. Tolbert, 850 A.2d 1192, 1200 (Md. 2004) (a defendant's statements are not inadmissible merely because police did not reissue properly administered Miranda warnings given to the defendant when the defendant was not in custody); Commonwealth v. Colby, 663 N.E.2d 808, 810 (Mass. 1996) (further Miranda warnings were not required after defendant failed a polygraph examination and his status became custodial); State v. Monroe, 711 A.2d 878, 886–87 (N.H. 1998) (pre-polygraph Miranda warnings were sufficient to protect defendant's Fifth Amendment right against self-incrimination even if the post-polygraph interrogation became custodial); State v. Rupe, 683 P.2d 571, 581 n.4 (Wash. 1984) (renewal of Miranda warnings was unnecessary where defendant "was effectively advised of his rights shortly before becoming technically in custody").

A conclusion that good faith early warnings are per se ineffective, even when those warnings are "sufficiently proximate" to actual custody to inform a suspect of his constitutional rights, would elevate form over substance. Tolbert, 850 A.2d at 1198. Once a suspect has made a knowing and voluntary waiver of his Miranda rights, there is no per se requirement to continually re-advise him of those rights. Monroe,

711 A.2d at 886. We join those jurisdictions holding that renewed <u>Miranda</u> warnings are not required based solely on a change in a suspect's status from non-custodial to custodial.

Rogers was advised of his <u>Miranda</u> rights and made a knowing and voluntary waiver of those rights on the morning of July 11, 1996. The <u>Miranda</u> warnings were sufficiently proximate to the custodial interrogation that afternoon to inform Rogers of his constitutional rights. Neither the five-hour time lapse nor any intervening event rendered Rogers incapable of remembering the prior advisement of his rights. Under the totality of the circumstances, the failure to re-administer <u>Miranda</u> warnings to Rogers upon the attachment of custody after the polygraph examination did not render his subsequent statements on July 11, 1996, inadmissible. The July 12, 1996, statements were immediately preceded by the re-administration of <u>Miranda</u> warnings and execution of a waiver. Nothing in the record indicates that the statements from either day were involuntary. We hold, therefore, that the admission into evidence of the oral and written statements obtained from Rogers as a result of custodial interrogation did not violate his constitutional rights.

<u>State v. Rogers</u>, 188 S.W.3d 593, 604–08 (Tenn. 2006).

Respondent moves for summary judgment on the basis that this disposition of Petitioner's claim was not unreasonable. (Doc. No. 94 at 193, 200.) In the section of his response that discusses Claim G generally, Petitioner does not address Claim G.5, the trial court's ruling on his motion to suppress, or the Respondent's argument in favor of summary judgment on this claim at all. (Doc. No. 111 at 404–41.)

The state court correctly identified <u>Wyrick v. Fields</u>, 459 U.S. 42, 47 (1982), as the Supreme Court case establishing the federal law applicable to situations where there is a delay between a <u>Miranda</u> warning and a custodial interrogation. Under <u>Fields</u>, "additional warnings are only required if the circumstances seriously changed between the initial warnings and the interrogation." <u>Treesh v. Bagley</u>, 612 F.3d 424, 432 (6th Cir. 2010) (citing <u>Fields</u>, 459 U.S. at 47). In this case, less than five hours passed between Petitioner's <u>Miranda</u> warning and waiver at 11:18 a.m. on July 11 and the verbal and written statements he gave to the same officers later that day. The first statement he gave on July 12 was immediately after being reminded of his <u>Miranda</u> rights,

and the second was in the presence of his attorney. The state court's determination that there had not been a serious change in circumstances between the warnings and the statements was not unreasonable. Moreover, Petitioner has not offered any argument or Supreme Court precedent to the contrary. Petitioner is not entitled to relief on this claim.

18. Claims G.39, I.5, I.8–I.11 — Evidence of Rape

Petitioner alleges that there is insufficient evidence to support his convictions for rape of a child and felony murder in the course of a rape, or to support the jury's finding of the aggravating circumstance of murder in the course of rape or kidnaping. (Doc. No. 14 at 60, 65–66.) He further alleges that, because there was insufficient evidence of rape, there was insufficient evidence to support the jury's finding of the aggravating factor that he murdered the victim to avoid arrest. (Doc. No. 14 at 66.)

At the time of the victim's murder, Tennessee defined rape of a child as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522 (1996).

In reviewing a claim of insufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Reviewing such a claim in the habeas context adds a second layer of deference to the analysis: "First, deference should be given to the trier-of-fact's verdict, as contemplated by Jackson; second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA." Tucker v. Palmer, 541 F.3d 652, 656 (6th Cir. 2008). This review imposes a "standard . . . so demanding that '[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.'" Davis

v. Lafler, 658 F.3d 525, 534 (6th Cir. 2011) (en banc) (quoting United States v. Oros, 578 F.3d 703, 710 (7th Cir. 2009)).  Jurors have "broad discretion in deciding what inferences to draw from the evidence," and when there are "a number of plausible ways to interpret the record," the state court's interpretation must not be disturbed by a habeas court as long as it is among those plausible interpretations. Coleman v. Johnson, 566 U.S. 650, 655 (2012) (per curiam); Renico v. Lett, 559 U.S. 766, 778 (2010).  The Supreme Court has explained how constrained a federal habeas court's review in these circumstances is:

> The opinion of the Court in Jackson v. Virginia, 443 U.S. 307 (1979), makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted).

> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam).

Petitioner exhausted these claims on direct appeal, and the state court rejected them on their merits:

> When a defendant challenges the sufficiency of the convicting evidence, the standard of appellate review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002). A guilty verdict by a jury accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). A conviction may be based on circumstantial evidence when the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993) (citations omitted).

> . . .

Finally, Rogers challenges his convictions for rape of a child and first degree felony murder in the perpetration of a rape on the ground that the evidence is entirely circumstantial, consisting solely of unidentified semen on the victim's shorts. Rogers claims that the proof does not exclude the possibility that Jeremy Beard was the source of the semen. By his own account, Rogers was the last person to see the victim alive, and he carried her away in his car. Immediately before her disappearance, the victim had changed into clean shorts. When the victim's remains were discovered in the woods, human semen stains were on the shorts. The source of the semen could not be determined. Because the victim's shorts were clean at the time of her abduction, the reasonable conclusion is that Rogers, her abductor, was the source of the semen. The record contains no evidence indicating that Jeremy Beard could have been responsible for the semen stains. Statements allegedly made by Jeremy, that his father had taught him how to have sex with his sister, referred to a period of time several years before the victim's disappearance. No proof was presented that Jeremy Beard had ever actually engaged in sexual activity with his sister or that any such conduct continued until her disappearance. Consequently, Jeremy's alleged statements do not cast doubt upon the conclusion that Rogers was the source of the semen. In addition, the victim's shirt was turned completely inside out, which would suggest that it had been removed from her body by a human rather than having been pulled off by animals or fallen off during the decomposition process. Rogers' removal of the victim's shirt would be consistent with sexual activity. This evidence is sufficient to support Rogers' convictions for rape of a child and first degree felony murder in the perpetration of a rape.

Viewing the evidence in the light most favorable to the State, we conclude that the proof points the finger of guilt unerringly at Rogers and Rogers alone. Therefore, we hold that his challenge to the sufficiency of the convicting evidence is without merit.

State v. Rogers, 188 S.W.3d 593, 616–17 (Tenn. 2006). Having found the evidence sufficient to support Petitioner's convictions on the charges, the court found no merit in his claims that the related aggravating factors were unsupported or "tainted by error." Id. at 617–18.

Respondent argues that he is entitled to summary judgment on these claims because the state court's rejection of them was not contrary to or an unreasonable application of federal law. (Doc. No. 94 at 216–21.)

Petitioner asserts that this ruling constituted an unreasonable determination of the facts and an unreasonable application of Supreme Court law. (Doc. No. 111 at 508.) He argues that because the victim's body was too decomposed to provide physical proof of penetration, and because the substance the state claimed was semen was not actually semen, or was not proved to be the

Petitioner's, "a reasonable juror could not exclude the possibility that the victim was not raped" by Petitioner or anyone else. (Id.)  In support of this argument, Petitioner cites State v. Keen, 31 S.W.3d 196, 218 (Tenn. 2000), which he says requires the State to "present sufficient evidence to exclude all other reasonable hypotheses except the existence of the underlying felony." (Doc. No. 111 at 508.)

Whether a defendant's conviction runs afoul of state law is a matter for state courts to determine; but neither Jackson nor any other United States Supreme Court precedent requires that circumstantial evidence exclude all possibilities other than the defendant's guilt. See Coleman v. Johnson, 566 U.S. 650, 655 (2012) ("Under Jackson, federal courts must look to state law for 'the substantive elements of the criminal offense,' 443 U.S., at 324, n.16, 99 S.Ct. 2781, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law.").  In fact, the Supreme Court expressly rejected that notion in 1954, and it has been repeatedly rejected by federal courts ever since:

> The petitioners assail the refusal of the trial judge to instruct that where the Government's evidence is circumstantial it must be such as to exclude every reasonable hypothesis other than that of guilt. There is some support for this type of instruction in the lower court decisions, but the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect.

> Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more.

Holland v. United States, 348 U.S. 121, 139–40 (1954) (internal citations omitted); see also Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003) ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required."); United States v. Kelley, 461 F.3d 817, 825 (6th Cir. 2006)

("Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.").

The Tennessee Supreme Court concluded that the evidence was sufficient for the rape conviction, and cited facts in evidence as support, including the presence of a substance a scientist testified appeared to be human semen found inside shorts that were clean when the victim left the house in them, and the apparent removal of the victim's clothing suggesting sexual activity. There are other ways Petitioner might have left semen on the victim's shorts before or after her death that did not involve penetration, but rape is certainly among that "number of plausible ways to interpret the record," which the jury and the state court were entitled to choose. See Coleman, 566 U.S. at 655. When a jury determines that a nine-year-old girl was taken by a grown man and later found dead, with some of her clothing removed and sperm on the inside crotch of her shorts, rape is not the only possible inference, but—when viewed in the light most favorable to the prosecution—it is a reasonable one. The possibility that other courts or fact-finders, including a reviewing federal court, might disagree about whether to make that inference does not make it unreasonable. See Walker v. Russell, 57 F.3d 472, 475 (6th Cir. 1995) (when reviewing a habeas claim of insufficient evidence, "the reviewing court need not be convinced of [the] petitioner's guilt beyond a reasonable doubt"). The state court's conclusion that the evidence supports Petitioner's rape conviction is not so clearly unjustified that the matter is "beyond any possibility for fairminded disagreement," as required by AEDPA to grant relief. Harrington v. Richter, 562 U.S. 86, 103 (2011).

Viewed through the exceedingly deferential lens of AEDPA, this set of claims fails on its merits, and judgment will be entered in favor of Respondent. However, the Court believes it to be debatable among jurists of reason whether any rational trier of fact could find evidence of

penetration beyond a reasonable doubt on this record. Accordingly, it will grant a certificate of appealability with respect to these claims.

19. Claim I.6 — Evidence of Kidnaping and Murder

In his next exhausted claim, Petitioner alleges that there was insufficient evidence to support his convictions for first degree premeditated murder, felony murder in the course of a kidnaping, and especially aggravated kidnaping. (Doc. No. 14 at 65.) The Tennessee Supreme Court accurately identified the Jackson standard for sufficient evidence, as quoted above, and went on to reject these claims:

> Rogers contends that the evidence is insufficient to prove premeditated first degree murder because the condition of the victim's remains does not rule out the accidental homicide to which he confessed. However, there was no visible trauma to any of the victim's bones supporting Rogers' claim that he ran over the victim with his car. Instead, the evidence shows that Rogers approached the victim and her playmates on July 3, 1996, and offered to take them swimming, that he returned to the victim's house on July 8, 1996, that he went to a nearby abandoned trailer from which he could observe the victim's house and see her come out alone to pick blackberries, that she was alive when she was in his car, that she was raped, and that she was driven 48.5 miles to the place where her body was found. This evidence is sufficient to support Rogers' conviction for premeditated first degree murder.
>
> Rogers next asserts that the evidence is insufficient to prove murder in the perpetration of a kidnaping because the proof does not exclude his theory that the victim was already dead when he transported her to the bridge. Rogers claims that the victim's body could have been carried down the Cumberland River to a point near Land Between the Lakes and then dragged inland by animals. However, the evidence excludes this theory. The statement Rogers gave police indicates that the victim was alive when he put her in his car. Although Rogers said that one of the victim's sandals came off and that he threw it into the water separately, both sandals were found with the victim's remains. Although Rogers claimed that he was applying for a job during the afternoon of July 8, 1996, his pants and car were muddy when he returned home that evening. The testimony of Rogers' wife that she saw small muddy fingerprints on the inside of the passenger side windshield of his car that evening supports a finding that the victim was alive and struggling to escape from the car when she was with Rogers. This evidence is sufficient to support Rogers' convictions for especially aggravated kidnapping and first degree felony murder in the perpetration of a kidnaping.

State v. Rogers, 188 S.W.3d 593, 616–17 (Tenn. 2006).

Petitioner argues, as he did in connection with his claims about the sufficiency of the

evidence of rape, that the lack of direct, physical evidence tying him to the victim's abduction and murder, and the existence of other theories about what happened to her, make the evidence insufficient to support his convictions pursuant to State v. Keen, 31 S.W.3d 196, 218 (Tenn. 2000). (Doc. No. 111 at 501–03.) But again, Keen does not constitute clearly established federal law, as required to grant relief on a claim that has been rejected by the state court. The evidence against Petitioner was circumstantial, but it was strong, and his alternate theories strain credulity. For example, the condition of the victim's remains and the small muddy fingerprints inside Petitioner's car refute his claim that she was run over with a car and was unconscious or dead by the time he got her in the car. The state court found that there was sufficient evidence for a rational trier of fact to convict Petitioner of these crimes, and that finding is not unreasonable under the heightened standard of § 2254(d). This claim is without merit, and Petitioner is not entitled to relief.

20. Claim G.42 — Unanimity Instruction at Sentencing

Petitioner alleges that the trial court's instruction to the jury on unanimity at sentencing, and the state statute that authorized or required such instruction, violated his constitutional rights. (Doc. No. 14 at 60.) The state courts rejected this claim on direct appeal:

> The defendant contends that T.C.A. § 39–13–204(f), providing that the jury must unanimously agree that the aggravating circumstances do not outweigh the mitigating circumstances in order to impose a life sentence, and T.C.A. § 39–13–204(h), prohibiting the trial court from informing the jury as to the effect of a nonunanimous verdict in the sentencing phase, violate his state and federal constitutional rights to a fair trial. Further, the defendant argues that Tennessee's death penalty statutes violate the holdings of McKoy v. North Carolina, 494 U.S. 433 (1990), and Mills v. Maryland, 486 U.S. 367 (1988), in that they require the jury to agree unanimously that the aggravating circumstances do not outweigh the mitigating circumstances before providing for a sentence less than death. See T.C.A. § 39–13–204(f)(1)–(2). These arguments have been rejected by the Tennessee Supreme Court. State v. Keen, 31 S.W.3d 196, 233 (Tenn. 2000); State v. Brimmer, 876 S.W.2d 75, 87 (Tenn. 1994); State v. Hall, 958 S.W.2d 679, 718 (Tenn. 1997); State v. Cazes, 875 S.W.2d 253, 269 (Tenn. 1994); State v. Smith, 857 S.W.2d 1, 22–23 (Tenn. 1993); State v. Harris, 839 S.W.2d 54, 76–77 (Tenn. 1992); State v. Thompson, 768 S.W.2d 239, 250 (Tenn. 1989).

State v. Rogers, 188 S.W.3d 593, 631 (Tenn. 2006) (incorporating the opinion of the Tennessee Court of Criminal Appeals). Respondent asserts that this ruling was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. (Doc. No. 94 at 211.)

Petitioner quotes portions of the sentencing instructions about which he complains, and argues that they violated the constitutional requirements set forth in Mills v. Maryland, 486 U.S. 367 (1988), and McKoy v. North Carolina, 494 U.S. 433 (1990), by conveying that the jury had to unanimously agree on the existence of mitigating circumstances in order to impose a sentence of life rather than death. (Doc. No. 111 at 437–40.) The portions of instruction about which he complains are:

> If you do not unanimously determine that a statutory aggravating circumstance has been proved by the state beyond a reasonable doubt, the sentence shall be life imprisonment.
>
> If you unanimously determine that a statutory aggravating circumstance or circumstances have been proven by the state beyond a reasonable doubt, but that said statutory aggravating circumstance or circumstances have not been proven by the state to outweigh any mitigating circumstances beyond a reasonable doubt, you shall, in your considered discretion, sentence the defendant either to life imprisonment without possibility of parole or to life imprisonment. . . .
>
> If you unanimously determine that a statutory aggravating circumstance or circumstances have been proven by the State beyond a reasonable doubt, and said circumstance or circumstances outweigh any mitigating circumstance or circumstances beyond a reasonable doubt, the sentence shall be death.

(Doc. No. 24-5 at 106–07.)

In his reply, Respondent correctly points out that the Sixth Circuit has repeatedly rejected Mills challenges to instructions substantially similar to those quoted above, explaining that they require unanimity only as to the results of the weighing of aggravating and mitigating factors, rather than the existence of a mitigating factor. See Henley v. Bell, 487 F.3d 379, 390–91 (6th Cir. 2007); Coe v. Bell, 161 F.3d 320, 336–39 (6th Cir. 1998). (Doc. No. 134 at 82–83.) Petitioner has not acknowledged or made any effort to distinguish those holdings.

Yet another point bearing on this claim lies in a portion of the sentencing instructions that neither party discusses, quotes or even cites:

> Any one or more of you may decide individually that a mitigating circumstance exists and thus should be considered by you in reaching a penalty decision. While you cannot find any aggravating circumstance to exist unless all twelve of you agree, all twelve of you do not have to agree on the existence of any of the mitigating circumstances. Therefore, under the law an individual juror must consider a mitigating circumstance when determining penalty even if other jurors believe that the mitigating circumstance does not exist.

(Doc. No. 24-5 at 105–06.) This instruction made perfectly clear to the jury that unanimity was not required with respect to the existence of mitigating circumstances, and it was not contradicted or rendered unclear by the subsequent instructions on unanimity required in weighing factors to reach a verdict.

Accordingly, the state court's rejection of this claim was not contrary to or an unreasonable application of Mills or McKoy. This claim is without merit, and Petitioner is not entitled to relief on it.

21. Claim I.12 — Proportionality Review

Petitioner alleges that he was unconstitutionally deprived of a meaningful proportionality review by the Tennessee courts. (Doc. No. 14 at 66.) Specifically, he complains that the Tennessee Supreme Court failed to fulfill its duty under state law to meaningfully determine whether his death sentence is "proportionate to other sentences imposed under similar circumstances," and thereby violated his Eighth and Fourteenth Amendment rights. (Doc. No. 111 at 512, 515–16.)

Petitioner exhausted a claim on direct appeal that the alleged failure to apply meaningful standards for the proportionality review mandated by state law violated his federal constitutional rights. (Doc. No. 26-4 at 4.) The Tennessee Court of Criminal Appeals rejected that claim:

> The defendant contends that the proportionality review mandated by T.C.A. § 39-13-206 is inadequate because it fails to apply meaningful standards for assessing whether a death sentence is disproportional. The [Tennessee] supreme court set

122

> forth the criteria for determining whether a sentence is proportional in <u>State v. Bland</u>, 958 S.W.2d 651, 667–68 (Tenn. 1997). The defendant challenges the adequacy of Tennessee's proportionality review and the criteria set forth in <u>Bland</u>, but the supreme court has rejected this challenge on numerous occasions. <u>See</u> [<u>State v.</u>] <u>Brimmer</u>, 876 S.W.2d [75,] 87 [(Tenn. 1994)]; [<u>State v.</u>] <u>Cazes</u>, 875 S.W.2d [253,] 270–71 [(Tenn. 1994)]; [<u>State v.</u>] <u>Harris</u>, 839 S.W.2d [54,] 77 [(Tenn. 1992)].

<u>State v. Rogers</u>, 188 S.W.3d 593, 631 (Tenn. 2006) (appendix adopting excerpts from the Tennessee Court of Criminal Appeals' Decision). The Tennessee Supreme Court did not address the claim beyond adopting that portion of the lower court's opinion, but it did explain the analysis it conducted to determine whether Petitioner's sentence was disproportionate to his crime:

> Next, we must determine whether the sentence of death in this case is disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. Tenn. Code Ann. § 39–13–206(c)(1)(D). We are mindful of the following principles applicable to proportionality review:

>> In conducting a comparative proportionality review, we begin with the presumption that the sentence of death is proportional with the crime of first degree murder. A sentence of death may be found disproportionate if the case being reviewed is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed." A sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence. Our inquiry, therefore, does not require a finding that a sentence "less than death was never imposed in a case with similar characteristics." Our duty "is to assure that no aberrant death sentence is affirmed."

> <u>State v. Hall</u>, 976 S.W.2d 121, 135 (Tenn. 1998) (citations omitted). We have found the following factors helpful in identifying and comparing similar cases: 1) the means and manner of death; 2) the motivation for killing; 3) the place of death; 4) the similarity of the victims and treatment of the victims; 5) the absence or presence of premeditation, provocation, and justification; and 6) the injury to and effects on non-decedent victims. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 667 (Tenn. 1997). In comparing defendants, we consider the following non-exclusive factors: 1) prior criminal history; 2) age, race, and gender; 3) mental, emotional, and physical condition; 4) role in the murder; 5) cooperation with authorities; 6) remorse; 7) knowledge of helplessness of victim; and 8) capacity for rehabilitation. <u>See id.</u>

> The proof in this case showed that Rogers kidnapped, raped, and murdered the nine-year-old victim. He had seen the victim five days earlier when she was with her brother and cousin. Rogers returned to her home and waited for an opportunity to capture her alone. Rogers drove the victim almost fifty miles away to a remote,

wooded area where he left her body to be scavenged by animals.

Rogers, a white male, was thirty-forty [sic] years old at the time of the murder and had a prior criminal history including convictions for aggravated assault. Rogers did not cooperate with authorities or express remorse for the crime. To the contrary, he evaded responsibility by giving law enforcement officers conflicting statements. He toyed with the victim's family by contacting them but never disclosing where the victim's body was located. Rogers presented mitigating evidence that he was subjected to neglect and abuse as a child.

Based upon an exhaustive review of the record and Supreme Court Rule 12 reports, we conclude that the sentence of death imposed in this case is not excessive or disproportionate when compared to the penalty imposed in similar cases. The sentence of death has been upheld in numerous cases where the defendant raped and murdered a child. See, e.g., State v. Keen, 31 S.W.3d 196 (Tenn. 2000) (murder during rape of eight-year-old girl; (i)(1) and (i)(5) (heinous, atrocious or cruel) aggravators); State v. Irick, 762 S.W.2d 121 (Tenn. 1988) (murder during aggravated rape of seven-year-old girl; (i)(1), (i)(5), (i)(6), and (i)(7) aggravators); State v. Coe, 655 S.W.2d 903 (Tenn. 1983) (kidnapping, rape, and murder of eight-year-old girl; (i)(1), (i)(5), (i)(6), and (i)(7) aggravators).

A search of Rule 12 reports reveals only two cases in which a sentencing hearing was held and a sentence of life without parole was imposed for a murder involving a sexual assault on a child. See State v. Paul William Ware, No. 03C01–9705–CR–00164, 1999 WL 233592 (Tenn. Crim. App., Knoxville, Apr. 20, 1999) (defendant raped and murdered four-year-old victim, but he was intoxicated at the time); State v. James Lloyd Julian, II, No. 03C01–9511–CV–00371, 1997 WL 412539 (Tenn. Crim. App., Knoxville, July 24, 1997) (defendant raped and murdered three-year-old victim, but he was under the influence of marijuana and alcohol). In addition, a life sentence was imposed by the jury in State v. Bibbs, 806 S.W.2d 786 (Tenn. Crim. App. 1991). In that case, the defendant murdered an eleven-year-old girl who was a guest at the motel where the defendant worked as a security guard. The defendant hit the victim with a toilet seat and his gun and then threw her off the balcony of the motel. The jury did not find the (i)(1) and (i)(5) aggravating circumstances, which were instructed at the sentencing hearing. The defendant's lack of any prior criminal record appeared to be the primary mitigating circumstance.

We reiterate that our analysis does not require a determination of whether a given case is subjectively "more or less" like other "death" cases or other "life" cases. State v. Davidson, 121 S.W.3d 600, 623 (Tenn. 2003) (citation omitted). Instead, our review requires that we identify an aberrant death sentence by determining whether the case is plainly lacking in circumstances consistent with those in similar cases in which the death penalty previously was imposed. Id. After reviewing the cases discussed above and many others not specifically cited, we are of the opinion that the sentence of death in this case is not excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the actions of the defendant.

State v. Rogers, 188 S.W.3d 593, 618–20 (Tenn. 2006).

Thus, the Tennessee Supreme Court compared several factors of this case to those of at least five other cases involving the rape and murder of a child and determined that Petitioner's sentence was not disproportionate. It observed that the defendant's intoxication at the time of the crimes, which was not asserted in this case, was a factor in both of the previous cases in which sentences of less than death were imposed. Petitioner's conclusory argument that this review was a "farce" that violated his "property, liberty, and life interests in having a meaningful proportionality review" does not make the state court's analysis unreasonable. (Doc. No. 111 at 515.)

Moreover, although neither party mentions this, the Supreme Court has held that "[p]roportionality review is not constitutionally required in any form." Walker v. Georgia, 555 U.S. 979 (2008). To the extent that the constitution requires anything resembling a proportionality review, "it only requires proportionality between the punishment and the crime, not between the punishment in this case and that exacted in other cases." Leonard v. Warden, Ohio State Penitentiary, 846 F.3d 832, 854 (6th Cir. 2017) (quoting Bowling v. Parker, 344 F.3d 487, 521 (6th Cir. 2003)). And the Sixth Circuit has held that Tennessee's statutory proportionality review requirement does not create any constitutional liberty interest in such a review. Coe v. Bell, 161 F.3d 320, 352 (6th Cir. 1998) (analyzing repealed statute using language identical to that in the statute that has been in effect since 1993; compare Tenn. Code Ann. § 39-2-205(c)(4) (1982) with Tenn. Code Ann. § 39-13-206(c)(1)(D)).[29]

---

[29] Specifically, the applicable statutes then and now require(d) the state court to review each death sentence to determine, among other things, whether "[t]he sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant."

Petitioner has not cited any Supreme Court precedent establishing that the constitution requires the type of proportionality review he demands, or that the death penalty is disproportionate to the rape, kidnaping, and murder of a child. This claim has no merit, and Petitioner is not entitled to relief.

22. Claim I.14 — Discriminatory Imposition of Death Sentence

Petitioner alleges that the death penalty is administered in Tennessee in an unconstitutionally discriminatory manner. (Doc. No. 14 at 66.) The state courts rejected this claim on direct appeal:

> Finally, the defendant contends that the death penalty is unconstitutional because it is imposed in a discriminatory manner. The Supreme Court has rejected this argument and held that the death penalty is not imposed in a discriminatory manner as to economics, race, geography or gender. State v. Hines, 919 S.W.2d 573 (Tenn. 1995); Cazes, 875 S.W.2d at 269; Smith, 857 S.W.2d at 22–23.

State v. Rogers, 188 S.W.3d 593, 631 (Tenn. 2006) (incorporating opinion of the Tennessee Court of Criminal Appeals). Respondent moves for summary judgment on the basis that this determination was not unreasonable. (Doc. No. 94 at 225.)

Petitioner does not acknowledge the state court's ruling. (Doc. No. 111 at 516–20.) It is clear from the first sentence of his argument that he does not rely on any specific or peculiar aspect of Tennessee's capital system, but attacks the death penalty itself as "a prohibited cruel and unusual punishment." (Doc. No. 111 at 516.) However, the primary opinion of the very case on which he relies expressly reiterates the Supreme Court's position that "it is settled that capital punishment is constitutional." Glossip v. Gross, 135 S. Ct. 2726, 2732 (2015).

Petitioner's argument also fails for many other reasons, including: his reliance on facts outside the state court's record, which cannot form the basis for relief under Pinholster; the possibility that the significant reversal rate for Tennessee death sentences on which he relies

establishes that the system of judicial review of such cases is working to ensure that the death sentence is not executed in an unconstitutional manner; and the fact that he relies largely on a proportionality argument that, as discussed above, is not supported by any requirement of the federal constitution. But most importantly, Petitioner's argument fails because, in more than four pages of argument, he does not cite a single Supreme Court opinion establishing a rule of federal law to which the state court's ruling was contrary, or which it unreasonably applied, as required to prevail under § 2254(d). His reliance on a dissenting opinion in <u>Glossip</u> obviously misses that mark.

Petitioner is not entitled to relief on this claim.

23. Claims I.15, I.16, J — Method of Execution

Petitioner alleges that Tennessee's statutory methods of execution by electrocution and lethal injection, and in particular the September 2013 pentobarbital-based lethal injection protocol in place at the time he filed his petition, are cruel and unusual punishment in violation of the Eighth Amendment, and further that the lethal injection protocol violates the Fourteenth Amendment and the Supremacy Clause of the constitution. (Doc. No. 14 at 66–75.) But it is now clear, at least in this circuit, that a constitutional challenge to a particular method of execution, as opposed to the constitutionality of the death sentence itself, does not constitute an "attack [on] the validity of the prisoner's conviction or death sentence," and must therefore be prosecuted in a civil suit pursuant to 42 U.S.C. § 1983 rather than through a habeas action. <u>In re Campbell</u>, 874 F.3d 454, 462–64 (6th Cir. 2017).

Moreover, the Court takes judicial notice that during the pendency of this action, the Tennessee Department of Correction announced a revised lethal injection protocol that eliminates the pentobarbital method Petitioner challenges in his amended petition. <u>Lethal Injection Execution</u>

<u>Manual: Execution Procedures for Lethal Injection</u>, at 34 (Rev. July 5, 2018). Accordingly,

Petitioner's Claim J is moot. And Petitioner acknowledges that his challenge in Claim I.16 to the

electrocution method of execution is not ripe, because that method has not been triggered under

Tennessee's statutory scheme,[30] as the Tennessee Supreme Court has found. <u>See</u> <u>West v. Scofield</u>,

468 S.W.3d 482, 494 (2015) (holding that the inmates' claims about electrocution "depend entirely

on future and contingent events that have not occurred and may never occur, and as a result, are

unripe and nonjusticiable").

Accordingly, these claims are not cognizable as presented, and Petitioner is not entitled to

relief.

24. Claim L.13 — Arbitrary and Capricious Death Sentence

Petitioner alleges that his death sentence was imposed arbitrarily and capriciously in

violation of his constitutional rights. (Doc. No. 14 at 89.) In keeping with its statutory duty, the

Tennessee Supreme Court considered this issue on direct appeal and ruled against Petitioner:

> We are bound by statute to review the application of the death penalty to determine whether:
>
> > (A) The sentence of death was imposed in any arbitrary fashion;
> >
> > (B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;
> >
> > (C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and
> >
> > (D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.
>
> Tenn. Code Ann. § 39–13–206(c)(1). Having thoroughly reviewed the record, we find no indication that the sentence of death was imposed in an arbitrary fashion. We also conclude that the evidence overwhelmingly supports the jury's findings

---

[30] Tenn. Code Ann. § 40-23-114(e) provides for electrocution as an "alternative method" to lethal injection, to be employed if lethal injection is held to be unconstitutional or if the TDOC commissioner certifies that one or more of the lethal injection ingredients is unavailable.

with respect to the four aggravating circumstances. We further hold that the evidence supports the jury's finding that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.

State v. Rogers, 188 S.W.3d 593, 618 (Tenn. 2006). As quoted above, the court went on to find that Petitioner's punishment was not disproportionate for the rape and murder of a child, in an analysis that included factors such as Petitioner's age, background, and circumstances of the crimes.

Respondent argues correctly that the state court's conclusion was not contrary to or an unreasonable application of any Supreme Court precedent. (Doc. No. 94 at 230.) Petitioner acknowledges that this claim is "subject to 28 U.S.C. § 2254(d)" (Doc. No. 111 at 485), but he does not discuss or identify any error in the state court's ruling, or cite any Supreme Court precedent to which it is contrary or which it unreasonably applied. (Doc. No. 111 at 481–87.) He relies on the general prohibition against mandatory, automatic death sentences (Doc. No. 111 at 481–82), but that high level of generality is unhelpful in analyzing specific issues under § 2254(d). In interpreting the phrase "clearly established Federal law," the Supreme Court has warned against interpreting its cases so broadly. See Nevada v. Jackson, 569 U.S. 505, 512 (2013) ("By framing our precedents at such a high level of generality, a lower federal court could transform even the most imaginative extension of existing case law into 'clearly established Federal law, as determined by the Supreme Court.'") (quoting § 2254(d)(1)).

Petitioner has not established that he is entitled to relief on this claim.

## IV.     DEFAULTED CLAIMS OTHER THAN INEFFECTIVE-ASSISTANCE CLAIMS

### A.  STANDARD OF REVIEW

As the Court explained above in Section III.A, habeas petitioners are generally required to exhaust a claim in state court in order to be entitled to habeas review of that claim. This rule has

been interpreted by the Supreme Court as one of total exhaustion. Rose v. Lundy, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state courts. Picard v. Connor, 404 U.S. 270 (1971); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). In order to fully exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). By rule, Tennessee has eliminated the need to petition the state supreme court for discretionary review in order to exhaust a claim. Tenn. Sup. Ct. R. 39; Adams v. Holland, 330 F.3d 398, 401 (6th Cir. 2003). Accordingly, a Tennessee petitioner's claim is deemed exhausted "following an adverse decision of the Court of Criminal Appeals." Tenn. Sup. Ct. R. 39.

The procedural default doctrine is ancillary to this exhaustion requirement. See Edwards v. Carpenter, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If a petitioner raises a claim in state court, but the state court rejects the claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, the claim is considered procedurally defaulted and not subject to federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 81–82 (1977); see Walker v. Martin, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment"); Coleman v. Thompson, 501 U.S. 722 (1991) (same). Alternatively, if a claim was never presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute

of limitations bars the claim), then the claim is technically exhausted, but still procedurally defaulted. Coleman, 501 U.S. at 731–32; see also Hicks v. Straub, 377 F.3d 538, 551 (6th Cir. 2004) (the procedural default doctrine prevents circumvention of the exhaustion doctrine), cert. denied, 544 U.S. 928 (2005).  Respondent in this case asserts that Petitioner no longer has any state post-conviction remedies available, due to Tennessee's one-petition rule and applicable statute of limitations (Doc. No. 94 at 43), which Petitioner does not dispute.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in fundamental miscarriage of justice." Coleman, 501 U.S. at 750.  The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. Lucas v. O'Dea, 179 F.3d 412, 418 (6th Cir. 1999) (citing Coleman, 501 U.S. at 754).

A petitioner can establish cause in two ways. First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). See also Coleman, 501 U.S. at 753; Maples v. Stegall, 340 F.3d 433, 438 (6th Cir. 2003). Objective impediments include an unavailable claim, or interference by officials that made compliance impracticable. Murray, 477 U.S. at 488.  Second, constitutionally ineffective assistance of counsel may constitute cause under certain circumstances, but that ineffective-assistance claim itself must generally be exhausted as an independent claim before it can constitute cause for the underlying default.[31] Murray, 477 U.S.

---

[31] An exception to this rule applies where the underlying claim is itself a claim of ineffective assistance at trial.  That exception and the claims to which it applies are addressed below in Section V.

at 488–89; <u>Broom v. Mitchell</u>, 441 F.3d 392, 401 (6th Cir. 2006); <u>Rust</u>, 17 F.3d at 161.

A petitioner seeking to overcome procedural default must establish prejudice as well as cause. To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." <u>Perkins v. LeCureux</u>, 58 F.3d 214, 219 (6th Cir. 1995) (quoting <u>United States v. Frady</u>, 456 U.S. 152, 170 (1982)). <u>See also</u> <u>Ambrose v. Booker</u>, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." <u>Simpson v. Jones</u>, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. <u>Dretke v. Haley</u>, 541 U.S. 386, 392 (2004) (citing <u>Murray</u>, 477 U.S. at 495–96); <u>see also</u> <u>Lundgren v. Mitchell</u>, 440 F.3d 754, 764 (6th Cir. 2006). Actual innocence in this context "means factual innocence, not mere legal insufficiency." <u>Bousley v. United States</u>, 523 U.S. 614, 623 (1998) (emphasis added). In <u>Schlup v. Delo</u>, 513 U.S. 298 (1995), the Supreme Court held that a habeas corpus petitioner should be permitted to argue the merits of defaulted underlying claims where he "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." <u>Id.</u> at 316. The threshold inquiry is whether "new facts raised sufficient doubt about [Petitioner's] guilt to undermine the confidence in the result of the trial." <u>Id.</u> at 317; <u>Reeves v. Fortner</u>, 490 F. App'x 766, 769 (6th Cir. 2012). "While <u>Schlup</u> does not require 'absolute certainty' about the innocence

of a party in order to establish a credible claim of actual innocence, it is a 'demanding' standard and 'permits review only in the extraordinary case.'" <u>Reeves</u>, 490 F. App'x at 769 (quoting <u>House v. Bell</u>, 547 U.S. 518, 538 (2006)). To satisfy this standard, Petitioner "must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." <u>Schlup</u>, 513 U.S. at 327.

In the capital-sentencing context, the miscarriage-of-justice exception applies where the petitioner can show "'by clear and convincing evidence' that no reasonable juror would have found him eligible for the death penalty in light of the new evidence." <u>Calderon v. Thompson</u>, 523 U.S. 538, 559–60 (1998) (citing <u>Sawyer v. Whitley</u>, 505 U.S. 333, 348 (1992)); <u>see</u> <u>also</u> <u>Dretke</u>, 541 U.S. at 392 (holding that petitioner must show "by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law").

## B. ANALYSIS

### 1. Claim A.1 — Automatic-Death-Penalty Jurors

Petitioner alleges that he was deprived of a fair trial because multiple jurors (Baggett, Reynolds, Shuffield, Richardson, and Spangenberger) expressed the view before they were empaneled that they would automatically vote for a death sentence after deciding guilt in his case. (Doc. No. 14 at 19.)

Petitioner did not raise any claim concerning "automatic death penalty jurors" on direct appeal. (Doc. No. 26-1.) He raised a claim on post-conviction that the "[t]rial court erred in not excusing for cause, those jurors who believed the death penalty should be automatic for persons convicted of murdering a child," and named Baggett, Shuffield, Richardson, Spangenberger, and Brown; he did not name Reynolds. (Doc. No. 26-7 at 196.) The post-conviction trial court denied

relief, observing that due process claims that were available but not raised on direct appeal were waived pursuant to a state statute, Tenn. Code Ann. § 40-30-106(g). (Doc. No. 26-8 at 212–13.) Petitioner did not raise this claim in his post-conviction appeal (Doc. No. 26-14 at 7, 134–38), nor did he raise a claim on post-conviction appeal about his counsel's failure to include the issue in his direct appeal. (Doc. No. 26-14 at 6–7, 123–24.)

The Sixth Circuit has held that Tennessee's waiver rule is an adequate and independent ground to foreclose review of the merits of a claim in habeas proceedings. Hutchison v. Bell, 303 F.3d 720, 738 (6th Cir. 2002); Cone v. Bell, 243 F.3d 961, 969 (6th Cir. 2001), overruled on other grounds by Bell v. Cone, 535 U.S. 685 (2002). And regardless of the reason for the trial court's rejection of the claim, Petitioner failed to raise it on post-conviction appeal. This claim is therefore procedurally defaulted.

Petitioner argues that he can overcome default and obtain habeas review of this claim because the "jurors' misconduct" constitutes a "fundamental miscarriage of justice" and a "structural error" requiring that his sentence be vacated. (Doc. No. 111 at 386–89.) But a juror's alleged bias against Petitioner does nothing to establish his actual innocence of the crimes, or to establish that no reasonable juror without such bias would have found him eligible for the death penalty under Tennessee law. As the Court has already found, the state court's determinations that there was sufficient evidence to support Petitioner's convictions and the aggravating factors found by the jury were not unreasonable, and the state court's proportionality review identified several other cases in which other juries imposed the death sentence on defendants found guilty of crimes similar to Petitioner's. State v. Rogers, 188 S.W.3d 593, 610–20 (Tenn. 2006). Moreover, an alleged structural error alone is not sufficient to overcome the procedural default of his claim. Ambrose v. Booker, 684 F.3d 638, 649 (6th Cir. 2012) ("This circuit has accordingly declined to

presume prejudice for the purposes of procedural default when considering structural error claims.").

Accordingly, and for the reasons explained above in connection with Claim D.18, Petitioner has not established cause and prejudice or the miscarriage of justice necessary to overcome default in connection with this claim. Judgment will enter in Respondent's favor on this claim.

### 2. Claim A.3 — Biased Jurors

Petitioner alleges that Juror Reynolds failed to disclose a personal matter that prevented her from being impartial at trial, and that Juror Milliken failed to disclose relationships with the prosecutor and other individuals that prevented him from being impartial. (Doc. No. 14 at 20.)

Respondent asserts that this claim is defaulted (Doc. No. 94 at 86), which Petitioner does not dispute. (Doc. No. 111 at 391–92.) For the reasons set forth above in the analysis of Claim A.1, Petitioner cannot establish that the omission of this biased-juror claim from habeas review will result in a fundamental miscarriage of justice, and he has not asserted any other grounds to overcome the default. Moreover, the Milliken claim appears to lack any factual basis, as discussed below in connection with Claim D.22.

Accordingly, Respondent is entitled to judgment on this claim.

### 3. Claim A.4 — Extrajudicial Information

Petitioner alleges that several prospective jurors had extrajudicial prejudicial information about his case, which they discussed during the jury selection process. (Doc. No. 14 at 20–23.) Respondent asserts that this claim is defaulted (Doc. No. 94 at 86), which Petitioner does not

dispute. (Doc. No. 111 at 393.)

Petitioner has not established any cause or prejudice to overcome this default. (Doc. No. 111 at 392–97.)  Moreover, he does not allege that any of the prospective jurors in question were actually on the empaneled jury, and the only "evidence" he marshals for the proposition that the prospective jurors discussed their knowledge of the case with other jurors is his statement that "Anyone who has been called for jury duty knows that these are social occasions." (Doc. No. 111 at 393.)  Even if it were not defaulted, Petitioner's rank speculation that any jurors were tainted with information that prevented them from being impartial would not establish a constitutional violation or any prejudice arising from it.

Judgment for Respondent will enter on this claim.

4.  Claims B.1, B.2, B.24 — <u>Brady</u> Violations

Petitioner alleges that the prosecution violated <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), by withholding several pieces of evidence: (B.1) evidence of the investigation of Thomas Steven Sanders, Quinton Donaldson, David La Bean, Christopher Scott Hall, Chandler Scott, William Meyer, and Jeannie Meyer as suspects; (B.2) the results and report of a polygraph examination administered to Jeannie Meyer; and (B.24) evidence of favorable consideration (specifically, an immunity deal) it gave Quinton Donaldson for his testimony. (Doc. No. 14 at 26, 29.)  Respondent asserts that these claims are all defaulted, and that Petitioner has failed to establish facts necessary to overcome the default. (Doc. No. 94 at 89–90.)

In <u>Brady</u>, the Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at

87. Suppression of evidence that prevents a petitioner from bringing claims arising from that evidence in state court can establish cause for the default of such claims. Hutchison v. Bell, 303 F.3d 720, 741 (6th Cir. 2002); Smith v. Bell, 381 F. App'x. 547, 552 (6th Cir. 2010), vacated on other grounds sub nom. Smith v. Colson, 566 U.S. 901 (2012)). Because "the requirements for showing cause and prejudice parallel the elements of the underlying Brady violation," Hutchison, 303 F.3d at 741, if Petitioner is able to establish a Brady violation, he necessarily overcomes both the statute of limitations and procedural default bars. Bies v. Sheldon, 775 F.3d 386, 396 (6th Cir. 2014) (explaining that cause and prejudice parallel two components of a Brady claim "with the suppression of the evidence constituting cause and the materiality of the evidence resulting in prejudice"). Accordingly, if Petitioner can establish that the state suppressed favorable evidence that he only discovered after his state court proceedings concluded, he could overcome the default of these claims.

In his response, however, Petitioner does not cite a single piece of material evidence discovered after the conclusion of his state proceedings. The only alternative suspects about whom he argues the state withheld information are the victim's parents and Quinton Donaldson. (Doc. No. 111 at 459–63.) It was a well-publicized fact long before trial that the victim's parents had been considered as suspects and that they had taken polygraphs; in fact, Petitioner's proof of that fact includes a 1996 newspaper article. (Doc. No. 111 at 460.) Accordingly, that fact was not "suppressed," and there was nothing preventing Petitioner from pursuing any claim arising from that information during his state court proceedings. See Bell v. Bell, 512 F.3d 223, 235 (6th Cir. 2008) (holding that Brady does not apply when the factual basis for the claim was readily available to the petitioner or his counsel from a publicly available source). He recounts portions of trial testimony, but does not state that the facts contained in the testimony were a surprise at trial, what

beneficial use he might have made of those facts if they had been disclosed earlier, or why the testimony did not provide him with the factual basis he needed to pursue any Brady claim related to it in state court.

Likewise, Petitioner discusses generally the fact and reasons that Quinton Donaldson was an early suspect, but he does not allege that those facts were withheld from him before trial. To the contrary, he acknowledges knowing prior to trial that Donaldson's residence had been searched and that he had taken a polygraph. (Doc. No. 111 at 461–62.) Counsel testified at the post-conviction hearing that he had the polygraph report prior to trial. (Doc. No. 26-9 at 109–10; Doc. No. 26-13 at 149–51.) Counsel's cross-examination of Donaldson at trial confirms that he had the polygraph report that described Donaldson as sobbing and hyperventilating, which caused the polygrapher to end the post-exam interview. (Doc. No. 25-9 at 36–37.) Although the trial judge ruled the polygraph evidence itself inadmissible, counsel was allowed to elicit testimony from Donaldson that an officer had accused him of lying after questioning him for hours about his involvement in the crimes. (Id. at 41–43.) He also cross-examined the head TBI agent on the case about reports identifying other suspects, including Donaldson and Chandler Scott. (Doc. No. 25-9 at 131–32.) And he included Donaldson's emotional response to his interrogation and the reports of other suspects in his closing argument. (Doc. No. 25-11 at 147–50.)

Petitioner's suggestion that the defense was surprised by any significant information at trial is belied by the testimony of trial counsel during the post-conviction hearing, when he was asked "did you later become aware of anything that the prosecuting authority withheld from you that was important, relevant[?]" (Doc. No. 26-9 at 142.) Counsel responded:

> No, not that I can recall. I don't ever remember going whoa — wait a minute, I didn't have that. . . . I had a good enough working relationship with General Baker that we were able — that I felt like they handed over everything. I think he was so

afraid that he would leave something out, he would just give me everything, probably stuff I wasn't even entitled to.

(Id. at 143.)

Petitioner also alleges that Donaldson was given an immunity deal in connection with this case, which the prosecution withheld. (Doc. No. 111 at 463.) In support of that allegation, he cites simply "supra," and the Court has been unable to locate any evidence of such a deal in Petitioner's response or the record. Moreover, Petitioner does not specify when he became aware of the alleged deal or otherwise explain why he failed to raise this claim in state court.

Because Petitioner has not identified any favorable information that was withheld from him and that could not have been the basis for a claim during proceedings in state court, he fails to establish cause to overcome the default of these claims. Moreover, he cannot establish prejudice with regard to any additional undisclosed polygraph materials, because polygraph evidence is inadmissible in Tennessee, State v. Sexton, 368 S.W.3d 371, 409 (Tenn. 2012), which prevents it from being material evidence for Brady's purposes unless a petitioner can establish—with more than mere speculation—that it would have led to the discovery of admissible evidence. Wood v. Bartholomew, 516 U.S. 1, 6 (1995). Petitioner has made no effort to do that in this case. Respondent is entitled to judgment on these claims.

5. Claim B.11 — False Theory That Petitioner Acted Alone

Petitioner claims that the prosecution knowingly presented a false theory at trial despite having evidence that more than one person was involved in the crimes. (Doc. No. 14 at 27.) Respondent argues that this claim is procedurally defaulted because it was never raised in state court, and that Petitioner cannot demonstrate cause or prejudice to overcome the default. (Doc. No. 94 at 98–99.)

Petitioner's argument with regard to this claim branches into matters having nothing to do with the involvement of other people in the crimes, but suggests vaguely that the victim's parents, Quinton Donaldson, and the Petitioner all "were connected." (Doc. No. 111 at 464.) His support for that theory is conclusory, speculative, and largely refuted by the very evidence he cites—much of which was presented at trial, and therefore was not hidden proof of anything nefarious. It was no secret at trial that Donaldson and the parents were investigated as suspects, including questioning them and subpoenaing their phone records, but ruled out when authorities found their statements were corroborated; counsel cross-examined investigators about that at trial. (Doc. No. 25-6 at 108–12; Doc. No. 25-7 at 49–52; 80–82.) But more importantly, Petitioner makes no effort to overcome the default of this claim, beyond his general assertion of a "miscarriage of justice." (Doc. No. 111 at 454–55, 464–66.) Because he has not presented any evidence establishing such a miscarriage in connection with this claim, he cannot overcome its default. Respondent is entitled to judgment on this claim.

### 6. Claim B.12 — Mother's False Testimony

Petitioner claims that the prosecution failed to correct false testimony by the victim's mother about having written in her diary just before the victim disappeared, when the mother actually made the journal entry after the fact to bolster the state's case. (Doc. No. 14 at 27.) Respondent argues that Petitioner defaulted this claim by never raising it in state court, and that he has not established cause and prejudice to overcome the default, or any facts necessary to support the claim itself. (Doc. No. 94 at 99.)

Because an allegedly falsified diary entry could not establish that Petitioner is actually innocent, Petitioner cannot establish a manifest injustice in connection with this claim. But in addition to being defaulted, the claim is based on nothing but speculation and unsupported

conclusion. Petitioner simply states that the timing of Ms. Meyer's diary entries is "beyond belief," and then leaps from that opinion to the conclusion that the state presented the diary entries "[d]espite knowing that Jeannie fabricated her diary entries." (Doc. No. 111 at 460–61.) In order to establish a constitutional violation in connection with false testimony, a petitioner must show that the testimony was indisputably false, that the prosecution knew it was false, and that it was material. Byrd v. Collins, 209 F.3d 486, 517 (6th Cir. 2000). Petitioner's wholly speculative insistence that Ms. Meyer's diary testimony was false does not establish that it *was* in fact false, much less that the prosecutor *knew* it was false.

Moreover, Petitioner's account of the relevant procedural history is inaccurate. Petitioner's brief repeatedly asserts that "the State submitted the entries," "the State presented them as evidence," and "the jury accepted the State's false version of events," while citing a portion of Ms. Meyer's *cross-examination* by defense counsel. (Doc. No. 111 at 460–61 and n.2009; 25-4 at 177.) Contrary to Petitioner's assertions (see Doc. No. 111 at 460), there was no mention of Ms. Meyer's diary during her direct testimony, and the prosecution did not enter her diary into evidence during her direct testimony. (Doc. No. 25-4 at 5, 82–134.) If the diary is in evidence at all, Petitioner has not cited to it in the record. Defense counsel was the first to ask her whether she kept a diary and to ask her if it was an accurate record (Doc. No. 25-4 at 176, 182), and the particular diary testimony about which Petitioner complains was not elicited by the prosecution, but by defense counsel on cross-examination. (Doc. No. 25-4 at 3 (testimony index); Doc. No. 25-4 at 176–78.) Counsel's later use of those lines of her diary in closing argument reflects that he believed they were useful to his trial strategy. (Doc. No. 25-11 at 129–30.)

Accordingly, this claim is defaulted and, alternatively, wholly without merit. Respondent is entitled to judgment on this claim.

7. Claims B.13, B.21 — False Human Semen Theory

Petitioner claims that the prosecution knowingly presented the false testimony of TBI Agent Squibb that the semen inside the victim's shorts "appear[ed] to be human," and knowingly presented a false theory that there was human semen inside the shorts, even though evidence was inconclusive about whether the sperm were human or animal. (Doc. No. 14 at 28, 29.) Respondent argues that these claims are procedurally defaulted, and that Petitioner has not established that Squibb's testimony or the theory based on it was false. (Doc. No. 94 at 100–01, 104.)

Again, Petitioner makes no real effort to demonstrate that any external factor prevented him from raising this claim in state court. He acknowledges that the prosecution disclosed that one confirmatory test for the presence of semen was negative. (Doc. No. 111 at 466.) He argues that Agent Squibb's notes were withheld and "would have proven the falsity" of his testimony that there was sperm on the shorts. (Id. at 469.) But Petitioner clearly had Squibb's notes at a time when he could have raised these claims in state court, as evidenced by his counsel's use of the notes to cross-examine Squibb at the post-conviction hearing. (Doc. No. 26-10 at 134–41; Doc. No. 26-12 at 157.)[32] Moreover, the notes relate to the number of double- and triple-confirmed sperm heads found and have nothing to do with their human or animal origin, which is the focus of these claims. These claims are procedurally defaulted without cause.

Furthermore, the notes do not change that Squibb and two other analysts did confirm the presence of a small number of sperm on the victim's shorts,[33] or that the only scientific evidence

---

[32] The Court cites the lab notes where they appear in the state court record of Petitioner's post-conviction hearing. Petitioner's brief cites another copy of the same lab notes filed as an exhibit to his response. (Doc. No. 111 at 467 n.2053; Doc. No. 125-19 at 2.)

[33] Petitioner now complains that Squibb's notes indicate that other analysts did not confirm sperm at many of the possible coordinates Squibb had identified. (Doc. No. 111 at 467–68.) However,

about their origin is Squibb's testimony that they appeared to be human. (Doc. No. 25-8 at 159–61, 171, 175; Doc. No. 26-10 at 145–46.)

The Court observes that, although Petitioner's amended petition does not hint at this argument, Petitioner repeatedly argues in his response that "five months prior to trial, the TBI concluded that the semen did not match Glenn's DNA," and that the state presented its false semen theory "[d]espite the fact that the semen did not match Glenn." (Doc. No. 111 at 465, 472.) Those assertions are unsupported by the record. It is perfectly clear from the record and from every recitation of the semen evidence presented at trial and at post-conviction that the scientists were unable to obtain any DNA sequence from the stains in the victim's shorts to compare to Petitioner's. It would be accurate to state that there was no match established, and the prosecution never argued otherwise. But to repeat that "the semen did not match" Petitioner is an objectively inaccurate statement of the evidence.

Accordingly, Petitioner has failed to establish: (1) that Squibb's testimony was indisputably false; or (2) that the prosecutor knew the testimony (or any arguments he based on it) to be false. These claims are defaulted and would fail on their merits even if they were subject to review.

8. Claim B.14 — False Carpet Fiber Evidence

Petitioner alleges that the prosecution knowingly presented the false testimony of FBI Agent Houck that carpet fibers found on the victim's clothing matched carpet fibers from Petitioner's residence. (Doc. No. 14 at 28.) Respondent argues that this claim is procedurally

---

Squibb testified at the post-conviction hearing that he did not ask other reviewers to confirm every single possible sperm head he identified. (Doc. No. 26-10 at 137.)

defaulted and that Petitioner has not demonstrated that the testimony was false or that the state knew it to be false. (Doc. No. 94 at 101.)

The Court cannot find any reference to Claim B.14 in Petitioner's response. In connection with some of his ineffective-assistance claims, he does assert briefly (but repeatedly) that the FBI methods "amounted to little more than junk science." (Doc. No. 111 at 350, 357.) But he does not establish any cause to overcome the default of this claim.

Moreover, Petitioner does not support his "junk science" assertion with any facts pertaining specifically to the methods used by Agent Houck in this case or anything else that would refute his results. Aside from Houck's testimony, the only evidence in the state court record about fiber analysis was defense counsel's testimony at post-conviction that an expert he consulted found even stronger evidence that the fibers matched than what the FBI had found. (Doc. No. 26-9 at 128–30.) There does not appear to be any factual basis whatsoever for Petitioner's claim that Houck's testimony was false, or that the prosecution knew that it was false. Accordingly, this claim is defaulted, and would fail on its merits even if it were not defaulted.

9. Claims B.15, B.16 — False Evidence of Donaldson Alibi

Petitioner claims that the prosecution also knowingly presented the false testimony of Quinton Donaldson about going to his cousin's home around 4 or 5 p.m. the day the victim disappeared and about the last time he had seen Petitioner. (Doc. No. 14 at 28.) Respondent asserts that these claims are procedurally defaulted, and that Petitioner has not demonstrated that the testimony was false. (Doc. No. 94 at 101–02.) Petitioner does not dispute that the claims are defaulted, but simply argues their merits, apparently in an attempt to convince the Court of a miscarriage of justice. (Doc. No. 111 at 454–63.)

One of the reasons Donaldson had been considered a suspect early in the investigation was that he was in the general area the day the victim disappeared. (Doc. No. 25-7 at 51.) He drove a white Chevrolet with a black fender in July 1996, and was interviewed that evening at his cousin's nearby home by a detective who spotted the car in the driveway. (Doc. No. 25-9 at 30; Doc. No. 25-7 at 80–82.) But Donaldson testified that he was at home that day until he went to his cousin's home around 4 or 5 p.m. (Doc. No. 25-9 at 28–29), and a witness who saw a white car with a "black front end" drive down into the hollow a bit before 2 p.m. identified photos of the car Petitioner was driving that day as the car he saw. (Doc. No. 25-4 at 233–35.) Petitioner insinuates that the car the neighbor saw was actually Donaldson's and argues Donaldson had "ample opportunity" to be involved in the crimes (Doc. No. 111 at 461–62), but that does not make his trial testimony about his activities that day indisputably false, and does not establish that the prosecution knew it was false.

The only testimony Donaldson gave about when he last saw Petitioner was elicited by defense counsel on cross-examination. (Doc. No. 25-9 at 32–33.) In response to counsel's questions, he acknowledged that during one police interview he had said he last saw Petitioner in mid-June 1996, and said he did not remember saying in another interview that he had last seen Petitioner in April or May. (Id.) Counsel's goal apparently was to impeach Donaldson's credibility with evidence of inconsistent statements. That may have been fine strategy with the jury, but "inconsistencies in the testimony or discrepancies between the testimony and his version of the facts, . . . is not enough to show the prosecution knowingly used perjured testimony or denied him a fair trial." Davis v. Burt, 100 F. App'x 340, 348 (6th Cir. 2004).

Moreover, none of the facts on which Petitioner bases his assertion that Donaldson testified falsely were unknown to him at the time Donaldson testified. As explained above, a finding of

miscarriage of justice must be based on new evidence. <u>Schlup v. Delo</u>, 513 U.S. 298, 317 (1995) (issue is whether "new facts raised sufficient doubt about [Petitioner's] guilt to undermine the confidence in the result of the trial"); <u>Calderon v. Thompson</u>, 523 U.S. 538, 559–60, (1998) (in capital sentencing context, petitioner must establish "'by clear and convincing evidence' that no reasonable juror would have found him eligible for the death penalty in light of the new evidence"). Accordingly, Petitioner has not demonstrated any cause for his default of these claims, or any prejudice arising from the default.

10. Claim B.22 — False Theory About DNA

Petitioner alleges that the prosecutor knowingly presented a false theory to the trial court during a jury-out proceeding when he argued that the substance found on the victim's shorts could contain DNA from several possible combinations of sources, which Petitioner alleges was "inaccurate and based on junk science." (Doc. No. 14 at 29.)

Respondent asserts that this claim is procedurally defaulted and that it fails to establish any constitutional violation. (Doc. No. 94 at 104–05.) Petitioner includes B.22 in a list of claims about which he responds, but his argument under that heading never mentions this particular allegation or provides any basis to overcome default or to establish the merits of the claim. (Doc. No. 111 at 466–70.)

Forensic serologist Megan Clement testified at trial that she was unable to get DNA results from the material on the victim's shorts, and acknowledged on cross-examination that one possible explanation for being unable to get a "clean sequence" for DNA analysis was the presence of two sources of semen. (Doc. No. 25-8 at 193–95.) She went on to explain that other hypothetical causes would include a combination of semen and vaginal fluid, or semen and saliva, or simply

the presence of "environmental insults" like dirt or other contaminants. (Id. at 195–96.) Petitioner has not offered any evidence to disprove that testimony or the prosecutor's argument to the same effect. Accordingly, even assuming the prosecutor's argument to the judge outside the presence of the jury could be material to the outcome of the trial, this claim is wholly unfounded in addition to being defaulted.

11. Claims G.8, G.10–G.13, G.15, G.16 — Jury Selection Errors

Petitioner alleges that the trial court committed various constitutional errors during jury selection. (Doc. No. 14 at 56–57.) Respondent argues that all of these claims are procedurally defaulted because Petitioner did not raise them in either of his appeals in state court. (Doc. No. 94 at 107.) Indeed, the only claim of trial court error in jury selection that Petitioner raised on direct appeal was that prospective jurors Washington and Green were wrongfully excluded, which the Court has already addressed as Claims A.2 and G.9 above, and Petitioner did not raise these claims of trial court error on post-conviction appeal.[34] (Doc. No. 26-1 at 3; Doc. No. 26-14 at 3–7.)

Petitioner responds generally that he "can overcome procedural default with regard to his claims of trial court error," in light of his "arguments below." (Doc. No. 111 at 414–05.) But the only argument he makes "below" for overcoming the default of these claims of trial court error is the following:

> For the reasons stated in Sections III.A(2)(a), (b) and (p) and IV.A(1)-(3), B, and C(2)(a), supra, to the extent that the Tennessee courts addressed the above issues expressly or by implication, their decisions were contrary to, and/or an unreasonable application of clearly established law and/or an unreasonable determination of the facts based on the record before them. To the extent that the above issues or the factual predicate supporting these issues was not properly presented to the Tennessee courts, the issue or facts are unexhausted and defaulted.

---

[34] Petitioner did discuss Washington and Green's exclusion in post-conviction proceedings, but in the context of blaming their exclusions on the ineffective assistance of counsel. (Doc. No. 26-14 at 30.)

> Any default is excused under <u>Strickland</u>, [or] <u>Martinez</u> . . . by the IATC, IAAC and/or IAPC of state court counsel based on the facts and the legal authority cited in the sections referenced in the initial sentence of this paragraph. The underlying IATC and IAAC claims are substantial for the same reasons. The IAPC claims are also substantial and are within the letter of <u>Martinez</u> because they fall squarely within the equitable rule, present a new claim, or reflect IAPC due to the failure to raise, investigate, research or present the claim and/or the facts supporting the claim.

(Doc. No. 111 at 417.) The more than 115 pages of his response to which he refers relate to other claims including ineffective assistance of counsel and denial of change of venue, which are all independently reviewed herein (to the extent that they are not themselves defaulted); none of his arguments in connection with those claims provides any sufficient cause to overcome the default of the claims at issue here. Similarly, neither <u>Strickland</u>, nor <u>Martinez</u> provides any support for Petitioner's effort to overcome the default of these claims, which—again—assert trial court error, not the ineffective assistance of counsel. And finally, Petitioner's vague, inconsistent reference to possible contrary decisions by the Tennessee courts does nothing to overcome the default of claims whose default he has not even refuted.

Accordingly, these claims are defaulted, and Petitioner has failed to establish cause and prejudice to overcome their default.

### 12. Claim G.25 — Exclusion of Prosecutor's Statement

Petitioner alleges that the trial court erred by preventing the defense from introducing evidence of a statement by the prosecutor after discovery of the victim's remains to the effect that, without DNA evidence from her clothes, the state only had enough evidence to convict Petitioner of aggravated kidnaping. (Doc. No. 14 at 58.) Respondent argues that this claim was never raised in state court and is procedurally defaulted. (Doc. No. 94 at 107.) Petitioner's response lists G.25 in a group of claims he addresses collectively, but that section of his argument never mentions the

prosecutor's statement, discusses its exclusion, or attempts to establish cause to overcome the default of the claim. (Doc. No. 111 at 419–32.)

Defense counsel at trial sought to cross-examine the victim's mother about a diary entry she wrote about a statement a prosecutor had made to her during the investigation, which the trial judge excluded as inadmissible hearsay. (Doc. No. 25-4 at 206–10.) Petitioner did not raise any claim about that evidentiary ruling on appeal. (Doc. No. 26-1 at 3–4.) In the absence of any effort by Petitioner to establish cause or prejudice, this claim is procedurally defaulted and not subject to further review.

13. Claim G.27 — Impeachment of Victim's Mother

Petitioner alleges that the "trial court erred in limiting the defense's cross-examination of Jeannie Meyer and thus prevented the defense from impeaching her credibility and her false testimony." (Doc. No. 14 at 58–9.) Respondent asserts that this claim is procedurally defaulted. (Doc. No. 94 at 107.)

In connection with Claim G.44 and related claims, the Court has already considered Petitioner's exhausted claims about his being prevented from cross-examining Ms. Meyer regarding the purported sexual relationship between the victim and her brother. It is not clear how the current claim, with its reference to unspecified "false testimony," relates to those other claims. However, nothing in Petitioner's amended petition or response provides any detail about Claim G.27 that requires its separate consideration. In fact, his only reference to this claim is in the portion of his brief devoted to the evidence of the sexual relationship, which never mentions any false testimony by Ms. Meyer. (Doc. No. 111 at 419–32.) To the extent that this claim is distinct from the claims already reviewed, Petitioner did not raise it on appeal in state court (Doc. No. 26-

1 at 9–10) and has made no effort to establish cause to overcome its default. Respondent is entitled to judgment on this claim.

### 14. Claim G.29 — Excluded Expert Testimony

Petitioner alleges that the trial court violated his right to due process and to trial by jury by excluding expert testimony at sentencing due to insufficient notice to the prosecution. (Doc. No. 14 at 59.) He did not raise this claim on appeal in state court. (Doc. No. 26-1 at 9–10.) Respondent asserts that this claim is procedurally defaulted. (Doc. No. 94 at 107.)

Petitioner does not mention Claim G.29 anywhere in his response. (See Doc. No. 111 at 404–41, covering other claims within Claim G.) He does not cite any ruling that excluded any expert testimony, and the Court has not found any such ruling in the record. Petitioner asserts elsewhere that trial counsel failed to give proper notice of experts Guin and Caruso, but as discussed below in connection with Claim E.19, neither expert's testimony was excluded or limited as the result of imperfect notice.

The Court deems Petitioner to have waived consideration of Claim G.29. Alternatively, Petitioner has failed to establish any basis to overcome the default of this claim, or that the claim has any merit. Respondent is entitled to judgment on this claim.

### 15. Claim G.31 — Victim Impact Testimony

Petitioner alleges that the trial court's admission of victim impact testimony by the victim's mother violated his constitutional rights. (Doc. No. 14 at 59.) He did not raise a claim about victim impact testimony on appeal (Doc. No. 26-1 at 9–10), and Respondent asserts that the claim is procedurally defaulted. (Doc. No. 94 at 107.)

Petitioner argues the merits of this claim in his response. (Doc. No. 111 at 417–19.) He does not, however, establish any basis to overcome his default of the claim. Accordingly, the claim is not subject to federal habeas review.

### 16. Claims G.34, G.35, G.46 — Jury Instructions

Petitioner alleges that the trial court gave various jury instructions that violated his constitutional rights. (Doc. No. 14 at 59, 61.) With the exception of the unanimity instruction, which he challenged in state court and has been addressed above as Claim G.42, the Petitioner did not exhaust any claims in state court about the instructions challenged in these habeas claims. (See Doc. No. 26-1 at 9–10.) Respondent argues that they are procedurally defaulted. (Doc. No. 94 at 107, 214–15.)

Petitioner argues the merits of these claims in his response. (Doc. No. 111 at 432–41.) Again, however, he does not establish any cause and prejudice to excuse their default. Respondent is entitled to judgment on these claims.

### 17. Claims. G.38, G.43 — Definition of "Intentional"

Petitioner alleges that the trial court's instruction defining the "intentional" mens rea element of first-degree murder violated his constitutional rights. (Doc. No. 14 at 60.) He raised that issue on direct appeal (Doc. No. 26-1 at 9, 63–4), but the Tennessee Supreme Court observed that the issue had been waived at trial and applied plain error review in rejecting it:

> During the guilt phase, the trial court instructed the jury that a "person acts 'intentionally' when that person acts with a conscious objective or desire either to cause a particular result or to engage in particular conduct." Relying on State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002), Rogers argues that this instruction lessened the State's burden of proof because it allowed the jury to convict him based on a finding that he acted with the conscious objective to engage in a particular conduct, i.e., backing up his car, rather than with the conscious objective

to kill the victim. The issue was not raised in the trial court. Rogers asserts, however, that because <u>Page</u> was not decided until almost six months after the motion for a new trial was heard, the issue was not waived. He also contends that the Court should review the issue as plain error.

We recently rejected a similar argument in <u>State v. Faulkner</u>, 154 S.W.3d 48 (Tenn. 2005), also a capital murder case. Noting that we had not previously addressed the holding in <u>Page</u>, a second-degree-murder case, we agreed that a proper instruction defining "knowingly" or "intentionally" does not include the nature-of-conduct and circumstances-surrounding-conduct language because second degree murder and first degree premeditated murder are result-of-conduct offenses. <u>Faulkner</u>, 154 S.W.3d at 58. We found no authority, however, supporting the conclusion in <u>Page</u> that the erroneous instruction lessened the State's burden of proof. <u>Faulkner</u>, 154 S.W.3d at 59. We held that the inclusion of the nature-of-conduct language in Faulkner's case was not an error of constitutional dimension because the instruction properly defined "intentionally" with regard to the result of conduct and any risk that the jury relied on the wrong definition was eliminated by the finding of premeditation which "requires a previously formed intent to kill." <u>Id.</u> at 60 (citation omitted). The instructional error was harmless because in finding that Faulkner acted with premeditation, the jury necessarily found that his conscious objective was to cause the result of his conduct, i.e., the victim's death. <u>Id.</u> at 61.

We reach the same result in this case. The instruction properly defined "intentionally" with regard to the result of conduct. The jury was instructed that "[p]remeditation means that the intent to kill must have been formed prior to the act itself." The jury could not have convicted Rogers of premeditated first degree murder unless it found that he acted with a previously formed intent to kill. Therefore, contrary to Rogers' assertion, even if the jury believed Rogers' account of the victim's death, it could not have convicted him based solely on a finding that it was his conscious objective to back up his car. In finding that Rogers acted with premeditation, the jury necessarily found that he acted with a specific intent to cause the victim's death. Therefore, the inclusion of the nature-of-conduct language was mere surplusage that did not affect the outcome of the trial. <u>See</u> Tenn. R. Crim. P. 52(a). Because the erroneous instruction defining "intentionally" was harmless, Rogers is not entitled to relief under the plain error doctrine. <u>See</u> <u>Faulkner</u>, 154 S.W.3d at 61.

<u>State v. Rogers</u>, 188 S.W.3d 593, 615–16 (Tenn. 2006).

Respondent argues that these claims are defaulted because the state court reviewed only for plain error, having found the issue waived by failure to raise it in trial court. (Doc. No. 94 at 108–09.) The Sixth Circuit has held that "[a] plain error analysis is not tantamount to a review on

the merits," meaning the state appellate court's review for plain error does not imply it overlooked Petitioner's procedural default, i.e. his failure to object at trial. Scott v. Mitchell, 209 F.3d 854, 865 (6th Cir. 2000); see also Lundgren v. Mitchell, 440 F.3d 754, 765 (6th Cir. 2006) (holding that plain error analysis is "viewed as a court's right to overlook procedural defects to prevent manifest injustice, but is not equivalent to a review of the merits").

Petitioner has not established any basis to overcome the default of these claims. (Doc. No. 111 at 435–37.) Moreover, these claims would fail even if they were subject to review, because Petitioner has not cited any United States Supreme Court precedent establishing that the Tennessee court's plain error ruling was unreasonable. (Id.) Respondent is entitled to judgment on these claims.

18. Claim G.45 — Pedophilia Opinion

Petitioner alleges that the trial court violated his right to due process by failing to declare a mistrial when the state presented Dr. Bernet's testimony that Petitioner was a pedophile, when that opinion was based on evidence that had been ruled inadmissible. (Doc. No. 14 at 61.) Petitioner did not raise this claim on appeal in state court (Doc. No. 26-1 at 9–10), and Respondent argues that it is procedurally defaulted. (Doc. No. 94 at 107.)

Petitioner does not mention Claim G.45 anywhere in his response, and he acknowledges that he did not move for mistrial based on Dr. Bernet's testimony. (Doc. No. 111 at 331–32.) Accordingly, this claim has been waived in these proceedings, in addition to being procedurally defaulted. Moreover, as discussed above in connection with Claims E.15 and E.16, the federal constitution does not require that expert opinions be based only on admissible evidence, and Petitioner has failed to discredit all of the underlying reports about Petitioner's sexual misconduct

with children on which Dr. Bernet relied.

Accordingly, Respondent is entitled to judgment on this claim.

19. Claim G.47 — Discrimination in Selection of Foreperson

Petitioner alleges that his jury's selection of a white male jury foreperson amounted to unconstitutional discrimination. (Doc. No. 14 at 61.) He did not raise this claim in state court (Doc. Nos. 26-1, 26-14), and Respondent asserts that it is procedurally defaulted. (Doc. No. 94 at 107.)

Petitioner's response lists Claim G.47 in his discussion of other claims related to voir dire, but he never mentions the substance of the petit jury foreperson claim[35] or otherwise establishes any basis to overcome its default. (Doc. No. 111 at 415–16.) The Court considers Claim G.47 to be waived, and alternatively finds that Petitioner has failed to overcome its default.

20. Claims H.1, I.3 — Statements to Third Parties

Petitioner alleges that the state violated his constitutional rights by arranging for and encouraging Willie and Jeannie Meyer, David Ross, Juanita Rogers, Cynthia Schexnayder, and David Schexnayder to record conversations with him while he was in jail without his counsel present (H.1), and that his convictions based on statements to those same parties working on behalf of the state violated his right to due process (I.3), both in violation of Massiah v. United States, 377 U.S. 201 (1964). (Doc. No. 14 at 61–62, 65.)

Petitioner exhausted a claim on direct appeal that the trial court's admission of his

---

[35] Petitioner's claims about the grand jury that indicted him are addressed below as Claim K. (See Doc. No. 14 at 75–9.)

statements to David Ross, Cynthia Schexnayder, and David Schexnayder violated his Sixth and Fourteenth Amendment rights pursuant to Massiah. (Doc. No. 26-4 at 84–86.) The Tennessee Supreme Court rejected that claim on its merits:

> The defendant contends that the trial court erred in refusing to suppress statements he made to his family, the victim's family, and the press while he was in jail. He asserts that members of his family, the victim's family, and the press acted as agents of the state in securing statements from him, and, accordingly, the statements should have been excluded from the trial.

> The proof shows that after defendant's arrest, he made collect telephone calls to the victim's mother, Jeannie Meyer, and Ms. Meyer's husband, Wilbur Meyer, from jail. After the telephone calls began, the Meyers contacted the authorities to determine if they could record the calls. There is no proof that the law enforcement officials suggested that the Meyers record the conversations or even continue to accept the collect calls. In fact, Ms. Meyer testified that two officers advised that she did not have to talk with the defendant, and one of those officers even urged her not to speak with the defendant. Ms. Meyer said she continued to accept the calls because she wanted to locate her daughter's body. The Meyers testified that they gave the tapes to the authorities to help with the investigation. The state did not introduce the tape recordings at trial. Additionally, the defendant sent a letter to Wilbur Meyer in which he denied killing the victim.

> The defendant also contacted reporter David Ross, who worked with the Clarksville Leaf Chronicle. Mr. Ross interviewed the defendant and tape recorded the interview. Mr. Ross testified that no one encouraged or requested him to speak with the defendant. He did not contact any law enforcement authorities about his interview until it was completed. He testified that he only turned over a transcript of his interview to authorities for the purpose of helping to locate the victim's body. Mr. Ross admitted that he spoke with the Meyers and shared information with them. The defendant asserts that Mr. Ross "through the Meyers, also became a state agent."

> Finally, the defendant contends that his own mother and step-brother became state agents when they drove to Tennessee from Louisiana to speak with him following his arrest. The defendant's step-brother testified that he met with the defendant in an attempt to find out what had happened and to determine if he could help find the victim. Cynthia and David Schexnayder did not contact the authorities until after they had met with the defendant. After their meeting with the defendant, the Schexnayders agreed to give authorities a statement about their conversations.

> The Sixth Amendment guarantees the accused the right to rely on counsel as a "medium" between the accused and the state following the initiation of formal charges. Massiah v. United States, 377 U.S. 201 (1964). The United States Supreme Court and this court have held that incriminating statements may not be deliberately elicited from an accused by action of the state, as such action amounts to an interrogation. Id.; State v. Webb, 625 S.W.2d 281, 284 (Tenn. Crim. App. 1980).

This court determined in <u>Webb</u> that the authorities had subverted the accused's right to counsel when they placed an undercover agent in a jail cell with the accused who elicited statements from the accused. <u>Webb</u>, 625 S.W.2d at 284. However, the facts of this case are far different from the facts in <u>Massiah</u> and <u>Webb</u>.

The state did not direct, elicit, or otherwise attempt to procure statements from the defendant through any of the subject persons. The defendant contacted the Meyers and David Ross. Neither the Meyers nor David Ross were asked by the state to elicit information from the defendant. Instead, the authorities discouraged Jeannie Meyer from communicating with the defendant. The defendant's family members, Cynthia and David Schexnayder, visited the defendant in jail on their own in an attempt to get information about the location of the victim's body. The Schexnayders did not go to the authorities with their information until following their meeting. There is no proof in the record to substantiate the defendant's arguments that the Meyers, David Ross, or the Schexnayders acted as state agents. Accordingly, the trial court was correct in concluding that the defendant's constitutional rights were not violated by the admission of statements the defendant voluntarily made to the subject parties. This issue is without merit.

<u>State v. Rogers</u>, 188 S.W.3d 593, 622–23 (2006) (appendix adopting excerpts from the Tennessee Court of Criminal Appeals' Decision).

Respondent construes that decision to exhaust Petitioner's Claim G.17 that the trial court erred in admitting Petitioner's statements to several third parties (except to the extent that the habeas claim raises for the first time the statements made to Juanita Rogers). (Doc. No. 94 at 201.) But for reasons unknown to the Court, Petitioner has affirmatively abandoned Claim G.17 (Doc. No. 111 at 7, 524), and both parties have taken the position that the related prosecutorial misconduct claims—H.1 and I.3—were never raised and are procedurally defaulted. (Doc. No. 94 at 111, 215; Doc. No. 111 at 441, 476.) Petitioner argues that he can overcome the default (Doc. No. 111 at 441, 476), but the only bases he asserts to overcome the default are <u>Martinez</u> and fundamental miscarriage of justice. (Doc. No. 111 at 454–55, 476.) Because these are not claims of ineffective assistance of counsel, <u>Martinez</u> does not apply to them. See <u>Hodges v. Colson</u>, 727 F.3d 517, 531 (6th Cir. 2013) (explaining that <u>Martinez</u> exception is strictly limited to claims of ineffective assistance of trial counsel). And a fundamental miscarriage of justice is presented only

where new evidence establishes either that a petitioner is probably actually innocent or that no reasonable juror would have found him eligible for the death penalty. Dretke v. Haley, 541 U.S. 386, 392 (2004). These alleged violations, known to Petitioner since before his trial, does not satisfy those requirements. Accordingly, Petitioner has failed to overcome the default of these claims, and they are not subject to habeas review.

Respondent argues alternatively that if the pending claims are deemed exhausted, the state court's ruling above was not contrary to or an unreasonable application of state law. (Doc. No. 134 at 93.) In Petitioner's response, he first asserts in conclusory fashion without any citation to the record that the third parties gathered information from Petitioner "[a]t the State's encouragement and direction." (Doc. No. 111 at 443.) Subsequently, however, he concedes that he cannot prove that the state asked the third parties to gather information from Petitioner or that the state was "the driving force" behind such gathering. (Doc. No. 111 at 478–79.) Accordingly, he cannot establish that the state court unreasonably determined that "[t]he state did not direct, elicit, or otherwise attempt to procure statements from the defendant through any of the subject persons."[36]

Petitioner argues that the state "exploited the opportunity," and that its actions were unconstitutional pursuant to opinions of the Seventh and Tenth Circuits. (Doc. No. 111 at 443, 477–78.) Court of Appeals decisions, however, do not constitute clearly established federal law for the purposes of § 2254(d). Kernan v. Cuero, 138 S. Ct. 4, 9 (2017), reh'g denied, 138 S. Ct. 724 (2018) ("Finally, as we have repeatedly pointed out, "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'"). The only Supreme Court precedents Petitioner cites are Massiah, in which the government used a co-defendant with a

---

[36] Petitioner cites evidence that the state had advance knowledge of recordings made by the Meyers, but those were not introduced at trial. (See Doc. No. 111 at 479–80.)

hidden radio transmitter to listen to a defendant's incriminating statements after his release on bail, and United States v. Henry, 447 U.S. 264 (1980) which involved the use of a paid government informant. Because those cases are easily distinguished from Petitioner's, the state court's determination was neither contrary to nor an unreasonable application of those precedents. As the Supreme Court has explained,

> [T]he primary concern of the Massiah line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. Since "the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached," [Maine v. Moulton,] 474 U.S. [159,] 176 [(1985)], citing United States v. Henry, supra, at 276 (POWELL, J., concurring), a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986) (finding no violation where jailhouse informant agreed in advance with police to passively observe and report the defendant's statements about the crime). Accordingly, even if these claims were not defaulted, Petitioner would not be entitled to relief pursuant to § 2254(d).

21. Claim H.3 — Prosecutor's Misstatement of Law

Petitioner alleges that the prosecutor misstated the law during voir dire when he asked juror Richardson and prospective juror Holleman whether they could "follow" or "apply" the law and sentence Petitioner to death if the state proved that aggravating factors outweighed mitigating factors.[37] (Doc. No. 14 at 62.) Petitioner did not raise this claim in state court (Doc. No. 26-1 at

---

[37] Petitioner originally also raised this claim with respect to a third prospective juror, Johnson, but he has affirmatively withdrawn that portion of his claim. (Doc. No. 111 at 7, 525, withdrawing Claim H.3(c).)

9–10; Doc. No. 26-14), and Respondent asserts that it is procedurally defaulted. (Doc. No. 94 at 111.)

Petitioner acknowledges that the issue of prosecutorial misconduct during voir dire was never raised in state court. (Doc. No. 111 at 443–44.)  He argues the merits of his claim (as well as related claims not raised in his amended petition), but does not establish any basis for overcoming the default of the claim. (Doc. No. 111 at 443–46.)  Accordingly, the claim is not subject to habeas review.

22.  Claim H.11 — Improper Closing

Petitioner alleges that the prosecutor committed misconduct during closing argument of the guilt phase of trial by vouching for the credibility of prosecution witnesses, and by describing Petitioner as "cocky," "arrogant," and "confident."[38] (Doc. No. 14 at 63.)  Petitioner did not raise this claim on direct appeal, and the state courts accordingly determined during post-conviction proceedings that it had been waived. Rogers v. State, 2012 WL 3776675, at *59–60.  Respondent asserts, therefore, that the claim is defaulted. (Doc. No. 94 at 110.)

Petitioner does not dispute that the claim is defaulted, but argues that he can overcome the procedural default. (Doc. No. 111 at 441.)  Again, however, he offers no basis for overcoming default aside from Martinez, which does not apply to prosecutorial misconduct claims, Myers v. Osborne, No. 17-5284, 2018 WL 4215638, at *3 (6th Cir. Apr. 12, 2018), cert. denied, 139 S. Ct. 393 (2018) ("Martinez is limited to claims of ineffective assistance of trial counsel that were procedurally defaulted by lack of or ineffective assistance of post-conviction counsel and does not

---

[38] Petitioner has voluntarily dismissed a portion of this claim related to the prosecutor's references to the "little" victim. (Doc. No. 111 at 7, 525, withdrawing claim H.11(a).)

apply to Brady claims or claims of prosecutorial misconduct." (punctuation and citation omitted)), and a fundamental miscarriage of justice, which does not apply to guilt-phase claims that do not present new evidence of Petitioner's actual innocence of the crimes. (Doc. No. 111 at 454–55.) Moreover, even if Petitioner had established cause to overcome default, he fails to establish prejudice for the same reasons explained above in connection with Claim D.43. This claim is defaulted and not subject to habeas review.

### 23. Claims H.12, H.14, H.17 — Prosecutor's Eliciting Pedophilia Diagnosis

Petitioner alleges that that the prosecutor committed misconduct by eliciting improper testimony about Petitioner's pedophilia diagnosis during the sentencing hearing, despite the trial court's exclusion of the evidence underlying that diagnosis. (Doc. No. 14 at 64.) Petitioner asserted in post-conviction proceedings that the state had improperly presented evidence during sentencing that Petitioner was a pedophile without adequate support for that diagnosis. (Doc. No. 26-14 at 144.) The state courts determined that this and other claims of "prosecutorial misconduct throughout the course of the trial" were waived by the failure to raise them on direct appeal. Rogers v. State, 2012 WL 3776675, at *59–60. Respondent argues that these claims are procedurally defaulted. (Doc. No. 94 at 110–11.)

Petitioner's response argues the merits of these claims, but does not dispute that they are defaulted. (Doc. No. 111 at 441, 449–52.) Instead, he asserts that he can overcome the default pursuant to either Martinez or the fundamental miscarriage of justice standard. (Doc. No. 111 at 441, 454–55.)

As explained above, Martinez does not apply to prosecutorial misconduct claims. Myers, 2018 WL 4215638, at *3. This claim is not based on new evidence, and there is no real likelihood

that an expert's diagnosis of Petitioner as a pedophile had a significant impact on a jury that had already convicted him of raping a nine-year-old girl. Accordingly, Petitioner cannot establish a fundamental miscarriage of justice at his sentencing hearing in connection with these claims. Petitioner fails to overcome the default of these claims, and they are not subject to further review.

Alternatively, these claims would fail on their merits because Petitioner's disagreement with evidence relied upon by the prosecution does not make such reliance misconduct. The trial court permitted the state to offer expert evidence of Petitioner's pedophilia, over Petitioner's objection. (Doc. No. 24-5 at 44–47; Doc. No. 25-13 at 7–9.) As explained above in connection with Claims E.15, E.16, and G.45, an expert's opinion is not inadmissible simply because it is based on otherwise inadmissible facts. Petitioner argues that the prosecution "misled" the jury into believing that he was a pedophile (Doc. No. 111 at 451), but a difference of opinion between experts does not prove that the state expert's diagnosis is indisputably "false," or that the prosecution knew it to be false. If that were the law, one side or the other would be guilty of misconduct every time expert opinion conflicted. Petitioner has simply not demonstrated that the prosecution made any misstatements or presented any false testimony in connection with these claims that would constitute misconduct.

Respondent is entitled to judgment on these claims.

24. Claim H.15 — "Trivializing" Abuse

Petitioner alleges that the prosecution violated his right to present mitigation evidence by "trivializing" evidence of childhood abuse suffered by his sister. (Doc. No. 14 at 64.) Respondent moves for summary judgment on the basis that this claim was never raised in state court and is procedurally defaulted. (Doc. No. 94 at 111.)

As he has done with the rest of his defaulted claims under Claim H, Petitioner simply relies on a blanket assertion that he can overcome default pursuant to <u>Martinez</u> and the fundamental-miscarriage exception. (Doc. No. 111 at 452–55.) Once more, <u>Martinez</u> does not apply to claims of prosecutorial misconduct. <u>Myers</u>, 2018 WL 4215638, at *3. And Petitioner's argument pertaining to trivializing abuse suffered by his sister amounts to two sentences:

> The State objected to the testimony of Glenn's sister's friend: "[The witness] keep[s] talking about Mildred, Mildred, Mildred. If she knows something about William Glenn Rogers, fine, but this is not a mitigation evidence for Mildred Rogers' death penalty hearing." However, witnessing abuse does constitute mitigation.

(Doc. No. 111 at 453.) Petitioner omits the facts that defense counsel responded to that objection by saying "we are establishing that there was child abuse in this house," and that the trial court overruled the objection and allowed the testimony to proceed. (<u>See</u> Doc. No. 25-15 at 54.) Accordingly, the chance that this overruled objection, which did not limit the evidence heard by the jury, made any difference in the jury's sentencing determination is much too small to amount to a fundamental miscarriage of justice at sentencing. And again, the claim is based on events that happened in open court at trial, rather than new evidence, as required to overcome default based on a fundamental miscarriage of justice. Petitioner has not overcome the default of this claim, and Respondent is entitled to judgment on it.

25. Claim I.2 — Marital Privilege

Petitioner alleges that the admission of written and oral communications between him and his wife, Juanita Rogers, violated the marital privilege.[39] (Doc. No. 14 at 65.) Petitioner affirmatively waived this claim at trial, where defense counsel acknowledged that he had no good

---

[39] Petitioner's defaulted claim that the use of these statements violated his constitutional rights pursuant to <u>Massiah</u> has been addressed above in connection with Claims H.1 and I.3.

faith basis to assert it under the circumstances of the case. (Doc. No. 25-8 at 257–58.) He never raised the actual privilege claim in state court thereafter, although he did exhaust a claim on post-conviction that trial counsel was ineffective for failing to assert the privilege.[40] (Doc. No. 26-14 at 4, 67–70.) Petitioner has not raised this ineffective-assistance claim in the present action, and Respondent asserts that the underlying privilege claim is defaulted. (Doc. No. 94 at 111.)

In his response, Petitioner nominally combines this claim with Claim I.3 (about statements to third parties), but he never mentions the marital privilege. (Doc. No. 111 at 476–81.) He also relies solely on Martinez to overcome the default of the claim, but Martinez does not apply to claims of trial court error for the reasons explained above. See Abdur'Rahman v. Carpenter, 805 F.3d 710, 713 (6th Cir. 2015) (finding that Martinez exception did not allow Petitioner to excuse the default of claims of trial court error "because the Supreme Court limited [Martinez] to the default of substantial claims of ineffective assistance of trial counsel"). Respondent is entitled to judgment on this claim.

26. Claim I.4 — Prosecutorial Discretion in Seeking Death Penalty

Petitioner alleges that the prosecutorial discretion about when to seek the death penalty in Tennessee's criminal justice system amounts to the arbitrary infliction of the death penalty in violation of Petitioner's right to due process. (Doc. No. 14 at 65.) He did not raise this claim in state court, and Respondent asserts that it is procedurally defaulted. (Doc. No. 94 at 111.)

Petitioner lists this claim under a heading about his "meritorious and exhausted claims."

---

[40] The state courts rejected the ineffective-assistance claim due to Petitioner's failure to present any proof about why counsel had not asserted the privilege, and also noted that the trial court had determined that the privilege did not apply to Juanita Rogers's testimony. Rogers v. State, No. M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *52 and n.6 (Tenn. Crim, App. Aug. 30, 2012).

(Doc. No. 111 at 6, 507, 510.)  He asserts generally that this entire category of claims "were addressed on the merits by the Tennessee courts, but because the state court determination was based on an unreasonable determination of the facts in light of the record and/or contrary to and an unreasonable application of clearly existing federal law, the state court determination is not subject to deference by this Court."[41] (Doc. No. 111 at 507.)  But with regard to Claim I.4, he does not refute Respondent's assertion of procedural default by citing to any document in the record establishing that he raised it in state court. (Doc. No. 111 at 510–12.)  Nor does he cite or discuss any state court ruling on the claim and explain what factual finding or legal conclusion therein runs afoul of § 2254(d).

In his reply, Respondent reiterates that "[c]ontrary to the petitioner's assertion, he did not present this claim to the state court." (Doc. No. 134 at 104.)  Indeed, Petitioner's state court briefs reflect that he did not present this claim to the highest available court either on direct appeal or post-conviction appeal. (Doc. No. 26-4 at 9–10; Doc. No. 26-14 at 3–7.)  Accordingly, the Court finds that this claim is procedurally defaulted, and that Petitioner has not established any basis to overcome that default.  Respondent is therefore entitled to judgment on this claim.

27.  Claim K — Discrimination in Selection of Grand Jury Foreperson

Petitioner alleges that he was indicted by a grand jury from which women and African-Americans were unconstitutionally systematically excluded as grand jury forepersons, and that counsel's failure to raise this claim at trial or on appeal constituted ineffective assistance. (Doc. No. 14 at 75–80.)  He alleged in his second amended post-conviction petition that the grand jury was unlawfully constituted and that counsel was ineffective in connection with his motion to

---

[41] This approach, which applies to a number of claims, of tossing out generic and alternative arguments and leaving the Court to sort out which ones apply to which claims, is unhelpful.

dismiss the indictment, but he did not appeal the denial of relief on these claims.[42] (Doc. No. 26-7 at 181, 200; Doc. No. 26-14 at 3–7.)  Respondent asserts that Claim K is defaulted. (Doc. No. 94 at 114.)

Petitioner does not dispute that the Claim K is defaulted, but argues that exhaustion is not required because Tennessee does not provide an effective process to address his claim. (Doc. No. 111 at 403–04.)  In support of this argument, Petitioner cites the rejection by the Tennessee Supreme Court of a similar claim in a single opinion announced more than ten years before Petitioner defaulted his claim. See State v. Bondurant, 4 S.W.3d 662 (Tenn. 1999).  That lapse of time easily distinguishes Petitioner's case from the Tenth Circuit decision on which he relies, in which the Court of Appeals observed that the Oklahoma Court of Criminal Appeals had consistently rejected the same claim "both at the time it decided [the petitioner's] direct appeal and for several years thereafter." Selsor v. Workman, 644 F.3d 984, 1026 (10th Cir. 2011).  In fact, the Oklahoma court had rejected the same claim the same day it ruled on Selsor's appeal. Id.

Petitioner is not excused from the exhaustion requirement simply because he presumes the state courts to be "unsympathetic to the claim." Engle v. Isaac, 456 U.S. 107, 130 (1982).  As the Supreme Court has explained, "[e]ven a state court that has previously rejected a constitutional argument may decide, upon reflection, that the contention is valid." Id.  Claim K is defaulted, and Petitioner has not established any basis for overcoming that default.

28.  Claim L — Unconstitutional Death Sentence

Petitioner alleges that his death sentence is unconstitutional for a variety of reasons, many

---

[42] Petitioner's appellate claim of ineffectiveness in the motion to dismiss the indictment was limited to a speedy trial issue. (Doc. No. 26-14 at 4.)

of which have already been addressed above in connection with his claims about venue, jury selection, bias, jury instructions, and prosecutorial misconduct. (Doc. No. 14 at 81–9.)

Petitioner is adamant that Claim L is separate and distinct from his other claims and "stands on its own bottom" (Doc. No. 111 at 485), and he affirmatively maintains in paragraph L.14 that it was never presented in state court. (Doc. No. 14 at 89.)  Respondent asserts that the claim is procedurally defaulted. (Doc. No. 94 at 119.)  Petitioner attempts to avoid the consequences of default in three ways: (1) he argues that Respondent did not raise a default defense, so the defense is waived (Doc. No. 111 at 486); (2) he asserts that the claim presents a fundamental miscarriage of justice in that he is "innocent of the death penalty" pursuant to Sawyer v. Whitley, 505 U.S. 333 (1992); and he alleges (3) that "[t]o the extent that this claim was not raised in the new trial motion or on direct appeal, trial and appellate counsel were ineffective in failing to research, investigate and present this claim and Glenn Rogers was prejudiced for the reasons discussed in more detail with respect to related ineffectiveness claims in other paragraphs of this Amended Petition." (Doc. No. 14 at 89.)

Petitioner's assertion that Respondent did not raise the procedural default of this claim is incorrect. (See Doc. No. 94 at 119.)  And nothing about Claim L relies on new evidence that would prevent any reasonable juror from finding him eligible for death, as required to establish a fundamental miscarriage of justice in the capital sentencing context.  Finally, for ineffectiveness of counsel to constitute cause to overcome default, the ineffectiveness claim itself must be exhausted. Murray v. Carrier, 477 U.S. 478, 488–89 (1986).  Petitioner has not cited any evidence in the record for such exhaustion in connection with Claim L.[43]  Accordingly, he has not

---

[43] As Petitioner acknowledges, his unspecified "related ineffectiveness claims" are already addressed separately.

demonstrated cause and prejudice to overcome his default of Claim L.

Alternatively, the Court concludes that Claim L is merely an assertion of cumulative error in connection with Petitioner's sentence, which does not state a claim for habeas relief for the reasons explained below in connection with Claim O.

Under either approach, Respondent is entitled to judgment on this claim.

29. Claim M — Violation of International Law and Treaties

Petitioner alleges that his death sentence violates his rights under international law and treaties. (Doc. No. 14 at 89–94.) Petitioner never raised this claim in state court, and Respondent asserts that it is procedurally defaulted. (Doc. No. 94 at 120–21.)

Petitioner devotes two sentences to this claim in his response, and does not address its default. (Doc. No. 111 at 520.) He categorizes it as one of his "meritorious and exhausted claims," along with Claim I.14, which the Court has already addressed above. (Doc. No. 111 at 6, 516–20.) Accordingly, Petitioner has not established any basis to overcome the default of this claim, and Respondent is entitled to judgment on it.

30. Claim O — Cumulative Error

Petitioner claims that the cumulative effect of errors in his case amounts to a constitutional violation that mandates relief. (Doc. No. 14 at 95.) Petitioner raised this claim in his post-conviction appeal, but the state court of appeals found it was waived due to his lack of citations to the record, pursuant to Tenn. R. App. P. 27(a)(7) and Tenn. Ct. Crim. App. R. 10(b). Rogers v. State, No M.2010-01987-CCA-R3-PD, 2012 WL 3776675, at *60 (Tenn. Crim. App. Aug. 30, 2012). The Sixth Circuit has confirmed that those state procedural rules constitute "an independent

and adequate state ground for denying [a] claim." <u>Middlebrooks v. Bell</u>, 619 F.3d 526, 538 (6th Cir. 2010), <u>vacated on other grounds sub nom.</u> <u>Middlebrooks v. Colson</u>, 566 U.S. 902 (2012). Accordingly, this claim is procedurally defaulted, and Petitioner has not established any basis to overcome that default. (Doc. No. 111 at 487–88.)

Moreover, the Sixth Circuit has repeatedly held that "post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief." <u>Moore v. Parker</u>, 425 F.3d 250, 256 (6th Cir. 2005) (citing <u>Scott v. Elo</u>, 302 F.3d 598, 607 (6th Cir. 2002); <u>Lorraine v. Coyle</u>, 291 F.3d 416, 447 (6th Cir. 2002)). Accordingly, this claim would not raise a basis for habeas relief even if it were not defaulted.

## V.     DEFAULTED CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

A. STANDARD OF REVIEW

The Court has explained above that procedurally defaulted claims are not generally subject to habeas review unless a petitioner establishes cause and prejudice to overcome the default. In the past it was firmly settled that ineffective assistance in state post-conviction proceedings could never establish such cause, because there is no constitutional right to effective assistance of counsel in such collateral proceedings. <u>Coleman v. Thompson</u>, 501 U.S. 722, 742–54; <u>Ritchie v. Eberhart</u>, 11 F.3d 587, 590 (6th Cir. 1993); <u>Pennsylvania v. Finley</u>, 481 U.S. 551, 555 (1987).

But in 2012, the Supreme Court found it "necessary to modify the unqualified statement in <u>Coleman</u> that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default." <u>Martinez v. Ryan</u>, 566 U.S. 1, 9 (2012). It held in <u>Martinez</u> that the ineffective assistance of post-conviction counsel may, under some circumstances, qualify as cause for the default of claims of ineffective assistance of counsel at trial. <u>Id.</u> at 9; <u>see also</u> <u>Sutton v. Carpenter</u>, 745 F.3d 787 (6th Cir. 2014) (holding that <u>Martinez</u> applies

in Tennessee). The Court addressed the "precise question" about overcoming the default of "a claim of ineffective assistance at trial," Martinez, 566 U.S. at 9, and relied on the significance of the right to effective representation at trial as the basis for treating these claims differently than others:

> A prisoner's inability to present a claim of trial error is of particular concern when the claim is one of ineffective assistance of counsel. The right to the effective assistance of counsel at trial is a bedrock principle in our justice system. It is deemed as an "obvious truth" the idea that "any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him." Gideon v. Wainwright, 372 U.S. 335, 344 (1963). Indeed, the right to counsel is the foundation for our adversary system. Defense counsel tests the prosecution's case to ensure that the proceedings serve the function of adjudicating guilt or innocence, while protecting the rights of the person charged. See, e.g., Powell v. Alabama, 287 U.S. 45, 68–69 (1932) ("[The defendant] requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence").

Martinez, 566 U.S. at 12. Accordingly, the Court emphasized the narrowness of its holding: "This opinion qualifies Coleman by recognizing a narrow exception: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." Martinez, 566 U.S. at 9.

The Supreme Court again emphasized that narrowness when it rejected the argument that Martinez applied to claims of ineffective assistance on appeal:

> Petitioner's primary argument is that his claim of ineffective assistance of appellate counsel might never be reviewed by any court, state or federal, without expanding the exception to the rule in Coleman. He argues that this situation is analogous to Martinez, where the Court expressed that same concern about claims of ineffective assistance of trial counsel. But the Court in Martinez was principally concerned about *trial errors*—in particular, claims of ineffective assistance of *trial* counsel. Ineffective assistance of appellate counsel is not a trial error. Nor is petitioner's rule necessary to ensure that a meritorious trial error (of any kind) receives review.

Davila v. Davis, 137 S. Ct. 2058, 2066 (2017) (emphasis in original). The Davila Court elaborated on the special significance of effective representation at trial, as distinct from other stages of

criminal litigation:

> The criminal trial enjoys pride of place in our criminal justice system in a way that an appeal from that trial does not. The Constitution twice guarantees the right to a criminal trial, see Art. III, § 2; Amdt. 6, but does not guarantee the right to an appeal at all, Halbert v. Michigan, 545 U.S. 605, 610 (2005). The trial "is the main event at which a defendant's rights are to be determined," McFarland v. Scott, 512 U.S. 849, 859 (1994) (internal quotation marks omitted), "and not simply a tryout on the road to appellate review," Freytag v. Commissioner, 501 U.S. 868, 895 (1991) (Scalia, J., concurring in part and concurring in judgment) (internal quotation marks omitted). And it is where the stakes for the defendant are highest, not least because it is where a presumptively innocent defendant is adjudged guilty, see Ross v. Moffitt, 417 U.S. 600, 610 (1974); Wainwright, 433 U.S., at 90, and where the trial judge or jury makes factual findings that nearly always receive deference on appeal and collateral review, see Jackson v. Virginia, 443 U.S. 307, 318–319 (1979); see also Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam) (under deferential standard of review, "judges will sometimes encounter convictions that they believe to be mistaken, but that they must nevertheless uphold").

> The Court in Martinez made clear that it exercised its equitable discretion in view of the unique importance of protecting a defendant's trial rights, particularly the right to effective assistance of trial counsel. As the Court explained, "the limited nature" of its holding "reflect[ed] the importance of the right to the effective assistance of *trial* counsel," which is "a bedrock principle in our justice system." 566 U.S., at 12, 16 (emphasis added). In declining to expand the Martinez exception to the distinct context of ineffective assistance of appellate counsel, we do no more than respect that judgment.

Davila, 137 S. Ct. at 2066–67. Once a defendant has been found guilty and sentenced, he is no longer a "presumptively innocent defendant" facing "the danger of conviction," about whom Martinez is concerned. See Martinez, 566 U.S. at 12; Davila, 137 S. Ct. at 2066–67. Accordingly, Martinez does not apply to claims of post-trial ineffectiveness. Milam v. Davis, 733 F. App'x 781, 784, 786 (5th Cir. May 10, 2018) (applying Davila to hold that Martinez does not apply to claim of ineffectiveness in motion for new trial and on appeal).

Another significant limitation on the scope of Martinez is that it only applies to claims that were defaulted at the initial review stage of collateral proceedings:

> The rule of Coleman governs in all but the limited circumstances recognized here. The holding in this case does not concern attorney errors in other kinds of

> proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts. See 501 U.S., at 754; Carrier, 477 U.S., at 488. It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons.

Martinez, 566 U.S. at 16. So Martinez does not apply to claims that were raised in a post-conviction petition but not raised on post-conviction appeal. West v. Carpenter, 790 F.3d 693, 698 (6th Cir. 2015).

The Court must address one final limitation of Martinez in light of Petitioner's argument in his response and surreply that "Martinez and Trevino apply not only to the failure of post-conviction counsel to raise the claim, but to all situations where the court denied a petitioner's opportunity to vindicate an IATC claim because counsel poorly presented it." (Doc. No. 111 at 346; Doc. No. 137 at 3–4.) In support of this position, he relies primarily on Justice Breyer's 2013 statement on the denial of certiorari, which acknowledges that no federal appellate court to that point had found Martinez to apply to a situation where post-conviction counsel raised a claim but failed to present evidence to support it. Gallow v. Cooper, 570 U.S. 933 (2013) (Breyer, J., statement respecting the denial of certiorari). Such a statement does not establish precedent in support of Petitioner's position, but rather illustrates the lack of it. Teague v. Lane, 489 U.S. 288, 296 (1989) ("[O]pinions accompanying the denial of certiorari cannot have the same effect as decisions on the merits."); Leonard v. Warden, Ohio State Penitentiary, 846 F.3d 832, 853 (6th Cir. 2017) ("This statement regarding certiorari has no precedential effect, and only serves to underscore the lack of clearly established Supreme Court law on precisely this point.").

Petitioner also cites a Fifth Circuit opinion that applied Martinez to review new evidence on a claim that was raised and rejected on its merits in state court. Newbury v. Stephens, 756 F.3d 850, 871 (5th Cir. 2014). But such an application of Martinez is contrary to AEDPA, to Cullen v.

Pinholster, 563 U.S. 170 (2011), and to Sixth Circuit precedent. A federal habeas court's review of "any claim that was adjudicated on the merits in State court proceedings" is limited to the evidence presented in the state proceeding, 28 U.S.C. § 2254(d); Pinholster, 563 U.S. at 181–82, and the Martinez exception to enable review of procedurally defaulted claims simply does not apply when a claim has been exhausted on its merits. Moore v. Mitchell, 708 F.3d 760, 785 (6th Cir. 2013) ("Moore is not asking that we afford a Martinez-like review of a procedurally defaulted claim, but rather that we turn Martinez into a route to circumvent Pinholster. As explained above, though, Pinholster plainly bans such an attempt to obtain review of the merits of claims presented in state court in light of facts that were not presented in state court. Martinez does not alter that conclusion."); West v. Carpenter, 790 F.3d 693, 699 (6th Cir. 2015) ("When the state court denies a petitioner's ineffective-assistance claim on the merits, Martinez does not apply.") The sole purpose of Martinez is to permit habeas petitioners an opportunity to overcome the bar against federal review of claims that "no state court at any level" has heard because they were procedurally defaulted. Martinez, 566 U.S. at 10–11. Accordingly, Martinez does not apply to claims that were not actually defaulted, or were defaulted at some stage other than initial review, even when Petitioner claims they were presented poorly at initial-review proceedings.

Where Martinez applies, a petitioner may establish "cause" to overcome default by showing that (1) he had ineffective assistance of post-conviction counsel during the "initial-review collateral proceeding," Martinez, 566 U.S. at 8, 9; and (2) the defaulted claim is "substantial," that is, "that the claim has some merit." Id. at 14. The Sixth Circuit has explained in relevant part that "to constitute cause to overcome procedural default under Martinez, a petitioner must show that: (1) he has a substantial claim of IATC [ineffective-assistance-of-trial-counsel]; (2) counsel on initial state collateral review was nonexistent or ineffective; [and] (3) the state collateral review

proceeding was the initial review proceeding as to the IATC claim alleged." Atkins v. Holloway,

792 F.3d 654, 658 (6th Cir. 2015) (citing Trevino v. Thaler, 133 S. Ct. 1911, 1918 (2013)). The

court went on to describe the proper framework for evaluating claims under Martinez:

> As to these claims, the district court should determine . . . : (1) whether state post-conviction counsel was ineffective; and (2) whether [Petitioner's] claims of ineffective assistance of counsel were "substantial" within the meaning of Martinez, Sutton, and Trevino. Questions (1) and (2) determine whether there is cause. The next question is (3) whether [Petitioner] can demonstrate prejudice. Finally, the last step is: (4) if the district court concludes that [Petitioner] establishes cause and prejudice as to any of his claims, the district court should evaluate such claims on the merits. Under this framework, which is consistent with Supreme Court precedent and our holding in Sutton, [Petitioner] has a long way to go before the district court could even evaluate the merits of his claims. Moreover, even "[a] finding of cause and prejudice does not entitle the prisoner to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." Martinez, 566 U.S. at 17.

Atkins, 792 F.3d at 660 (some internal citations omitted). More recently, the court has elaborated

on what is required to satisfy those first three prongs:

> First, [Petitioner] must establish that his underlying ineffective assistance of trial counsel claims are "substantial," "which is to say that . . . [they have] some merit." Martinez, 566 U.S. at 14 (citing Miller–El v. Cockrell, 537 U.S. 322 (2003)). Or, in certificate of appealability parlance, it is "debatable among jurists of reason." Abdur'Rahman v. Carpenter, 805 F.3d 710, 713 (6th Cir. 2015); see also Atkins, 792 F.3d at 660 ("The Court in Martinez cited Miller–El v. Cockrell . . . for purposes of defining a 'substantial claim,' and Cockrell describes the standard for issuing a COA."). . ..

> Second, [Petitioner] must also establish he received ineffective assistance of counsel during his initial-review collateral proceeding under the familiar Strickland standards. Martinez, 566 U.S. at 13–14. Under Strickland v. Washington's two-prong test, a person challenging his counsel's representation must show (1) deficient performance, i.e., that "counsel's representation fell below an objective standard of reasonableness" and (2) prejudice. 466 U.S. 668, 687–88, 691–92 (1984). Courts must "apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 689). To establish prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A 'reasonable probability' is a probability 'sufficient to undermine confidence in the outcome,' but something less than a showing that the outcome more likely than not would have been different." Bigelow

v. Williams, 367 F.3d 562, 570 (6th Cir. 2004) (quoting Strickland, 466 U.S. at 693, 694). This "difference" is "slight and matters 'only in the rarest case.'" Harrington [v. Richter], 562 U.S. at 112 (quoting Strickland, 466 U.S. at 697).

Porter v. Genovese, 676 F. App'x 428, 431–32 (6th Cir. Jan. 17, 2017).

If Petitioner succeeds in satisfying the Martinez standard, he still does not necessarily prevail on his claim; he simply overcomes the default bar. The underlying ineffective-assistance claim is then subject to review on its merits under the ordinary Strickland standard. Where a claim has not been adjudicated on the merits in state court, but is still subject to federal review despite the bars of exhaustion and default, the federal court reviews the claim de novo. Moritz v. Lafler, 525 F. App'x 277, 282 (6th Cir. 2013) (quoting Cone v. Bell, 556 U.S. 449, 472 (2009)); accord Bies v. Sheldon, 775 F.3d 386, 395–96 (6th Cir. 2014) ("Because Bies' Brady claim was never 'adjudicated on the merits in State court proceedings,' the limitations imposed by § 2254(d) do not apply, and we review the claim de novo.").

## B. ANALYSIS

### 1. Claim C.1 — Visit to Alleged Disposal Site

Petitioner alleges that his first appointed counsel was ineffective for arranging for him to go with law enforcement officers to visit the location where he claimed to have disposed of the victim's body, during which Petitioner made incriminating statements. (Doc. No. 14 at 31–33.) He raised this claim in his post-conviction petition (Doc. No. 26-7 at 185), but did not raise it on post-conviction appeal. (Doc. No. 26-14 at 3–7.) Respondent moves for summary judgment on the basis that the claim is procedurally defaulted. (Doc. No. 94 at 48–49.)

Petitioner does not dispute that the claim was defaulted on post-conviction appeal. (Doc. No. 111 at 338.) Accordingly, as explained above, Martinez does not provide any basis for overcoming the default of this claim. West v. Carpenter, 790 F.3d 693, 698 (6th Cir. 2015).

Petitioner quotes the post-conviction trial court's rejection of his claim and argues that "because [that] decision was based on an unreasonable determination of facts in light of the evidence presented in state court, this Court can review the claims." (Doc. No. 111 at 338.) In support of that argument, he cites § 2254(d)(2), which provides a standard for reviewing an *exhausted* claim. Petitioner completely disregards the prohibition on any such review of a defaulted claim, and does not attempt to establish any cause or prejudice to overcome the default. If Petitioner believed the post-conviction court's determination to be unreasonable, his recourse was to include this claim in his appeal to the Tennessee Court of Criminal Appeals. That appeal would have satisfied the exhaustion requirement of § 2254(b)(1)(A) and enabled this Court to review the state appellate court's determination. Instead, he has circumvented that exhaustion and seeks a direct review of the trial court's opinion by this Court.

Petitioner's argument that this Court is authorized to review the reasonableness of the post-conviction trial court's ruling, despite his failure to exhaust his claim by challenging that ruling on appeal, is contrary to AEDPA, to the well-established doctrine of procedural default, and to the reasoning of Martinez. See Martinez, 566 U.S. at 11 (explaining that the new exception would not apply to alleged ineffectiveness outside the initial-review collateral proceeding because "[w]hile counsel's errors in these proceedings preclude any further review of the prisoner's claim, the claim will have been addressed by one court"); see also West v. Carpenter, 790 F.3d 693, 698–99 (6th Cir. 2015) (holding federal review not available for claim rejected on the merits by post-conviction trial court and not raised on post-conviction appeal); Wallace v. Sexton, 570 F. App'x 443, 453 (6th Cir. 2014) (holding alleged ineffectiveness of post-conviction counsel on appeal is not cause to excuse procedural default). Petitioner does not identify any good faith basis for urging such a departure from established law. This claim is defaulted and not subject to federal review.

2.   Claim C.2 — Failure to Control Petitioner

Petitioner alleges that counsel failed to adequately meet with him and take appropriate action to control his communication with other parties. (Doc. No. 14 at 33.) Respondent asserts that this claim was defaulted on post-conviction appeal. (Doc. No. 94 at 48–49.)

As he did with Claim C.1, Petitioner acknowledges that this claim was defaulted on post-conviction appeal and argues that this Court should review the post-conviction trial court's ruling. (Doc. No. 111 at 338.) He does not offer any basis to overcome the default of the claim. For the same reasons set forth above in connection with Claim C.1, this claim is defaulted and not subject to habeas review.

3.   Claims C.3, C.4 — Delay in Hiring Investigator and Developing Narrative

Petitioner alleges that counsel was ineffective for failing to secure a fact investigator until more than three years after his arrest, and for failing to develop a defense narrative before trial. (Doc. No. 14 at 33.) He did not raise any claim about the delay in hiring an investigator or failure to develop a "defense narrative" in his post-conviction petition (Doc. No. 26-7 at 178), and Respondent asserts that these claims are defaulted. (Doc. No. 94 at 51–54.) Respondent also asserts that Petitioner has not satisfied the requirements of <u>Martinez</u> to overcome the default. (<u>Id.</u>)

In his response, Petitioner provides evidence that sometime before Jerome Converse's appointment in November 1997, his first appointed attorney had a private investigator working on the case, but that the investigator had not prepared any written work product. (Doc. No. 111 at 340–41; Doc. No. 118-24 at 2.) A new investigator began working on the case in June 1999 (Doc. No. 111 at 341), approximately seven months before trial began in January 2000. Petitioner argues that, as the result of the delayed investigation, counsel never developed a defense theme, and that

these circumstances "defied community standards." (Id.)  He identifies three ways in which lack of investigation affected his defense: (1) the defense team did not visit the mud hole or the woods where the victim's remains were found until the fall of 1999, "canvassing these areas more than three years after the crime"; (2) the defense did not establish a relationship with Petitioner's then-wife, Juanita Rogers, who testified for the prosecution; and (3) they did not "timely reach out" to Petitioner's mother and brother, who also testified for the prosecution. (Doc. No. 111 at 342–43.)

Petitioner's argument fails to establish that his underlying ineffective-assistance claim is substantial enough to warrant further development pursuant to Martinez.  Even assuming that seven months is an objectively insufficient period of investigation, Petitioner has not demonstrated that the delayed investigation prejudiced his defense in any way.  He does not identify any beneficial evidence that an earlier visit to the mud hole or recovery site would have produced.  He also does not explain why the delayed fact investigation had any impact on the defense team's failure to establish favorable relationships with Juanita Rogers or the Schexnayders, as those witnesses' connection to Petitioner did not require any investigation to discover.

Moreover, his unsupported argument that counsel could have "softened the blow" of Juanita Rogers's testimony or "presented a more nuanced, less harsh picture" of Petitioner through the Schexnayders if they had approached those witnesses more or earlier than they did is pure speculation that is contradicted by the record.  Petitioner's defense mitigation specialist, Frank Einstein, had conducted interviews with Petitioner's mother, Cynthia Schexnayder, prior to August 26, 1999. (Doc. No. 123-19 at 6.)  He feared that she would appear "completely erratic and irresponsible" to the jury and that it would be "dangerous" to use her as a witness, and advised against doing so. (Doc. No. 123-19 at 6.)  Nevertheless, Einstein wrote to her in early December 1999 asking to meet with her. (Doc. No. 123-23 at 2.)  One of Petitioner's expert witnesses at trial,

Cecile Guin, indicates that Ms. Schexnayder did have a "brief and unhelpful" meeting with Einsten that December, but that a desired second meeting with Dr. Guin never happened. (Doc. No. 115-10 at 7.) Dr. Guin says that Ms. Schexnayder refused to testify on Petitioner's behalf, and describes her as "openly hostile," "highly volatile," and "[q]uite simply . . . crazy." (Id.) On the record during trial, when an issue arose about whether Ms. Schexnayder intended to ignore a subpoena to testify for Petitioner at sentencing, she was indeed openly hostile over being required to remain in Tennessee, and expressed more concern about the possibility of losing her truck than the outcome of Petitioner's trial. (Doc. No. 25-7 at 107–14.) More recently, Petitioner's mother told members of his current legal team that she loves him but does not "like" him, and she refused to meet with them again or sign a declaration for use in this case. (Doc. No. 111-6 at 15, 16.) A relative describes Ms. Schexnayder as bearing "such hatred" toward Petitioner. (Doc. No. 111-11 at 3.) There is simply nothing about this evidence, or the impression Petitioner has conveyed of his mother both at his sentencing hearing and in this case as a detached, uncaring mother who allowed him to be brutally abused in her home for years, that would suggest that earlier contact with her after Petitioner's arrest would have produced testimony materially benefitting Petitioner. Nor is there any reason to believe that earlier or additional contact with the defense team would have altered the Schexnayders' brief, straightforward testimony about how Petitioner had told them the victim had died. (Doc. No. 25-7 at 100–02, 105–06.)

Similarly, Juanita Rogers refused to speak to Einstein, and it was clear to the defense fact investigator and legal assistant working on the case that she "had long turned against" Petitioner. (Doc. No. 123-4 at 4.) Petitioner apparently blames lack of contact with the defense team for Ms. Rogers's negativity, but his own psychiatric expert testified at trial that Petitioner was already distressed that his marriage was in jeopardy at the time of the crimes. (Doc. No. 25-16 at 14, 20;

Doc. No. 25-24 at 86.) From the time Petitioner informed her that he had confessed to vehicular homicide, Ms. Rogers had no further contact with Petitioner despite his many attempts to contact her by phone and mail. (Doc. No. 25-9 at 70–75.) She was so annoyed by his frequent calls that she repeatedly blocked his calls and ultimately changed her phone number. (Doc. No. 25-9 at 94–95.) Within a year after Petitioner's arrest, he had also been accused of molesting Ms. Rogers's granddaughter. (E.g., Doc. No. 124-17 at 2.) Regardless of the veracity of that accusation, it certainly provided reason—completely unrelated to any lack of contact from the defense team—to expect Ms. Rogers to have an even more unfavorable view of Petitioner than she did before or even shortly after his arrest. She initiated divorce proceedings against Petitioner in February 1997, less than a year after his arrest and almost three years before trial, and was angry that Petitioner was contesting the divorce. (Doc. No. 25-9 at 93.) Neither common sense nor any evidence suggests that the defense could have "softened" her testimony at trial by more promptly retaining an investigator or doing anything else.

Finally, Petitioner's allegation that defense counsel had no trial strategy at all is also contradicted by the record. Counsel testified at the post-conviction hearing that their goal was to create enough reasonable doubt during the guilt phase to avoid the death penalty at sentencing. (Doc. No. 26-9 at 116–19.) That strategy was apparent from the opening statement, when counsel told the jury that the proof would show it was "almost physically impossible" for "one man [to] have done what the State claims he did in the time period that the State claims he did," and suggested that someone else was involved in the crimes and that police simply had stopped investigating the other person. (Doc. No. 25-3 at 61–62.) He also emphasized the lack of any DNA evidence tying Petitioner to the crime or proving whose semen was on the victim's shorts. (Id. at 63–64.) That a strategy was not successful does not establish that there was no strategy. Moreover,

Petitioner has not identified any strategy that would have been revealed by earlier fact investigation and would have had any likelihood of changing the outcome of the trial.

Petitioner has not carried his burden of establishing that these defaulted ineffective-assistance claims are substantial. Accordingly, there is no need to develop evidence about why post-conviction counsel did not raise these claims. Petitioner fails to overcome the default of Claims C.3 and C.4, and Respondent is entitled to judgment on them.

### 4. Claims C.6, D.25 — Failure to Investigate Other Suspects

Petitioner alleges that counsel failed to investigate and present evidence of the following other suspects: Thomas Steven Sanders, Quinton Donaldson, David La Bean, Christopher Scott Hall, and Chandler Scott. (Doc. No. 14 at 33, 40.) He raised a claim in his post-conviction petition about counsel's failure to sufficiently investigate Donaldson's alibi (Doc. No. 26-7 at 185), but he did not repeat the claim in his post-conviction appeal. (Doc. No. 26-14 at 3–7.) He did not raise a claim in state court about the failure to investigate the other named individuals. Respondent asserts that these claims are defaulted. (Doc. No. 94 at 54, 67–68.)

Because Petitioner defaulted the claim with regard to Donaldson on post-conviction appeal rather than at post-conviction initial review, Martinez cannot provide any basis for overcoming its default. West v. Carpenter, 790 F.3d 693, 698 (6th Cir. 2015). And the argument in Petitioner's response with regard to these claims never mentions Sanders, La Bean, Hall, or Scott. (Doc. No. 111 at 351–54.) Accordingly, Petitioner has failed to establish that his defaulted claims with regard to those individuals are substantial for Martinez purposes or otherwise establish cause and prejudice to overcome the default. These claims are defaulted and not subject to federal review.

5.  Claim C.7 — Failure to Investigate Brother's Mental Health Treatment

Petitioner alleges that "[c]ounsel failed to investigate Jeremy Beard's mental health records in order to ascertain what type of treatment he received based on his reported behavioral issues and disorders." (Doc. No. 14 at 33.)  Respondent asserts that this claim is defaulted. (Doc. No. 94 at 55.)

Petitioner's response combines his argument regarding this claim with sixteen other claims. (Doc. No. 111 at 346–51.)  The argument is largely devoted to semen evidence and other forensic evidence in the case. (Id.)  Petitioner never mentions the "type of treatment" Jeremy Beard received or explains why evidence about the type of treatment would have benefited him at trial. (Id.)  Accordingly, he has failed to establish that this defaulted claim is substantial for Martinez purposes, and this claim is not subject to federal habeas review.

6.  Claims C.8, D.26 — Failure to Investigate Brother as Source of Semen

Petitioner alleges that counsel failed to investigate, develop and present evidence that Jeremy Beard was the source of the semen on the victim's shorts. (Doc. No. 14 at 34, 40.)  As discussed above in detail, one of the theories defense counsel attempted to present at trial was that Jeremy Beard's semen was on the victim's shorts because they had engaged in sexual activity before her death.  The trial court excluded the evidence that counsel argued supported that theory, and Petitioner exhausted claims arising from that ruling.  The Court analyzed those claims above as Claims G.21–24, 26, and 44.  Petitioner also exhausted a broad claim that counsel failed to sufficiently investigate semen[44] evidence, including the possibility that sperm might be

---

[44] Petitioner changed the word "semen" in his post-conviction petition to "serological" in his post-conviction appellate brief, but the substance of the claim remained the same, including weaknesses

transplanted onto clothing in the laundry, which the Court has analyzed above as Claim C.10. Although it was not apparent from the habeas petition itself, Petitioner's response to Respondent's summary judgment motion suggests that Claims C.8 and D.26 might be intended to assert that counsel should have developed yet another theory about how sperm came to be on the victim's shorts: Jeremy wiped himself with them after masturbating. (Doc. No. 111 at 347–49; Doc. No. 130 at 347–49.) That theory was never raised in state court.[45]

To the extent that these are indeed new claims (as opposed to new evidence in support of an exhausted claim that counsel was ineffective in failing to prove that Jeremy was the source of the semen), they are not substantial for at least two reasons. First, Petitioner's new evidence simply does not prove what he asserts it proves—that the semen on the victim's shorts was Jeremy's. Jeremy testified at his deposition that at some point before his sister disappeared — "quite possibly" three or four days before — he masturbated in the bathroom and wiped himself with what he is "pretty certain" was a pair of shorts, the color of which he cannot remember. (Doc. No. 129 at 71, 73.) But the victim's mother testified at trial that just before she left the house, the victim retrieved clean clothes from her bedroom and changed into them in the bathroom. (Doc. No. 25-4 at 100.) Her mother later found the shorts the victim had previously been wearing discarded in the bathroom. (Doc. No. 25-4 at 128–29.) Accordingly, Petitioner's new theory does not conflict with or disprove the evidence at trial that the victim left the house in clean shorts.

---

in the state's proof that semen was present on the victim's shorts and the theory about the Canadian washing machine study. (Compare Doc. No. 26-7 at 182 with Doc. No. 26-14 at 3, 41–46.)

[45] Respondent's assertion that these claims were raised in Petitioner's post-conviction petition and defaulted on post-conviction appeal (Doc. No. 94 at 56–59) appears to the Court to be incorrect, but it put Petitioner on notice that the claims could be deemed defaulted and that Petitioner needed to either cite the record establishing that they were exhausted or establish cause and prejudice to overcome the default.

Second, there is no reason to believe that trial counsel could have obtained this evidence in advance of trial even if they had tried. Jeremy was twelve years old when his sister disappeared, and sixteen when he testified at trial. (Doc. No. 25-4 at 10–11.) In the interim, he was struggling with serious mental health problems, including post-traumatic stress disorder and major depression, and was considered to be a significant risk to himself. (Doc. Nos. 81-9, 81-10 at 6, 81-11 at 3.) Petitioner has not demonstrated any likelihood whatsoever that his counsel would have been permitted to interview Jeremy.[46] And in the improbable event that counsel had spoken with Jeremy during that time, Petitioner has not demonstrated any likelihood that he would have shared the facts contained in his 2013 statement or his 2016 deposition. According to his February 1997 psychological evaluation, in the period between his sister's death and the trial, Jeremy was "experiencing extensive difficulty trusting others," and was reticent to discuss sensitive issues, including whether he had ever "sexually acted-out," even with the mental health professionals who were trying to help him. (Doc. No. 81-10 at 2, 5, 7.) The statement from the foster mother with whom he lived for part of that period confirms that he was "defensive and withdrawn" when questioned. (Doc. No. 125-6 at 3.) Petitioner obtained Jeremy's statement during these proceedings by having a member of his habeas team meet Jeremy late at night when he was admittedly under the influence of drugs (Doc. No. 129 at 69–70), and had to obtain a subpoena and order to show cause to depose him. (Id. at 7.) These facts in the record strongly suggest that Jeremy would not willingly have shared any personal details with defense counsel before trial.

Because Petitioner's underlying defaulted claims are not substantial, additional review of the Martinez factors is unwarranted. These claims are not subject to federal habeas review.

---

[46] Tennessee criminal rules permit the deposition of witnesses only in extraordinary circumstances when it is necessary to preserve a witness's testimony for trial; not for general discovery of uncooperative witnesses. Tenn. R. Crim. P. 15.

However, for the reasons explained above in connection with Claim G.21, the Court will grant a certificate of appealability for these claims.

### 7. Claim C.18 — One Attorney

Petitioner alleges that his representation by only one attorney for the majority of the time between his arrest and trial violated his right to effective counsel in a capital case. (Doc. No. 14 at 34.) He raised this claim in his post-conviction petition. (Doc. No. 26-7 at 185.) The post-conviction trial court rejected the claim on the basis that Petitioner had the benefit of two lawyers for nearly eight months preceding his trial, and that there was no evidence that any problems encountered before that point had prevented counsel from adequately preparing for and performing at trial. (Doc. No. 26-8 at 117–18.) Petitioner did not raise the claim in his post-conviction appeal.[47] (Doc. No. 26-14 at 3–7.) Respondent asserts that the claim is procedurally defaulted. (Doc. No. 94 at 48–49.)

Petitioner responds that he can overcome the default pursuant to Martinez because post-conviction counsel did not raise the claim "sufficiently." (Doc. No. 111 at 346.) The Court has already explained above that Martinez does not apply to claims that were raised in state court and about which Petitioner simply wants to add new evidence. However inept post-conviction counsel might be in the development of a factual record, that ineptitude does not cause a *default* of the claim. A rejection of the merits of a claim by the post-conviction trial court is not the application

---

[47] Petitioner's only claim on post-conviction appeal about representation by a single attorney was limited to the presence of only one of his lawyers during voir dire, which has already been addressed above as Claim D.19. (Doc. No. 26-14 at 137.) He expressly disavowed any claim to a general right to two attorneys: "This Court should find the circumstances presented by Mr. Rogers distinguishable from those presented in State v. Hester, 324 S.W.3d 1, 35 (Tenn. 2010), which found no constitutional basis for the appointment of two attorneys in a capital case, in that Mr. Rogers presents a procedural due process challenge which was not considered in Hester." (Id. at 137–38.)

of a procedural bar to its review. Accordingly, the allegedly ineffective handling of this claim in initial review proceedings would not excuse the actual default of this claim, which occurred on post-conviction appeal: "[e]ven if the post-conviction trial court had ruled erroneously, and its error were traceable directly to counsel's deficient advocacy, the . . . claim would not have been *procedurally defaulted* at the post-conviction trial proceeding because [Petitioner] retained the right to preserve the claim by appealing." West v. Carpenter, 790 F.3d at 699 (emphasis in original).

Petitioner has failed to overcome the default of this claim, and it is not subject to federal habeas review.

### 8. Claim C.20–C.23, E.2–E.5 — Mitigation Evidence

Petitioner alleges that counsel "failed to investigate and develop an accurate mitigation narrative in advance of trial" (C.20), and that they "failed to develop and present an accurate mitigation narrative" (E.2). (Doc. No. 14 at 34, 44.) Those general claims appear simply to summarize the following more specific claims: counsel failed to investigate and present evidence that Petitioner had suffered permanent and significant brain damage in connection with his stepfather's torture of him (C.21 and E.3); counsel "failed to investigate that [Petitioner] experienced Complex Trauma throughout his developmental years" (C.22 and E.4); counsel failed to investigate and present evidence that Johnny Michelli is Petitioner's biological father and that the Michelli family history contains mitigating evidence (C.23 and E.5). (Doc. No. 14 at 35, 44–45.)

In his post-conviction petition, Petitioner raised a claim that counsel had failed to present available mitigation testimony and evidence during the sentencing phase of the trial. (Doc. No. 26-

7 at 190.)  The post-conviction trial court denied relief on that claim:

> The record reflects that trial counsel presented the testimony of several mitigation witnesses. These included the petitioner's family members, family friends, and school principal, who detailed his difficult upbringing; Dr. Guin, a social worker who detailed the abusive environment present in Louisiana youth correctional facilities during the period in which the petitioner was held at such a facility; Dr. Cunningham, who testified regarding the petitioner's potential for violence in prison; and Dr. Caruso and Dr. Neilson, who testified regarding their psychological testing of the petitioner. The petitioner has raised specific issues regarding the testimony of both Dr. Caruso and Dr. Guin; as stated earlier in this order, these issues are without merit. Furthermore, no proposed mitigation evidence was presented during the evidentiary hearing, as the only mental health expert who testified, Dr. Auble, focused her testimony on the petitioner's contention that his initial statements to police were coerced. Thus, the Court can only speculate as to the nature of any proposed mitigation evidence or the manner in which it would have aided the petitioner. Thus, the Court finds that the petitioner has not established that counsel rendered ineffective assistance as to this issue.

(Doc. No. 26-8 at 189–90.)  Petitioner did not raise this claim on post-conviction appeal. (Doc. No. 26-14.)  Accordingly, Respondent argues that the current claims were defaulted on post-conviction appeal. (Doc. No. 134 at 23–24.)

Petitioner relies on Martinez to overcome the default of these claims. (Doc. No. 111 at 309.)  He submits mitigation evidence that he argues counsel should have presented in state court (see Doc. No. 111 at 249–309) and argues that Martinez applies to these claims because "if post-conviction counsel's ineffectiveness is the reason that evidence was not developed in state court, the petitioner is not at fault for failing to develop that evidence." (Doc. No. 137 at 3.)  But for the reasons discussed above, Martinez does not provide an opportunity to present new evidence in support of claims that were raised and addressed on the merits in state court *or* apply to claims that were defaulted on post-conviction appeal. West v. Carpenter, 790 F.3d 693 (6th Cir. 2015).

Accordingly, Petitioner has failed to overcome the default of these claims, and they are not subject to federal habeas review.

9. Claim C.28 — Motion for Change of Venue

Petitioner alleges that counsel "failed to adequately follow through on the investigation, presentation, and supplementation of evidence supporting a change of venue." (Doc. No. 14 at 35.) He raised this claim in his post-conviction petition. (Doc. No. 26-7 at 181–82.) The post-conviction court rejected the claim on the merits:

> The record reflects that Mr. Converse provided the trial court with extensive information regarding the pretrial publicity the petitioner's case received. In one memorandum accompanying the petitioner's initial change of venue motion, filed in April 1998, the trial counsel attached copies of forty-five articles published in the Clarksville newspaper, The Leaf-Chronicle, exemplifying the extensive pretrial publicity this case received; in another memorandum, Mr. Converse attached copies of eleven articles appearing in Nashville's two newspapers, the Banner and the Tennessean, and in the Knoxville News Sentinel. The trial court took the motion under advisement until after voir dire of potential jurors; shortly before trial, Mr. Converse filed a "late-filed" motion renewing his objection, to which he attached a January 3, 2000 article published in the Leaf Chronicle focusing on the petitioner's upcoming trial.
>
> The petitioner argues that trial counsel should have offered more examples of pretrial publicity, but at the evidentiary hearing, the petitioner presented as an exhibit a copy of only one article: an article entitled "Jackie Beard quilting days scheduled for '97." The copy of the article does not indicate the source of the article but does indicate that it was introduced as an exhibit at some judicial proceeding on January 8, 1997. Furthermore, this Court has reviewed the individual voir dire of the twelve jurors who deliberated in this case, and the record reflects no evidence that the jurors were prejudiced by pretrial publicity. All of the jurors were asked by either the trial court, the State, or Mr. Warner (and in some instance, all three) about their exposure to pretrial publicity; the jurors' answers indicate that none of the jurors had formed any opinion of the petitioner's guilt or innocence before trial and that they were willing to consider the petitioner's case based solely on the evidence produced at trial.
>
> The petitioner has produced no evidence to refute the Court of Criminal Appeals' conclusion that the petitioner's assertion regarding the change of venue motion was without merit. The Court therefore finds that counsel did not render ineffective assistance as to this issue.

(Doc. No. 26-8 at 84–85.) Petitioner did not appeal this ruling in his post-conviction appeal. (Doc. No. 26-14 at 3–7.) Respondent moves for summary judgment on the basis that this claim was defaulted on post-conviction appeal. (Doc. No. 94 at 48–9.)

Petitioner acknowledges that this claim is "previously raised, but unexhausted," and argues that he "can overcome any procedural default because the state court's decision . . . was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in state court." (Doc. No. 111 at 385.)  As the Court has explained above in connection with Claim C.1, the notion that a federal habeas court may review the merits of a claim based on a state trial court's ruling that was not appealed is wholly unfounded and contrary to existing law.  See West v. Carpenter, 790 F.3d 693, 698–99 (6th Cir. 2015) (holding federal review not available for claim rejected on the merits by post-conviction trial court and not raised on post-conviction appeal).  Petitioner has failed to overcome the procedural default of this claim, and it is not subject to further review.

### 10. Claim D.17 — Leading Questions to Exclude Potential Jurors

Petitioner alleges that trial counsel was ineffective for failing to object to the court's use of leading questions intended to exclude jurors who expressed reservations about the death penalty. (Doc. No. 14 at 38.)  Petitioner raised this claim in his state post-conviction petition as claim 1.15. (Doc. No. 26-7 at 180.)  But on post-conviction appeal, he raised only the inverse claim that counsel failed to object to the court's leading questions to *rehabilitate* prospective jurors. (Doc. No. 26-14 at 31–32.)  Respondent asserts that the claim is procedurally defaulted. (Doc. No. 94 at 48–49.)  Because this claim was defaulted on post-conviction appeal, Martinez cannot provide cause for its default.

Petitioner does not dispute that the claim is defaulted, but asserts that this Court may nevertheless review it because the lower state court's decision "was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in state court." (Doc. No. 111 at 385.)

For the reasons explained above in connection with Claim C.1, that argument is legally indefensible. See West, 790 F.3d at 698–99 (holding federal review not available for claim rejected on the merits by post-conviction trial court and not raised on post-conviction appeal). This claim is procedurally defaulted and not subject to federal habeas review.

Alternatively, for the reasons discussed above in connection with Claims A.2 and G.9, the Court finds that Petitioner's underlying claim is not sufficiently substantial to warrant further review under Martinez.

11. Claim D.22 — Milliken Voir Dire

Petitioner alleges that counsel was ineffective for failing to question Juror Milliken about the extent of his relationships with people who either were involved in or had knowledge of facts relevant to the case. (Doc. No. 14 at 40.) Respondent moves for summary judgment on the basis that Petitioner never raised this claim in state court and has not established cause and prejudice to overcome that default. (Doc. No. 94 at 67.)

Petitioner lists Claim D.22 among a large number of claims purportedly addressed in section III.A.2.b of his response, but he does not mention Juror Milliken or the specific allegations of this claim anywhere therein. (Doc. No. 111 at 222–49.) The record reflects that the prosecutor questioned Milliken about the relationships he had disclosed in his questionnaire; Milliken's responses indicated no close friendships with anyone involved in the case, and he stated that none of his relationships would affect his judgment about the case. (Doc. No. 25-2 at 40–43.) Petitioner has not specified what additional questioning counsel should have pursued, or how the lack of such questioning caused him any prejudice. Accordingly, he has not demonstrated that this claim is sufficiently substantial for further consideration pursuant to Martinez.

12. Claim D.28 — Blood on Petitioner's Shirt

Petitioner alleges that counsel failed to present evidence that blood his wife said she saw on his shirt was not actually blood or was not the victim's blood. (Doc. No. 14 at 41.) This claim was never raised in state court, and Respondent asserts that it is procedurally defaulted. (Doc. No. 94 at 68–69.)

Ms. Rogers testified at trial that she observed a spot of blood on Petitioner's shirt on the day the victim disappeared, which Petitioner attributed to a cut finger that she did not see. (Doc. No. 25-9 at 67.) Petitioner now characterizes Ms. Rogers's testimony as "prejudicial false testimony" and argues that if counsel had conducted a thorough examination they could have located the shirt and submitted it for testing to demonstrate that there was no blood. (Doc. No. 111 at 350–51.) But counsel elicited testimony from Ms. Rogers on cross-examination that she believed the shirt had been turned over to police (Doc. No. 25-9 at 96), and Agent Squibb testified that his tests failed to indicate the presence of blood on shirts and other items of clothing retrieved from Petitioner's home. (Doc. No. 25-8 at 176, 178.) Additional evidence produced at the post-conviction hearing indicated that the clothes Petitioner wore on July 8 had already been washed by July 11, the day that he was arrested and his clothes were retrieved from his home. Rogers v. State, No. M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *48 (Tenn. Crim. App. Aug. 30, 2012). Petitioner has not presented any evidence that there was anything counsel could have done after that point to determine what, if anything, had been on his shirt on the day of the victim's disappearance.

Accordingly, Petitioner has not demonstrated that Ms. Rogers's testimony was false, or that counsel could have presented any better proof of the lack of blood on Petitioner's shirt than the state's own tests. He has failed to establish that this claim is substantial for Martinez purposes,

and it is not subject to federal review.

13. Claim D.29 — "Junk" Fiber Science

Petitioner alleges that counsel was ineffective for failing "to present evidence in the context of an appropriate in limine motion, and failing that, to the jury to the effect that the State's fiber analysis testimony was based on junk science." (Doc. No. 14 at 41.)  Petitioner exhausted a claim that counsel was ineffective for failing to investigate the fiber evidence, which the Court has already addressed above as Claim C.13.  However, Petitioner's related post-conviction claim did not specifically mention the failure to file a motion in limine[48] (Doc. No. 26-7 at 184), so Respondent asserts that this claim is procedurally defaulted. (Doc. No. 94 at 69.)

Petitioner argues this claim along with his exhausted Claim C.13 and several others, characterizing them all as "meritorious new claims." (Doc. No. 111 at 2, 346–51.)  Petitioner does not clearly acknowledge whether this claim is defaulted, or whether he views it as simply a repackaging of Claim C.13.  Either way, Respondent is entitled to judgment on Claim D.29, because Petitioner has never established that the state's fiber evidence, which was corroborated by his own expert's analysis, was "junk science" or otherwise subject to exclusion.  To whatever extent Claim D.29 was not exhausted and adequately addressed above in connection with Claim C.13, it is not substantial for Martinez purposes for the same reasons the Court has already relied on to deny relief on Claims C.13 and B.14.

---

[48] In his post-conviction appellate brief, Petitioner complained that counsel's lack of investigation lost the defense the opportunity to "seek exclusion of the so-called 'fiber evidence' due to an apparent contamination of the sample" (Doc. No. 26-14 at 50), but that issue is distinct from the current "junk science" claim.  Petitioner does not raise any claim related to fiber contamination in either his petition or his response in this court.

14. Claim D.31 — "Junk" Soil Science

Petitioner alleges that counsel was ineffective for failing to "present evidence in the context of an appropriate limine motion, and failing that, to the jury to the effect that the State's soil analysis testimony was based on junk science." (Doc. No. 14 at 41.)  Petitioner exhausted a claim that counsel failed to investigate the soil evidence, which is discussed above as Claim C.11.  He also raised several post-conviction claims about counsel's failure to seek exclusion of the soil evidence. (Doc. No. 26-7 at 182.)  But he did not appeal the denial of relief on those latter claims in his post-conviction appellate brief. (Doc. No. 26-14 at 48 (complaining that the lower court had "collapse[d]" the investigation claim into his "alternate claim that trial counsel was ineffective for failing to seek exclusion of soil evidence).)  Accordingly, Respondent asserts that this claim was defaulted on post-conviction appeal and is not subject to further consideration under Martinez. (Doc. No. 94 at 49 n.9, 71.)

Again, Petitioner argues this claim along with his exhausted Claim C.11 and others, all described as "meritorious new claims." (Doc. No. 111 at 2, 346–51.)  Based on the record and Petitioner's failure to contest the issue, the Court deems this claim to be defaulted on post-conviction appeal, as Respondent asserts.  But again, the claim fails regardless of whether or when it was defaulted, because, as suggested above in connection with Claim C.11, Petitioner has failed to prove or even explain the basis for his allegation that soil evidence was based on "junk science."  In fact, he has not even identified what soil evidence at trial is the focus of his concern.  This is not surprising, because the state presented ***no*** evidence at trial of any soil analysis that connected Petitioner to the crimes or otherwise damaged his case.  Petitioner's underlying ineffective-assistance claim is therefore without merit and is not subject to further review.

### 15. Claim D.45(a) and (b) — Jury Instructions

Petitioner alleges that trial counsel was ineffective for failing to object to jury instructions about sequential, acquittal-first consideration and about the definition of premeditation for first degree murder. (Doc. No. 14 at 43.)  Respondent asserts that both these claims are defaulted. (Doc. No. 94 at 49, 72.)

Petitioner raised the claim about failure to object to sequential, acquittal-first consideration in his post-conviction petition. (Doc. No. 26-7 at 191.)  He did not raise the claim about that particular instruction on post-conviction appeal. (Doc. No. 26-14 at 6.)  Accordingly, Petitioner's invocation of <u>Martinez</u> as cause to overcome the default (Doc. No. 111 at 368) is unavailing, and this claim is not subject to federal habeas review.

Petitioner never raised a claim in state court about counsel's failure to object to the trial court's definition of premeditation. (<u>See</u> Doc. No. 26-7 at 190–94.)  Petitioner asserts that <u>Martinez</u> provides cause to overcome the default of the claim, but nowhere in his argument about Claim 45 does he cite, quote or otherwise identify the trial court's premeditation instruction in question. (Doc. No. 111 at 362–68.)  Nor does he cite or discuss any law establishing that the instruction was erroneous or that counsel had any basis for objection, or provide any reason to believe that an objection would have had any likely impact on the outcome of his case. (<u>Id.</u>)  Petitioner has not carried his burden of establishing that his underlying ineffective-assistance claim is sufficiently substantial to warrant further consideration pursuant to <u>Martinez</u>.

### 16. Claims E.12, E.13 — Future Dangerousness Testimony

Petitioner alleges that trial counsel was ineffective at sentencing for presenting the testimony of Dr. Mark Cunningham regarding his risk of future dangerousness, which enabled the

state to elicit otherwise inadmissible evidence about Petitioner's criminal record and prison escape attempt. (Doc. No. 14 at 46.) These claims were never raised in state court, and Respondent asserts that they are procedurally defaulted. (Doc. No. 94 at 77–79; Doc. No. 134 at 41–43.) Petitioner responds that post-conviction counsel's ineffectiveness in failing to raise this claim constitutes cause to overcome the default pursuant to <u>Martinez</u>.

Clinical and forensic psychologist Dr. Mark Cunningham testified that, based on factors including Petitioner's age and prior institutional record, he believed Petitioner's potential for violent behavior in prison was between eight and seventeen percent. (Doc. No. 25-16 at 88–91.) On cross-examination, Dr. Cunningham acknowledged that Petitioner's previous conviction for escaping from prison was one of the factors he considered, but said that studies show prior escapes are a "relatively weak predictor of future prison misconduct." (Doc. No. 25-16 at 95.) He said that he had not heard of Petitioner's threat to escape or die trying, but that it did not alter his analysis because he assumed anyone serving a life sentence in maximum security would escape if he could. (<u>Id.</u> at 95–96.) He testified that Petitioner's diagnosis of antisocial personality disorder combined with his criminal history made him a significant risk in the community, but not in prison. (<u>Id.</u> at 97–98.) And he acknowledged that prisoners do "on rare occasions" escape. (<u>Id.</u> at 99.)

Petitioner's counsel argued for the opportunity to present Cunningham's testimony, observing that it was a new field of evidence and citing other jury trials in Tennessee in which Cunningham had been permitted to testify, before the state finally withdrew its objection to its admissibility. (Doc. No. 25-16 at 46–58.) At a sidebar conference just before Dr. Cunningham testified, the trial judge confirmed that defense counsel was aware that presenting evidence about future dangerousness would "open up the counter strike, so to speak." (Doc. No. 25-16 at 59.) The prosecutor announced his intention to cross-examine Cunningham about the possibility of

Petitioner's getting out of prison, and about his prior escape conviction, and Petitioner's attorney acknowledged that he was aware of the escape conviction. (Id. at 60.) Counsel testified at the post-conviction hearing that the purpose of presenting Cunningham's testimony "was to basically tell the jury look, if you don't kill this guy, he can be of some use to somebody, essentially. . . that he would be able to adapt to prison life and not be a danger to guards or other prisoners." (Doc. No. 26-9 at 131–32.)

Dr. Cunningham's testimony ultimately did not persuade the jury to spare Petitioner's life, but that does not mean that presenting his testimony constituted deficient performance by counsel. Trial counsel's arguments in favor of presenting the evidence in the trial court and his explanation for it in the post-conviction hearing bolster the legal presumption that he made a strategic choice to present the evidence, despite knowing its potential to be double-edged. Having already convicted Petitioner of the kidnaping, rape, and murder of a child, and having already heard in the sentencing hearing of Petitioner's previous convictions for violent felonies, the jury likely already shared Dr. Cunningham's opinion that Petitioner posed a risk if he were free in the community. Accordingly, any damage inflicted by that testimony was surely negligible. Petitioner's prior escape and his threat to escape posed more of a risk to his case,[49] but counsel clearly deemed that risk to be outweighed by the benefit of Dr. Cunningham's opinion that Petitioner was a very low risk to commit any violence if he were allowed to live in prison. This Court must defer to that strategic choice. Strickland v. Washington, 466 U.S. 687, 689 (1984).

---

[49] After Dr. Cunningham testified, Juanita Rogers testified about the letter Petitioner wrote to her in which he said that he would be killed trying to escape or kill himself if he were convicted. (Doc. No. 25-16 at 100–03.) Petitioner did not object to that evidence, so it is not clear from the record whether that testimony and the letter itself would have been admitted in the absence of Dr. Cunningham's future dangerousness testimony.

Moreover, the clarity of the trial transcript regarding counsel's arguments and acknowledgments at the sidebar, as well as the discussion of Dr. Cunningham's testimony at the post-conviction hearing, strongly support the legal presumption that post-conviction counsel, too, made a strategic choice not to raise this claim. See Porter v. Genovese, 676 F. App'x 428, 432 (6th Cir. 2017), cert. denied, 138 S. Ct. 1178 (2018) (explaining application of Strickland standard to post-conviction representation for Martinez purposes and instructing that "[c]ourts must apply a 'strong presumption' that [post-conviction] counsel's representation was within the 'wide range' of reasonable professional assistance"). Accordingly, Petitioner has not demonstrated that his underlying claim is substantial or that his post-conviction counsel performed deficiently in failing to raise it. This claim is not subject to further review pursuant to Martinez.

The Court believes, however, that reasonable jurists might debate whether defense counsel's opening the door to evidence about Petitioner's prior escape and his threat to attempt another escape was objectively deficient and prejudicial in this case. Accordingly, it will grant a certificate of appealability on these claims.

### 17. Claim E.17 — Failure to Move for Mistrial Over Pedophilia Testimony

Petitioner alleges that counsel was ineffective for failing to move for a mistrial in light of Dr. Bernet's testimony that Petitioner was a pedophile. (Doc. No. 14 at 47.) This claim is closely related to Petitioner's exhausted Claims E.15 and E.16, addressed above, which concerned counsel's alleged failure to review Bernet's report and properly object to or move to exclude his testimony about pedophilia. Respondent's briefs are inconsistent with regard to whether this claim should be considered exhausted or defaulted. (See Doc. No. 94 at 79 (asserting that E.17 is defaulted), and Doc. No. 134 at 43 (stating that E.17 was "properly exhausted").) Petitioner's brief addresses all of his Bernet claims together as "meritorious new claims," and does not attempt to

distinguish between the exhausted and defaulted claims. (Doc. No. 111 at 2–3, 331–34.)

As discussed above in connection with Claims E.15 and E.16, counsel tried to have Dr. Bernet's pedophilia testimony excluded, but the trial court denied their motion and ruled the testimony was admissible. Petitioner has not provided any reason to believe that the trial court would have granted a motion for mistrial arising from testimony that it had expressly found to be admissible. Accordingly, he cannot demonstrate any prejudice arising from the failure to move for mistrial, and this claim fails regardless of whether it is deemed exhausted or defaulted. The state court reasonably rejected Petitioner's claims that counsel were ineffective in connection with Bernet's testimony, and this particular prong of those claims is not substantial for <u>Martinez</u> purposes. Respondent is entitled to judgment on Claim E.17.

18. Claim E.18 — Bernet Cross-Examination

Petitioner alleges that counsel failed to cross-examine Dr. Bernet effectively. (Doc. No. 14 at 47.) Respondent asserts that this claim was not raised in state court and is procedurally defaulted. (Doc. No. 94 at 80; Doc. No. 134 at 45.) Petitioner, again, does not distinguish between his properly exhausted and procedurally defaulted Bernet claims. (Doc. No. 111 at 331–34.)

Petitioner characterizes aspects of Dr. Bernet's testimony, including his diagnoses of antisocial personality disorder and possible pedophilia and his conclusions that Petitioner's difficult childhood did not have a direct or significant connection to his crimes, as medically inaccurate and false. (Doc. No. 111 at 332–33.) But his argument boils down to a difference of opinion among experts. Where Bernet's opinions conflicted with those of defense experts—regarding pedophilia and the connection between Petitioner's childhood and his crimes—counsel chose to rebut Bernet's opinions with the testimony of their experts rather than through cross-

examination. Counsel presented Dr. Caruso's testimony that he did not find that Petitioner met the criteria of pedophilia, and both Caruso and Dr. Neilson testified about the connection between childhood trauma, psychological disorders, and dysfunctional behaviors. Petitioner has not established any reason to believe that additional cross-examination of Dr. Bernet would have produced any better evidence about those points. It is apparent from the trial transcript that defense counsel's approach to Dr. Bernet's cross-examination was to highlight to the jury that his opinions were largely consistent with Dr. Caruso's, thereby adding credibility to Caruso's testimony, and get Bernet off the stand without allowing him to add any damaging testimony. (Doc. No. 25-16 at 120–21.)

Moreover, as Petitioner acknowledges, Dr. Bernet's diagnosis of antisocial personality disorder was consistent with the opinions of at least three other mental health professionals, including his own experts. (Doc. No. 111 at 112, 147–48, 320, 321.) Other experts' disagreement about that diagnosis does not establish that it is "false." Rather than denying or challenging the diagnosis, counsel attempted to use Petitioner's psychological diagnoses as advantages by having Dr. Neilson and Dr. Caruso testify about the connection between Petitioner's disorders and a traumatic childhood, and with his inability to function properly under stress. (Doc. No. 25-14 at 43–46, 70–74, 80–81, 104; Doc. No. 25-16 at 17.) That approach was not successful, but it was not objectively unreasonable. "That a diagnosis of antisocial personality disorder has negative characteristics or presents a double-edged sword renders it uniquely a matter of trial strategy that a defense lawyer may, or may not, decide to present as mitigating evidence." Morton v. Sec'y, Fla. Dep't of Corr., 684 F.3d 1157, 1168 (11th Cir. 2012); see also Fairbank v. Ayers, 650 F.3d 1243, 1254 (9th Cir. 2011) (rejecting habeas claim that counsel was ineffective for presenting evidence of antisocial personality disorder). Where the defense strategy itself included diagnoses of

psychological disorders, counsel had no reason to challenge the same diagnoses by the prosecution's witness.

The Court must presume that counsel's approach represented a sound strategy, and Petitioner has not carried his burden of proving otherwise. Nor has he established that further cross-examination of Dr. Bernet would have had any likelihood of changing the jury's decision in light of the multiple aggravating factors they found. Petitioner's underlying claim is not sufficiently substantial to warrant further consideration under <u>Martinez</u>.

19. Claim E.19 — Notice of Expert Testimony

Petitioner alleges that trial counsel "failed to give proper notice of expert testimony relevant to sentencing, resulting in the exclusion of mitigating mental health evidence." (Doc. No. 14 at 47.) In his state post-conviction petition, he asserted that "[c]ounsel failed to give proper notice of expert testimony relevant to sentencing, resulting in the exclusion of mitigating mental health evidence from Cecille Guin." (Doc. No. 26-7 at 185.) On post-conviction appeal, he raised a claim that appellate counsel had been ineffective for failing to appeal the exclusion of some of Guin's testimony (Doc. No. 26-14 at 7), but he did not reassert the claim that trial counsel ineffectively failed to give proper notice of her testimony. (Doc. No. 26-14 at 3–6.)

Accordingly, Respondent asserts that Claim E.19 was defaulted on post-conviction appeal. (Doc. No. 94 at 50.) Respondent argues correctly that <u>Martinez</u> cannot provide cause to overcome the default of a claim that was not defaulted at the initial-review stage of post-conviction. (<u>Id.</u> at 51.) Accordingly, the Court finds that Claim E.19 is procedurally defaulted and not subject to

further review.[50]

In his response, Petitioner argues that Claim E.19 actually relates to counsel's delayed notice of *Dr. Caruso's* testimony (Doc. No. 111 at 313, 318), which is a claim that was never raised in state court. But Petitioner acknowledges that Dr. Caruso was ultimately permitted to testify. (Id. at 318.) The state court record confirms that the trial court overruled the state's late-notice objection to Caruso's testimony. (Doc. No. 25-12 at 19–20.) Accordingly, even if E.19 does actually pertain to Dr. Caruso, Petitioner cannot establish that he suffered any prejudice from counsel's performance. The claim would therefore be insufficient to merit further review pursuant to Martinez.

20. Claim E.22 — Reasonable Doubt Instruction at Sentencing

Petitioner alleges that counsel was ineffective for failing to object to improper instructions about reasonable doubt at the sentencing hearing. (Doc. No. 14 at 48.) Petitioner raised this claim in his post-conviction petition (Doc. No. 26-7 at 192), but in his post-conviction appeal he limited his claim about reasonable doubt instruction to the instruction given in the guilt/innocence phase of the trial.[51] (Doc. No. 26-14 at 111.) Accordingly, Respondent asserts that this claim was procedurally defaulted on post-conviction appeal, and that Martinez cannot provide cause to

---

[50] Even if this claim were subject to review, it is apparent from the state court record that it is without merit. As counsel explained during a jury-out conference, Dr. Guin was called for the narrow purpose of testifying to the factual conditions at institutions where Petitioner had previously been incarcerated, the psychological effects of which were to be explained by other experts. (Doc. No. 25-12 at 9–11, 17–18.) The limited purpose for which counsel retained Dr. Guin is confirmed by her 2017 declaration that Petitioner has filed in this case. (Doc. No. 115-10 at 2, ¶ 1.) Dr. Guin was allowed to testify at trial despite counsel's allegedly deficient notice (Doc. No. 25-15 at 92–143), and there is no evidence that lack of notice limited her intended testimony in any way. Accordingly, Petitioner cannot establish any prejudice arising from the allegedly deficient notice.

[51] That exhausted claim is addressed above as Claim D.45(c).

overcome that default. (Doc. No. 94 at 50–51.)

In his response, Petitioner argues that he can overcome the default because the state court's rejection of it "was contrary to, or involved an unreasonable application of, clearly established law, or was based on an unreasonable determination of the facts in light of the evidence presented in state court." (Doc. No. 111 at 385.)  That argument is unfounded for the reasons explained above in connection with Claim C.1.

This claim is procedurally defaulted and not subject to further review.

21. Claim F.3 — Motion for New Trial

Petitioner alleges that counsel was ineffective at the motion-for-new-trial stage of proceedings. (Doc. No. 14 at 50.)  This vague, sweeping allegation, without any facts alleged to support it, does not state a claim for relief that satisfies Rule 2(c) of the Rules Governing Section 2254 Cases.

Moreover, as Respondent asserts, the claim was never raised in state court and is therefore procedurally defaulted. (Doc. No. 94 at 84.)  Petitioner responds that he can overcome the default of this claim pursuant to Martinez. (Doc. No. 111 at 373.)  Respondent counters that Martinez does not apply to Claim F, because the Supreme Court has held in Davila v. Davis, 137 S. Ct. 2058, 2066 (2017), that Martinez does not apply to claims of ineffective assistance of appellate counsel. (Doc. No. 134 at 74–75.)

Davila is not directly applicable to this claim, because it involved alleged ineffective assistance in briefing on appeal, rather than in the post-judgment motion stage. Davila, 137 S. Ct. at 2063.  But even before Davila was decided, the narrow language of Martinez itself caused federal courts to be skeptical about whether it applied to claims concerning counsel's performance

in post-trial proceedings. <u>Chamblin v. Sec'y, Dep't of Corr.</u>, No. 1:13-CV-25-MP-GRJ, 2015 WL 9701074, at *12 (N.D. Fla. Dec. 3, 2015), report and recommendation adopted, No. 1:13-CV-00025-MP-GRJ, 2016 WL 164309 (N.D. Fla. Jan. 13, 2016) ("The narrow exception announced in Martinez does not apply here because Petitioner's claim in this case asserts ineffective assistance by his trial counsel in failing to file a motion for an arrest of judgment after trial."); <u>Esposito v. Humphrey</u>, No. 5:12-CV-163 CAR, 2014 WL 7003770, at *34 (M.D. Ga. Dec. 10, 2014) ("[Petitioner's] underlying claim is that counsel were deficient during the motion for new trial, not during trial. It is unclear if <u>Martinez</u> and <u>Trevino</u> would even apply in such a situation."). As the Court explained in Section V.A above, <u>Davila</u> strongly reinforced the notion that <u>Martinez</u> was based on the special significance of the right to counsel *at trial*, and that the exception it created does not apply to claims arising after the trial is over. The Court concludes, therefore, that <u>Martinez</u> does not apply to Claim F.3.

However, the Court will grant a certificate of appealability with regard to Claim F.3. Neither the Supreme Court nor the Sixth Circuit has ever addressed whether <u>Martinez</u> applies to claims that counsel was ineffective at the motion-for-new-trial stage. Moreover, Petitioner's complaints about his then-newly-appointed attorney's handling of the motion for new trial relate to issues of juror bias and misconduct (Doc. No. 111 at 372–73), in support of which he has submitted new evidence in the form of recent juror declarations that no court will ever review if he is unable to overcome the default of this claim. (See Doc. Nos. 119-19–119-21, 123-9–123-14.)

22. Claims F.6, F.7 — Motion to Dismiss

Petitioner alleges that counsel failed to have transcripts from three hearings on a motion to dismiss included in the record (F.6) and "failed to preserve or present the written motion to dismiss issue for appeal" (F.7). (Doc. No. 14 at 50.) Respondent asserts that Claim F.6 is procedurally

defaulted. (Doc. No. 94 at 85.)  It appears from the record that Claim F.7 was raised in Petitioner's post-conviction petition (Doc. No. 26-7 at 181), but was omitted from his post-conviction appeal. (Doc. No. 26-14.)

Petitioner appears to concede that these claims are defaulted, although he does so with regard to an entire category of claims without ever specifically referencing either F.6 or F.7, and without mentioning the motion to dismiss in question or explaining its significance to the outcome of his case. (Doc. No. 111 at 371–73.)  In fact, there is no discussion anywhere in Petitioner's response of the referenced "motion to dismiss issue."  The Court finds that Petitioner has waived these claims by failing to provide any factual support for them in either his petition or his response.  Alternatively, the Court concludes that Petitioner has failed to establish cause and prejudice to overcome the default of these claims.

### 23. Claim N — Ineffectiveness of Post-Conviction Counsel

Petitioner alleges that post-conviction counsel were ineffective for failing to raise any claims that are raised in his amended petition but were not raised during post-conviction proceedings. (Doc. No. 14 at 94.)  This claim was never raised in state court, but more importantly, it does not raise a basis for federal habeas relief.  Title 28 U.S.C. § 2254(i) expressly provides that "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." Petitioner apparently intends this claim to be a catch-all assertion of post-conviction counsel's ineffectiveness as cause to excuse the default of underlying claims. (See Doc. No. 111 at 490–506.)  The Court considers that argument where it applies throughout Section V.  But Respondent is entitled to judgment on Claim N as an independent claim for relief.

## VI.    VOLUNTARILY ABANDONED CLAIMS

Petitioner has affirmatively withdrawn all of his claims that are not addressed above. (Doc. No. 111 at 6–7, 398, 523–25.)  Those claims are: Claim A.6; Claim B.3, B.4, B.5, B.6, B.7, B.8, B.9,  B.10, B.17, B.18, B.19, B.20, B.23, B.25; Claim C.5, C.9, C.14, C.15, C.16, C.17, C.25, C.26, C.27, C.31, C.32, C.33, C.34, C.35, C.36; Claim D.2, D.3, D.5, D.6, D.12, D.16, D.21, D.23, D.24, D.32, D.34, D.35, D.36, D.37, D.38, D.39; Claim E.14, E.23, E.24, E.25; Claim F.1, F.2; Claim G.1, G.2, G.3, G.6, G.7, G.14, G.17, G.18, G.19, G.20, G.28, G.30, G.32, G.33, G.36, G.37, G.40, G.41; Claim H.2, H.3(c), H.4, H.5, H.6, H.7, H.8, H.9, H.10, H.11(a), H.13, H.16, H.18; Claim I.1, I.7, and I.13.  Petitioner concedes that these claims are either defaulted or that he cannot establish the proof necessary to overcome Respondent's motion for summary judgment. Accordingly, judgment will enter for Respondent on these claims.

## VII.    CONCLUSION

For the reasons stated above, Petitioner has not established that he is entitled to relief pursuant to 28 U.S.C. § 2254.  Accordingly, his petition will be denied, and judgment will enter in favor of Respondent on all claims.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Governing Section 2254 Cases.  A petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).  A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2).  A petitioner makes a "substantial showing" when he demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented

were adequate to deserve encouragement to proceed further." <u>Miller–El v. Cockrell</u>, 537 U.S. 322, 336 (2003) (citations and internal quotation marks omitted). "[A] COA does not require a showing that the appeal will succeed," but courts should not issue a COA as a matter of course. <u>Id.</u> at 337.

In the course of its analysis, the Court has considered whether reasonable jurists could debate the outcome with respect to each claim. Except where the Court has expressly indicated its intention above to grant a COA, a COA will be denied. Petitioner may still seek a COA directly from the Sixth Circuit Court of Appeals. Rule 11(a), Rules Governing Section 2254 Cases.

An appropriate Order shall enter.


_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE